UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| CUBE INFRASTRUCTURE FUND SICAV, CUBE INFRASTRUCTURE MANAGERS S.A., <br>   5, allé Scheffer <br>   Luxembourg <br>   L-2520 Luxembourg <br><br> CUBE ENERGY S.C.A (NOW CUBE ENERGY S.À.R.L.), <br>   41, avenue de la Liberté <br>   Luxembourg <br>   L-1931 Luxembourg <br><br> DEMETER PARTNERS S.A., AND DEMETER 2 FPCI. <br>   7-9 rue La Boétie <br>   75008 Paris <br>   France <br><br>                              Plaintiffs, <br><br>              v. <br><br> THE KINGDOM OF SPAIN <br>   The Ministry of Justice of the <br>   Government of Spain <br>   Calle Ayala 5 <br>   28001 Madrid <br>   Spain <br><br>                              Defendant. | Civil Action No. 1:20-cv-01708 |

**COMPLAINT**

Plaintiffs Cube Infrastructure Fund SICAV, Cube Infrastructure Managers S.A., Cube Energy S.C.A. (now Cube Energy S.à.r.l.), Demeter Partners S.A., and Demeter 2 FPCI (collectively "**Plaintiffs**"), by and through its undersigned counsel, allege as follows for their Complaint against Defendant the Kingdom of Spain ("**Spain**"):

**I.      NATURE OF THE ACTION**

1. This is an action to recognize and enforce an arbitral award (the "**ICSID Award**") issued on July 15, 2019 in ICSID Case No. ARB/15/20 against Spain. A true and correct copy of the ICSID Award is attached hereto as **Exhibit A**.[1] The ICSID Award in favor of Plaintiffs was issued by an arbitral tribunal (the "**Tribunal**") following arbitration proceedings (the "**Arbitration**") conducted in accordance with the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "**ICSID Convention**"). A true and correct copy of the ICSID Convention is attached hereto as **Exhibit C**. Pursuant to Article 54 of the ICSID Convention and 22 U.S.C. § 1650a, Plaintiffs request that this Court (1) enter an order recognizing the ICSID Award in the same manner as a final judgment issued by a court of a state of the United States, (2) enter judgment in Plaintiffs favor in the amounts and currency denominations specified in the Award, and (3) grant any other and further relief that the Court may deem appropriate.

**II.     THE PARTIES**

2. Plaintiff Cube Infrastructure Fund SICAV is a private investment fund, and Plaintiff Cube Energy S.C.A., now Cube Energy S.à.r.l., is a limited partnership. Cube Energy S.C.A. became Cube Energy S.à.r.l., a private limited liability company, on March 29, 2019. Plaintiff Cube Infrastructure Managers S.A. (formerly Natixis Environnement & Infrastructure Luxembourg S.A. or "**NEIL**"), is the manager of, and holds shares in, Cube Infrastructure Fund SICAV and Cube Energy S.C.A (now Cube Energy S.à.r.l.). Both companies are established under the laws

---

[1] The Tribunal previously issued a Decision on Jurisdiction, Liability and Partial Decision on Quantum (the "**Decision**") on February 19, 2019 and as per the text of the Award, "[t]he full text of that Decision is . . . an integral part of [the] Award." Ex. A, ¶ 5. A true and correct copy of the Decision is attached hereto as **Exhibit B**. The Separate and Partial Dissenting Opinion issued by one of the arbitrators is also provided to the Court as a part of Exhibit B, notwithstanding the fact that the Separate and Partial Dissenting Opinion does not comprise part of the ICSID Award, nor is it entitled to recognition under 22 U.S.C. § 1650a.

2

of the Grand Duchy of Luxembourg. The corporate address of Cube Infrastructure Fund SICAV and Cube Energy S.C.A. (now Cube Energy S.à.r.l.) is 5, allée Scheffer, Luxembourg, L-2520 Luxembourg. The corporate address of Cube Infrastructure Managers S.A. is 41, avenue de la Liberté, Luxembourg, L-1931 Luxembourg. These Plaintiffs are collectively referred to as the "**Cube Plaintiffs**."

3. Plaintiff Demeter 2 FPCI is a professional private equity fund, which is managed by Demeter Partners S.A., a public limited company. Both Demeter 2 FPCI and Demeter Partners S.A. are organized under the laws of France. Their corporate address is 7-9 re La Boétie, 75008 Paris, France. These Plaintiffs are collectively referred to as the "**Demeter Plaintiffs**."

4. Defendant Spain is a foreign state within the meaning of the Foreign Sovereign Immunities Act ("**FSIA**"), 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602-1611.

### III.   JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1330(a) as this case falls under the exception to immunity set forth at 28 U.S.C. § 1605(a)(6) for cases brought against a foreign state to confirm arbitration awards that "[are] or may be governed by a treaty or other international agreement in force in the United States calling for the recognition and enforcement of arbitral awards," and 22 U.S.C. § 1650a.

6. Personal jurisdiction over Spain is expressly conferred by 28 U.S.C. § 1330(b), which provides that this Court may exercise personal jurisdiction over a foreign state in any action with respect to which the foreign state is not entitled to sovereign immunity under 28 U.S.C. §§ 1605-1607, and over which the Court has subject matter jurisdiction.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(f)(4).

IV.     **FACTS**

    A.     **SUMMARY OF THE DISPUTE**

8.     Plaintiffs are investment and private equity funds that focus their investments in brownfield projects with regulated profit streams. *See* Ex. B, ¶ 285. Plaintiffs invested both jointly and separately in a number of photovaltaic ("**PV**") plants and hydro-power ("**hydro**") plants. *Id.* ¶ 234. The parties' dispute arises out of Spain's modification of its regulatory regime governing renewable energy investment incentives to the disadvantage of Plaintiffs and other renewable energy producers. *Id.* ¶ 236-237. On February 19, 2019 the Tribunal issued the Decision and found that Spain breached its obligations of fair and equitable treatment as contained in Article 10 of the Energy Charter Treaty (the "**ECT**" or the "**Treaty**"). A true and correct English version of the Treaty is attached hereto as **Exhibit D**. The Tribunal unanimously found that Spain breached this obligation with respect to Petitioners' investments in PV plants and found by majority that Spain breached this obligation with respect to Petitioners' investments in hydro plants. Ex. B, ¶¶ 544-545. As a result of this breach, the Tribunal, on July 15, 2019, issued the Award and awarded Petitioners €33.7 million in losses plus certain costs totaling €1,545,501.80 and US$ 262,500.00. Ex. A, ¶ 48(d)-(f).

9.     The facts underlying Petitioners' investment in Spain, and the parties' dispute, are briefly summarized as follows:

10.     Prior to 2008, Spain adopted numerous measures seeking to "increase greatly the proportion of its energy that it obtained from renewable sources." Ex. B, ¶ 241. These efforts were undertaken due to global policy concerns regarding climate change and the effects of fossil fuels, as well as the evolving European Union ("**EU**") policy which fixed targets for Member States regarding what share of their energy consumption should be coming from renewable

resources.  *Id*. ¶ 241.

11. On December 9, 1994 Spain enacted Royal Decree 2366/1994 which created a special regime for renewable energy (the "**Special Regime**").  *Id*. ¶ 242.  Under the Special Regime enhanced prices were to be paid to the producers of renewable energy.  *Id.*  (Changes to the Special Regime underlie the Arbitration.).

12. Among other measures which aimed at expanding the Special Regime, Spain adopted two critical Royal Decrees:  Royal Decree 436/2004 ("**RD 436/2004**") and Royal Decree 661/2007 ("**RD 66/2007**").

13. On March 12, 2004 Spain enacted RD 436/2004 due to Spain's inability to achieve its renewable energy goals and to encourage the establishment of more renewable energy facilities.  RD 436/2004 was described as having brought stability to the Special Regime by establishing a methodology for approval or modification of the average or reference tariff.  *Id.* ¶ 246.  RD 436/2004 fixed the relevant tariff rates and premiums for the lifetime of each facility, subject to a reduction after 15 years (in the case of hydro plants between 10 MW and 25 MW) or 25 years (in the case of hydro plants of up to 10 MW and all PV plants).  *Id*. ¶ 248.  The tariffs and premiums offered under RD 436/2004 were higher than those previously offered, but were subject to review in 2006 and every four years thereafter.  *Id*. ¶ 250.

14. Then on May 25, 2007 Spain enacted RD 661/2007.  RD 661/2007 classified producers into two categories: (a) producers utilizing combined heat and power plants; and (b) non-consumable renewable energies (including b.1.1 PV plants, and b.4, b.5 covering hydro plants).  Pursuant to RD 661/2007 designated public authorities could grant recognition of Special Regime status on application by the owners or operators of a facility.  Once registered, these facilities "were given the right inter alia to '[r]eceive, for the total or partial sale of their net

electrical energy generated under any of the options appearing in Article 24.1, the compensation provided in the economic regime set out by this Royal Decree.'" *Id*. ¶ 256 (citing RD 661/2007, Article 17). Proprietors of PV plants (*i.e.*, group b.1.1) were only eligible for the regulated tariff under RD 661/2007 while and proprietors of hydro plants (*i.e.* groups b.4 and b.5) had a choice between a regulated tariff and a market premium (exercisable annually). *Id*. Plants registered under RD 436/2004 could instead opt to remain under that Decree. *Id*. (Critically, it was this decree upon which Plaintiffs explicitly based their legitimate expectations. *Id*. ¶ 252.).

15. The Cube Plaintiffs invested in three PV facilities in Spain in June 2008. The Tribunal concluded that these investments were made in reliance on RD 661/2007 and that while this regime was not "petrified," Plaintiffs had reasonably assumed that any change to the regime would not have "significantly altered the economic balance that existed at [that] time . . ." *Id*. ¶ 308.

16. Following this investment, on April 23, 2009, the EU adopted Directive 2009/28/EC which established mandatory national targets for EU Member States with respect to renewable sources. For Spain, this meant that its target was moved from 8.7% to 20% by 2020. *Id*. ¶ 316. In response, Spain enacted Royal Decree Law 6/2009 ("**RDL 6/2009**"). The Tribunal found that the language of RDL 6/2009, while acknowledging the need to reform the Special Regime system to ensure sustainability, also made clear that – at the time – Spain believed that it had certain obligations to Special Regime plants and that it was not "allow[ed] [] to make the changes to tariffs and subsidies that it subsequently made under RDL 6/2009 and later legislation." *Id*. ¶ 322.

17. Nonetheless, the regulatory regime in Spain began to change in 2010. In November 2010, Spain enacted Royal Decree 1565/2010 which removed the fixed tariffs. *Id*. ¶ 324. This

was a significant variation to the RD 661/2007 regime. *Id*. In December 2010, Spain enacted Royal Decree-Law 14/2010 ("**RDL 14/2010**") which aimed at correcting the tariff deficit in the electricity sector by, *inter alia*, setting a limitation on the number of operating hours each year that a facility would be entitled to Special Regime payments, and charging an 'access fee' for using the network. In February 2011, the EU Commissioners for Energy and for Climate Action wrote to the Spanish Minister of Industry, Tourism and Trade expressing concerns about the retroactive effect of RDL 14/2010. *See id*. ¶ 326.

18. In June 2011 the Cube Plaintiffs and Demeter Plaintiffs partnered and acquired rights in ten hydro facilities in Spain. *Id*. ¶ 327. The following June, Plaintiffs acquired rights to six others. *Id*. Of Plaintiffs hydro facilities: three opted to stay under the RD 436/2004 regime; thirteen opted for the RD 661/2007 fixed tariff regime. All sixteen of these plants were receiving renumeration as specified in RD 661/2007.

19. Spain continued to adjust its regulatory regime introducing Law 15/2012 in 2012 which imposed a 7% tax on electricity production and a levy on the use of inland waters for generation of hydroelectricity.[2] On February 1, 2013, Spain adopted Royal Decree Law 2/2013 ("**RDL 2/2013**"), which de-linked tariffs from the consumer price index established by RD 661/2007 and removed the 'market premium' option for Special Regime facilities. *Id*. ¶ 364. Then, in July 2013, Royal Decree Law 9/2013 ("**RDL 9/2013**") was enacted which sought to amend the remuneration scheme for special regime facilities, including by repealing RD 661/2007 and abolishing the Special Regime. *Id.* ¶ 365-366. Following this decree, Spain enacted Law 23/2013 on December 26, 2013, which, *inter alia*, introduced a system of deferral payments to

---

[2] This law, however, was not analyzed by the tribunal as Article 21(1) of the ECT precludes the Tribunal from taking into account the impact of taxation measures. *See* Ex. B, ¶ 362; *see also* Ex. D, Art. 21(1).

producers in order to balance annual accounts. *Id.* ¶ 370. Then, on June 6, 2014, Spain enacted Royal Decree 413/2014 ("**RD 413/2014**") which replaced the fixed support offered to producers under the Special Regime with a "reasonable return." *Id.* ¶ 373. And on June 16, 2014 the Ministry of Industry, Energy and Tourism enacted Order IET 10/45/2014 which established a complex regime for compensation. In particular, it set the reasonable rate of return (foreshadowed in RD 413/2014) and set it initially at 7.398%. *Id.* ¶ 376.

20. The Tribunal found that RDL 9/2013, Law 23/2013, RD 413/2014 and IET 10/45/2014 collectively created, what the Tribunal called in the Award, the "**New Regulatory Regime**." *Id.* ¶ 367. The Tribunal found that RDL 9/2013 "mark[ed] the beginning of a radical and decisive break with the earlier regime" and that the New Regulatory Regime as a whole "represented a fundamental change in the economic basis of the relationship between the State and the [Plaintiffs]." *Id.* ¶¶ 425, 427. The New Regulatory Regime replaced the incentive schemes provided under RD 661/2007 and the Special Regime with a fixed reasonable rate of return.

21. It was on this basis that the Tribunal found Spain frustrated Plaintiffs' legitimate expectations and violated the fair and equitable treatment standard in Article 10(1) of the ECT. In light of this finding, the Tribunal found it "unnecessary to decide" Plaintiffs' additional expropriation claim. *Id.* ¶ 457.

    **B.**    **THE ENERGY CHARTER TREATY**

22. Both the relationship and dispute at issue between Plaintiffs and Spain are governed by the ECT, which Spain signed on December 17, 1994 and ratified on December 11, 1997, Luxembourg signed on December 17, 1994 and ratified on February 7, 1997, and France signed

on December 17, 1994 and ratified on September 1, 1999.[3] The ECT entered into force between Luxembourg and Spain on April 16, 1998[4] and between France and Spain on December 27, 1999.

23. Article 1(7) of the ECT provides that the term "investor" means "a company or other organization organized in accordance with the law applicable in that Contracting Party." Ex. D, Art. 1(7). The domestic laws of each Contracting State determine nationality. *Id.* Spain acknowledged that it is a Contracting Party to the ECT, and over Spain's objections, the Tribunal concluded that Plaintiffs are considered investors "of another Contracting Party" notwithstanding the fact that Spain, Luxembourg and France are all EU member states. Ex. B, ¶¶ 121-202, 543.

24. Article 26 of the ECT provides that "[d]isputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former . . . shall, if possible, be settled amicably" and "[i]f such disputes cannot be settled according to paragraph (1) . . . the Investor party to the dispute may choose to submit it for resolution" before an ICSID Tribunal. Ex. D, Art. 26.

25. The Tribunal found that all of the States involved in the dispute (*i.e.*, Spain as respondent and France and Luxembourg being the States of nationality of the corporations having brought the dispute) had ratified the ECT and the ICSID Convention and are therefore "Contracting Parties." Ex. B, ¶ 120. While Spain alleged that there was an intra-EU exception,

---

[3] Energy Charter Secretariat: Spain, *available at* https://energycharter.org/who-we-are/members-observers/countries/spain/ (last updated Aug. 10, 2015).; Energy Charter Secretariat: Luxembourg, *available at* https://energycharter.org/who-we-are/members-observers/countries/luxembourg/ (last updated July 31, 2015); Energy Charter Secretariat: France, *available at* https://energycharter.org/who-we-are/members-observers/countries/france/ (last updated July 31, 2015).

[4] Energy Charter Secretariat: Spain, *available at* https://energycharter.org/who-we-are/members-observers/countries/spain/ (last updated Aug. 10, 2015).; Energy Charter Secretariat: Luxembourg, *available at* https://energycharter.org/who-we-are/members-observers/countries/luxembourg/ (last updated July 31, 2015); Energy Charter Secretariat: France, *available at* https://energycharter.org/who-we-are/members-observers/countries/france/ (last updated July 31, 2015).

precluding disputes between EU investors and EU member states, but the Tribunal found that the text of the ECT did not contain any provision imposing this restriction (*id.* ¶¶ 125-126) and that Article 26 of the ECT "does not permit any differentiation as regards the investors authorized to bring a claim to arbitration against another Contracting Party to the ECT." *Id.* ¶ 138. The Tribunal therefore dismissed this jurisdictional objection.

26. The ECT also sets forth the substantive obligations of each Party to protect the investors of the other Party, as well as their investments. Specifically, Article 10(1) provides:

> Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions of Investors of other Contracting Parties to make Investments in its Area. **Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment**. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party.

Ex. D, Art. 10(1).

  **C.**   **THE PARTIES' AGREEMENT TO ARBITRATE**

27. Spain, by signing and ratifying the ECT, made a binding offer to arbitrate disputes covered by the ECT. Claimants accepted that offer. In a treaty arbitration, an agreement to arbitrate exists where the State has signed and ratified a treaty containing an arbitration provision and the investor submits a notice of arbitration invoking that provision. *See Stati v. Republic of Kazakhstan* 199 F. Supp.3d 179, 188 (D.D.C. 2016) (finding that proffer of treaty containing arbitration provision, coupled with notice of arbitration, establishes prima facie evidence of arbitration agreement) (citing *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 205 (D.C. Cir.

2015), aff'd, No. 18-7047 (D.C. Cir. 2019) (unpublished)); *see also, Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 393 (2d Cir. 2011) ("[a]ll that is necessary to form an agreement to arbitrate is for one party to be a . . . signatory and the other to consent to arbitration of an investment dispute in accordance with the Treaty's terms.").

28. Article 26(4) of the ECT memorializes Spain's, Luxembourg's, and France's consent to arbitration of claims by an investor of a Party against the other Party and provides that:

> In the event that an Investor chooses to submit the dispute for resolution [in international arbitration], the Investor shall further provide its consent in writing for the dispute to be submitted to:
>
> (a)(i) The International Centre for Settlement of Investment Disputes . . . if the Contracting Party of the Investor and the Contracting Party to the dispute are both parties to the ICSID Convention . . .

Ex. D, Art. 26(4).

29. Plaintiffs affirmed in writing their consent to ICSID jurisdiction in their Request for Arbitration. Request for Arbitration, ¶ 63. A true and correct copy of the Request for Arbitration is attached hereto as **Exhibit E**.

30. Spain gave its consent to the submission of this dispute to ICSID arbitration when it ratified the ECT. Ex. B, ¶ 120. Article 26(3)(a) of the ECT, which provides that "subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article." Ex. D, Art. 26.

31. Accordingly, under Article 26 of the ECT, Plaintiffs' submission to arbitration, coupled with Spain's consent set forth in Article 26(3)(a) constituted an enforceable agreement to arbitrate within the meaning of Chapter II of the ICSID Convention.

### D.     THE ARBITRATION

32.     On April 16, 2015, Plaintiffs commenced the arbitration by filing and serving a Request for Arbitration on Spain. Ex. B, ¶ 6.  On June 1, 2015, the Secretary General of ICSID registered the Request for Arbitration in accordance with Article 36 of the ICSID Convention and notified the Parties of the registration.  *Id.* ¶ 7.

33.     The Arbitration was seated in Washington, D.C., and proceeded in accordance with the ICSID Convention and the ICSID Arbitration rules.  *Id.* ¶¶ 7, 146. Selection of the Tribunal was completed on December 8, 2015, and composed of: Professor Vaughan Lowe (President), the Honourable James Jacob Spigelman (appointed by Plaintiffs), and Professor Christian Tomuschat (appointed by Spain).  *Id.* ¶¶ 9-12.

34.     Spain was represented in the Arbitration by attorneys from the Abogacía General del Estado (*i.e.,* the Ministry of Justice of the Government of Spain). *Id.* at p. i.  Spain participated in the Arbitration, including by submitting its Counter-Memorial on the Merits and Memorial on Jurisdiction (accompanied by a witness statement and two expert reports) (*id.* ¶ 17), and a Rejoinder on the Merits and Reply on Jurisdiction (accompanied by a second witness statement, and two expert reports). *Id.* ¶ 28.

35.     The Tribunal conducted the hearing on Jurisdiction and the Merits in Paris, France from October 9 to 13, 2017.  After the hearing the Tribunal requested that the parties submit post-hearing briefs (*id.* ¶ 40) and later to comment on the Court of Justice of the European Union's *Achmea* Judgment, the arbitral award issued in *Novenergia v. Kingdom of Spain* (*id.* ¶ 52) and the arbitral award issued in *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain* (*id.* ¶ 59). Spain submitted briefing on each of these issues. *See id.* ¶¶ 46, 58, 61.

36.     On October 31, 2018 the European Commission filed an application to intervene as

12

a non-disputing party in the case; however, the Tribunal denied this application because "allowing the Commission to intervene at this stage would significantly disrupt the proceedings." *Id.* ¶¶ 62-63.

37. The Tribunal closed the proceedings on November 12, 2018 (*id.* ¶ 64); however, it subsequently reopened the proceedings on January 11, 2019, pursuant to ICSID Arbitration Rule 38(2) because there was "a need for clarification from the Parties" concerning (as became evident in the Tribunal's Decision), the amount of damages suffered by Plaintiffs' hydro investments. *Id.* ¶ 67. The Tribunal also requested an updated submission on costs from both parties. *Id.*

38. On February 19, 2019 the Tribunal issued its Decision on Jurisdiction, Liability and Partial Decision on Quantum. The Decision unanimously awarded Plaintiffs €2.89 million in respect to losses caused to the PV investments and by majority found Plaintiffs entitled to damages in respect to the losses suffered to the hydro investments. *Id.* ¶¶ 530-531. However, to determine the precise value of these losses, the Tribunal requested that the parties' two experts submit a joint report computing the losses suffered by the hydro plants in accordance with the Tribunal's findings as articulated in paragraph 532 of the Decision. *Id.* ¶¶ 532-533. Thereafter, the Tribunal would issue its Award "incorporating this Decision and confirming . . . the precise amount awarded in respect of the hydro investments." *Id.* ¶ 533.

39. After receiving Plaintiffs' and Spain's Joint Expert Report and Supplementary Joint Expert Report, the Tribunal declared the proceedings closed on May 31, 2019.

### E. THE AWARD

40. The Tribunal issued the ICSID Award on July 15, 2019.

41. The Award incorporated the text of the Decision. Ex. A, ¶ 5.

42. With regard to jurisdiction, the Tribunal first dismissed Spain's intra-EU objection.

Spain had alleged that Plaintiffs (domiciliaries of Luxembourg and France) were not from "another Contracting Party" because they are domiciliaries of the EU, and Spain is a member of the EU. On this basis, Spain alleged that the Tribunal lacked jurisdiction *ratione personae*. The Tribunal rejected this objection, recalling that all States present in the dispute ratified both the ECT and the ICSID Convention and are thus "Contracting Parties." *Id.* ¶ 120. The Tribunal found that the text of the ECT does not "differentiate between different classes of Contracting Parties" and rejected Spain's objection that it could not have agreed to arbitrate a dispute under the ECT with an investor from another state in the EU. *See id.* ¶¶ 124, 130, 138.

43. Second, Spain alleged that the Tribunal lacked jurisdiction because Plaintiffs claims could only be asserted by **owners** of the plants, as opposed to shareholders in the companies that own the plants. *Id.* ¶¶ 161-163. The Tribunal, describing this as the "corporate personality objection," rejected it on the basis that the ECT defines an Investment as including indirect investments. *See id.* ¶¶ 197, 202.

44. Finally, Spain alleged that the tax on the value production of electrical energy and the levy on the use of commercial waters (contained in Act 15/2012) are taxation measures; it asserted that because Article 10(1) of the ECT does not create any rights for investors in response to taxation measures, the measures at issue were not covered by the ECT and were beyond the Tribunal's scope of review. The Tribunal granted this objection in part and found it did not have jurisdiction with respect to Act 15/2012. *Id.* ¶ 233

45. On the merits of Plaintiffs' remaining claims, the Tribunal found that Plaintiffs reasonably relied upon a legitimate expectation that the benefits set out under RD 661/2007 would continue and that there would be "no 'dramatic' or 'fundamental' change in the Special Regime." *Id.* ¶ 440 (regarding the hydro investments); *see also id.* ¶¶ 432-434 (regarding the PV

14

investments). The Tribunal found further that Spain's 2013-2014 reforms "defeated" Plaintiffs' legitimate expectations and therefore constituted a breach of Plaintiffs' rights under Article 10(1) of the ECT. *Id.* ¶ 442.

46. The Tribunal dismissed Plaintiffs' other Article 10(1) ECT claims regarding (i) the prohibition against unreasonable or discriminatory measures that impair the management, maintenance, use, enjoyment, or disposal of investments, and (ii) requirement to observe any obligations that Spain entered into with an investment or an investor. *See id.* ¶¶ 451 (regarding impairment), *id.* ¶ 454 (regarding the umbrella clause). The Tribunal also found that "in accordance with the principle of judicial economy," it was "unnecessary" to decide Plaintiffs' allegations regarding an expropriation (constituting a breach of Article 13 of the ECT), the damages for which would have completely overlapped with those associated with Spain's breach of Article 10(1). *Id.* ¶ 457.

47. To compensate Plaintiffs for Spain's breach, the Tribunal unanimously awarded Plaintiffs €2.89 million in respect to their PV investments and, by majority, awarded €30.81 million in respect to losses caused to the hydro investments. Ex. A, ¶¶ 48(d)-(e). The Tribunal also ordered interest payable at the six-month EURIBOR rate compounded semi-annually from June 20, 2014 until the date of payment. *Id.* By majority, the Tribunal also awarded Plaintiffs costs totaling €1,545,501.80 and US$ 262,500.00. *Id.* ¶ 48(f).

F. **ANNULMENT PROCEEDING**

48. On November 12, 2019 Spain filed an application for annulment of the Award.[5] Spain's application contained a request for a provisional stay of enforcement of the Award. As a

---

[5] The procedural history of the Stay Application is discussed in the Committee's Decision on the Stay of Enforcement of the Award, ¶ 2. A true and correct copy of the Decision on the Stay of Enforcement of the Award is attached hereto as **Exhibit F**.

15

result, on November 18, 2019 when the ICSID Secretary-General registered Spain's application, it issued a provisional stay of enforcement.

49.     The ICSID Annulment Committee (the "**Committee**"), composed of Prof. Dr. Jacomijn van Haersolte-van Hof (President), Mr. Álvaro Castellanos Howell, and Mr. Timothy J. Feighery, was appointed by the Chairman of ICSID's Administrative Council. Ex. F, ¶ 3. The Committee scheduled briefing from the parties regarding Spain's request for a continued stay of enforcement of the Award which, if granted, would last through the remainder of the Annulment phase. The parties engaged in two rounds of briefing. *Id.* ¶¶ 6-9.

50.     But, before the Plaintiffs submitted their final brief concerning the stay issue on February 28, 2020, the European Commission (the "**EC**") submitted an application to the ICSID Secretariat requesting Leave to Intervene as a Non-Disputing Party, or in the alternative to be granted permission to submit an expert report. *Id.* ¶ 10; *see also* the Committee's Decision on the European Commission's Application for Leave to Intervene as a Non-Disputing Party, ¶ 24. A true and correct copy of the Decision on the European Commission's Application for Leave to Intervene as a Non-Disputing Party is attached hereto as **Exhibit G**.

51.     The parties submitted two rounds of comments on the EC's request to intervene. Ex. F, ¶ 10.

52.     On April 2, 2020, after having reviewed both parties' submissions as well as the EC's application, the Committee issued its decision and denied the EC's application for Leave to Intervene as a Non-Disputing Party. *Id.* It also rejected the EC's request to appear as an expert finding that the EC on the basis that "[f]or any expert's testimony to be of assistance to the Committee, it would have to reflect an independent and impartial view" and that "because of the critical and extensive role of the Commission in the EU legal architecture, it is difficult to square

16

this role with the notion of the commission as independent in this dispute." Ex. G, ¶ 43.

53. Then on April 17, 2020 the Committee issued its decision denying Spain's request for a stay of enforcement. In its decision, the Committee recalled that "but for the showing of circumstances dictating otherwise, the structure of the [ICSID] Convention provides that awards are binding and enforceable." Ex. F, ¶ 131.

54. The Committee further took note of the fact that "a significant number of ICSID and other awards against Spain have been issued recently . . . and that some of these have led to (ongoing) enforcement proceedings in national courts, suggesting an unwillingness by Spain to volunteer payment." *Id.* ¶ 133. Moreover, the Committee considered "[t]he application to seek authorization from the EC" to "further suggest that . . . compliance with the Award is likely to be delayed and potentially frustrated." *Id.* Therefore, "while generally the payment of interest is adequate to mitigate the delay in payment, where the chances of enforcement are negatively impacted by a delay in enforcement, interest may not be sufficient compensation." *Id.*

55. The Committee also rejected Spain's arguments that its alleged obligations under European Union law (which Spain claims precludes payment of the Award) are a "hardship" which warrant a stay. It found that "the legal quagmire Spain finds itself in . . . is a legal conundrum of [Spain's] own making" and did not constitute a 'hardship' which would be remedied by a stay. *Id.* ¶ 138 (internal citations omitted). The Committee considered that "[a]t most, a stay would defer the (potential) conflict," but it found no basis for such a delay to prevent the Plaintiffs from exercising their right under the ICSID Convention to enforce the award. *Id.* Indeed, the Committee recalled that "the merits of an annulment application are not relevant for purposes of the decision on whether or not to grant the stay." *Id.* ¶ 139 (quoting *Karkey Karadeniz Elektrik Uretim A.S. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/13/1, Annulment Proceeding,

17

Decision on the Stay of Enforcement of the Award, Feb. 22, 2018, ¶ 118). Thus, it found that Spain did not show it would face any hardship should the Plaintiffs be permitted to exercise their right to enforce the Award while the annulment proceeding progressed. *Id.* The Committee therefore ended the provisional stay of enforcement of the Award. *Id.* ¶ 141(a).

56. The ICSID Award remains unpaid. By this action, Plaintiffs seek recognition and enforcement of the ICSID Award by this Court.

V. **CAUSE OF ACTION**

57. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 56 as if set forth fully herein.

58. The United States is a signatory to the ICSID Convention, which establishes a framework for the resolution of investment disputes between a foreign sovereign party to the Convention and a national of another State party to the Convention. Awards issued pursuant to the ICSID Convention are subject to recognition and enforcement in the United States under Article 54 of the ICSID Convention and pursuant to 22 U.S.C. § 1650a.

59. Spain signed the ICSID Convention on March 21, 1994, and deposited its ratification on August 18, 1994.[6] The ICSID Convention entered into force for Spain on September 17, 1994. Plaintiffs are nationals of Luxembourg, which became a State party to the ICSID Convention on August 29, 1970 and France, which became a State party to the ICSID Convention on September 20, 1967.[7]

60. Article 53(1) of the ICSID Convention provides that an award rendered by an ICSID tribunal "shall be binding on the parties and shall not be subject to any appeal or to any

---

[6] *See* Database of ICSID Member States, *available at* https://icsid.worldbank.org/en/Pages/about/Database-of-Member-States.aspx (last visited June 15, 2020).

[7] *See id.*

other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention." Ex. C, Art. 53(1). There is no stay of enforcement currently in place. Thus, pursuant to Article 53 of the ICSID Convention, Spain is obligated to abide by and comply with the terms of the ICSID Award without any further action by Plaintiffs.

61. Article 54(1) of the ICSID Convention provides that "[e]ach Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State." *Id.*, Art. 54(1).

62. The United States has been a party to the ICSID Convention since October 14, 1966,[8] when the Convention entered into force and Congress enacted enabling legislation in the form of 22 U.S.C. § 1650a, which provides as follows:

> An award of an arbitral tribunal rendered pursuant to chapter IV of the [ICSID] convention shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States. The Federal Arbitration Act (9 U.S.C. 1 et seq.) shall not apply to enforcement of awards rendered pursuant to the convention.

63. The ICSID Award was rendered by an arbitral tribunal pursuant to Chapter IV of the ICSID Convention.

64. The ICSID Award includes pecuniary obligations in the amount of €33.7 million plus interest at the six-month EURIBOR rate compounded semi-annually from June 20, 2014 until the date of payment, and legal costs in the amount of €1,545,501.80 and US$ 262,500,000. Spain

---

[8] *See id.*

has not paid any part of this outstanding pecuniary obligation.

65. Pursuant to 22 U.S.C. § 1650a and Article 54 of the ICSID Convention, the ICSID Award must be recognized and the pecuniary obligations therein must be enforced "as if the award were a final judgment of a court of general jurisdiction of one of the Several States." 22 U.S.C. § 1650a.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order and judgment:

(a) Recognizing the ICSID Award and enforcing the pecuniary obligations imposed by the ICSID Award as if the ICSID Award were a final judgment of a court of general jurisdiction of one of the Several States;

(b) Entering judgment in Plaintiffs favor in the amounts specified in the ICSID Award, including the principal amount of €33.7 million, costs, and pre-award and post-award interest as granted by the Tribunal; and

(c) Awarding such other and further relief as may be proper.

Dated: New York, New York
June 23, 2020

Respectfully submitted,

/s/ James E. Berger
James E. Berger (D.C. Bar 481408)
Charlene C. Sun (D.C. Bar 1027854)

**KING & SPALDING LLP**
1185 Avenue of the Americas
New York, NY 10036-4003
Tel: (212) 556-2100
Fax: (212) 556-2222
jberger@kslaw.com
csun@kslaw.com
*Attorneys for Plaintiffs*