# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| | ) |
| CUBE INFRASTRUCTURE FUND SICAV et al., | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) Civil Action No. 1:20-cv-01708-EGS |
| | ) |
| KINGDOM OF SPAIN, | ) |
| | ) |
| *Defendant*. | ) |
| | ) |

_____


## BRIEF OF THE EUROPEAN COMMISSION
## ON BEHALF OF THE EUROPEAN UNION AS *AMICUS CURIAE*
## IN SUPPORT OF THE KINGDOM OF SPAIN

R. Stanton Jones (D.C. Bar No. 987088)
Sally L. Pei (D.C. Bar No. 1030194)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743
T: (202) 942-5000
F: (202) 942-5999
stanton.jones@arnoldporter.com
sally.pei@arnoldporter.com


*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTEREST OF AMICUS CURIAE ............................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................................................2

RELEVANT LEGAL BACKGROUND ......................................................................................3

      A.      The nature and special characteristics of the EU legal order .................................3

      B.      The Energy Charter Treaty ("ECT") .....................................................................5

      C.      The *Achmea* Judgment ...........................................................................................9

      D.      EU Member States' declarations on the legal consequences of the *Achmea* Judgment and termination of intra-EU BITs .......................................................10

ARGUMENT ............................................................................................................................11

I.      The Energy Charter Treaty, properly interpreted under the rules of customary international law on treaty interpretation, does not apply intra-EU..................................11

II.     The EU Treaties preclude arbitration of intra-EU disputes under the Energy Charter Treaty .............................................................................................................14

      A.      Intra-EU application of ECT Article 26 conflicts with the EU Treaties and fundamental principles of EU law .......................................................................15

      B.      The conflict must be resolved in favor of EU law. ..............................................19

III.    At a minimum, international comity favors allowing the compatibility of intra-EU arbitration under the ECT to be decided within the EU judicial system. .........................23

CONCLUSION..........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*CEF Energia, B.V. v. Italian Republic*,
  2020 WL 4219786 (D.D.C. July 23, 2020)...............................................................................24

*Mujica v. AirScan Inc.*,
  771 F.3d 580 (9th Cir. 2014) ...................................................................................................24

*Novenergia II – Energy & Environment (SCA) v. Kingdom of Spain*,
  2020 WL 417794 (D.D.C. Jan. 27, 2020).................................................................................24

*Sumitomo Shoji Am., Inc. v. Avagliano*,
  457 U.S. 176 (1982)..................................................................................................................12

*Ungaro-Benages v. Dresdner Bank AG*,
  379 F.3d 1227 (11th Cir. 2004) ...............................................................................................24

**Statutes**

22 U.S.C. § 1650a .........................................................................................................................2, 25

**Treaties and International Agreements**

Convention on Biological Diversity, June 5, 1992,
  1760 U.N.T.S. 79. ......................................................................................................................7

Convention on Long-Range Transboundary Air Pollution, Nov. 13, 1979,
  1302 U.N.T.S. 217. ....................................................................................................................7

Convention on the Law of the Sea, Dec. 10, 1982,
  1833 U.N.T.S. 397. ....................................................................................................................7

Energy Charter Treaty and its Protocol on Energy Efficiency and Related Environmental
  Aspects, *adopted* Dec. 17, 1994, *entered into force* April 16, 1998,
  2080 U.N.T.S 95 (1995) ..................................................................................................... *passim*

Treaty on European Union, Oct. 26, 2012,
  2012 O.J. (C 326) 13..................................................................................................................3

Treaty on the Functioning of the European Union, Oct. 26 2012,
  2012 O.J. (C 326) 47........................................................................................................... *passim*

Vienna Convention on the Law of Treaties, *opened for signature* May 23, 1969,
  1155 U.N.T.S. 331 ...............................................................................................................11, 19

## European Union Authorities

*Bundesgerichtshof* Order, *Slovak Republic v. Achmea B.V.*
(Oct. 31, 2018), I ZB 2/15.................................................................................9, 10, 21

Case 24/86, *Blaizot v. University of Liège*,
[1988] E.C.R. 379 .........................................................................................................19

Case 10-61, *Commission v. Italy*,
[1962] E.C.R. 1 ..............................................................................................................22

Case 26-62, *Van Gend & Loos v. Netherlands Inland Revenue Administration*,
[1963] E.C.R. 1 ........................................................................................................3, 20

Case 121/85, *Conegate Ltd. v. HM Customs & Excise*,
[1986] E.C.R. 01007, EU:C:1986:114........................................................................20

Case 147/03, *Commission v. Austria*,
[2005] E.C.R. I-5969 ....................................................................................................22

Case 235/87, *Annunziata Matteucci v. Communauté française of Belgium*,
[1988] EC.R. 5589 ........................................................................................................20

Case 286/86, *Ministère Public v. Deserbais*,
[1988] E.C.R. 4907 .......................................................................................................22

Case 478/07, *Budějovický Budvar v. Rudolf Ammersin GmBH*,
[2009] E.C.R. I-07721 ..................................................................................................20

Case C-66/13, *Green Network SpA v. Autorità per l'energia elettrica e il gas*,
26 Nov. 2014, EU:C:2014:2399 .....................................................................................8

Case C-284/16, *Slovak Republic v. Achmea B.V.*,
6 March 2018, ECLI:EU:C:2018:158 .................................................................. *passim*

Case C-301/08, *Bogiatzi v. Deutscher Luftpool et al.*,
[2009] E.C.R. I-10185 ..................................................................................................22

Case C-459/03, *Commission v. Ireland* ("*Mox Plant*"),
30 May 2006, ECLI:EU:C:2006:345............................................................................23

Cases C-241/91 P and C-242/91 P, *RTE and ITP v. Commission*,
[1995] E.C.R. I-743 ......................................................................................................22

Case C-676/19 P, *Gollnisch v. European Parliament*,
12 Nov. 2020, ECLI:EU:C:2020:916 ...........................................................................19

Court of Justice Opinion 1/17,
30 April 2019 (ECLI:EU:C:2019:341) ....................................................................15, 16

Court of Justice Opinion 2/13,
  18 December 2014 (ECLI:EU:C:2014:2454) .......................................................3

Court of Justice Opinion 2/91,
  [1993] E.C.R. I-01061 ...................................................................................7

Court of Justice Ruling 1/78,
  [1978] E.C.R. 2151 .......................................................................................7

Commission Communication to the European Parliament and Council on
  Protection of intra-EU investment (July 19, 2018), COM(2018) 547 ...................4, 9

Decision on State Aid, SA.40348, slip op. (Nov. 10, 2017).......................................17

Declaration of the Government of Hungary, of 16 January 2019, on the Legal
  Consequences of the Judgment of the Court of Justice in *Achmea* and on
  Investment Protection in the European Union ..................................................10, 11

Declaration of the Representatives of the Governments of the Member States, of
  15 January 2019, on the Legal Consequences of the Judgment of the Court of
  Justice in *Achmea* and on Investment Protection in the European Union ..........10, 11

Declaration of the Representatives of the Governments of the Member States, of
  16 January on the Enforcement of the Judgment of the Court of Justice in
  *Achmea* and on Investment Protection in the European Union ........................10, 11

Declarations Annexed to the Final Act of the Intergovernmental Conference which
  Adopted the Treaty of Lisbon, 13 December 2007, 2008 O.J. C115/335, at 344 ..................21

Opinion of Advocate General Bot, Court of Justice Opinion 1/17, Request for an
  Opinion by the Kingdom of Belgium (ECLI:EU:C:2019:72) ....................................12, 13, 15

Opinion of Advocate General Mazák, *Bogiatzi v. Deutscher Luftpool et al.*,
  Case C-301/08, [2009] E.C.R. I-10185....................................................................21

Opinion of Advocate General Saugmandsgaard Øe, *Anie v. Ministero dello
  Sviluppo Economico, Gestore dei servizi energetici (GSE) SpA*, Case Nos. C-
  798/18, C-799/18, 29 Oct. 2020 (ECLI:EU:C:2020:876)........................................13

Statement submitted by the European Communities to the Secretariat of the
  Energy Charter Treaty pursuant to Article 26(3)(b)(iii) of the Energy Charter
  Treaty, [1998] O.J. L69/115 .............................................................................12

**Other Authorities**

*Access to German Minority Schools in Upper Silesia*,
  1931 P.C.I.J. Series A/B, No. 40 ............................................................................19

Albert Bleckmann, *The Mixed Agreements of the EEC in Public International Law*,
   *in* David O'Keeffe & Henry G. Schermers, *Mixed Agreements* 155 (1983) ...........................6

*Electrabel SA v. Republic of Hungary*,
   ICSID Case No. ARB/07/19, Award, Nov. 25, 2015 .......................................................21, 23

Eleftheria Neframi, *The Duty of Loyalty*,
   47 Common Market L. Rev. 323 (2010)...................................................................................6

Johann Robert Basedow, *The European Union's international investment policy*
   (Nov. 2014) (unpublished Ph.D. dissertation, London School of Economics).........................6

M. Cremona, *Disconnection Clauses in EU Law and Practice*, in *Mixed
   Agreements Revisited: The EU and its Member States in the World* (2010) ..........................13

Maja Smrkolj, *The Use of the 'Disconnection Clause' in International Treaties*
   (May 14, 2008) (paper presented at GARNET Conference) ...................................................14

Marcus Klamert, *The Principle of Loyalty in EU Law* (2014) .....................................................21

O. Dörr & K. Schmalenbach, *Vienna Convention on the Law of Treaties:
   A Commentary* (2018)...........................................................................................................19

Order No. 3, *Ireland v. United Kingdom* ("*Mox Plant*"),
   UNCLOS Arbitral Tribunal, June 23, 2003............................................................................20

Pieter J. Kuijper, *The Conclusion and Implementation of the Uruguay Round
   Results by the European Community*, 6 Eur. J. Int'l L. 222 (1995)........................................14

Press Release, Kingdom of Belgium, *Belgium requests an opinion on the intra-
   European application of the arbitration provisions of the future modernised
   Energy Charter Treaty* (Dec. 3, 2020) ..................................................................................25

Rafael Gil Nievas, *A New Approach to Intra-EU ISDS*,
   Kluwer Arbitration Blog (April 5, 2019)................................................................................14

Report of the Study Group of the International Law Commission, *Fragmentation
   of International Law: Difficulties Arising from the Diversification and
   Expansion of International Law*, UN Doc. No. A/CN.4/L.682 (2006) ............................19, 21

Sir Humphrey Waldock (Special Rapporteur on the Law of Treaties), *Sixth Report
   on the Law of Treaties*, UN Doc. A/CN.4/186 and Add.1-7,
   [1966] 2 Y.B. Int'l L. Comm'n, 95 & 219..............................................................................11

United Nations, *Handbook: Final Clauses of Multilateral Treaties* (2003)...................................7

Vera Rodenhoff, *Die EG und ihre Mitgliedstaaten als völkerrechtliche Einheit bei
   umweltvölkerrechtlichen Übereinkommen* (2008)................................................................6, 7

v

## INTEREST OF AMICUS CURIAE

The European Commission ("Commission") is an institution of the European Union (the "EU"), a treaty-based international organization composed of 27 Member States.[1]  The Commission is an independent institution and acts in the interests of the EU as a whole, not of individual Member States.  Known as the "Guardian of the Treaties," the Commission is responsible, inter alia, for ensuring the proper application of the EU treaties—including the Treaty on European Union ("TEU") and the Treaty on the Functioning of the European Union ("TFEU")—and of measures EU institutions adopt under those treaties.  The Commission represents the EU in proceedings before the Court of Justice of the EU ("Court of Justice"), national and international courts (including the WTO dispute settlement bodies) and arbitration tribunals, and has special expertise in matters of EU law and public international law.  The Commission is also responsible for representing the EU in third countries, including in judicial proceedings.  In that capacity, the Commission submits this amicus brief on behalf of the EU.  TFEU art. 17(1).  The Council of the EU—an institution composed of government ministers from each EU Member State—when expressing its unanimous agreement with the Commission's intention to file an amicus brief, has endorsed the Commission's views as the official position of the EU on the matters addressed in this submission.[2]

The EU has a substantial interest in this case, which concerns investments that took place within the EU.  Plaintiffs are entities formed under the laws of EU Member States—Luxembourg and France—and hence are EU companies. Plaintiffs seek to enforce an arbitration award they

---

[1] These Member States are Austria, Belgium, Bulgaria, Croatia, Cyprus, the Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Ireland, Italy, Latvia, Lithuania, Luxembourg, Malta, the Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, and Sweden.

[2] Six Member States—Finland, Hungary, Malta, Luxembourg, Slovenia, and Sweden—did so while referring to their declaration of 16 January 2019 on the enforcement of the judgment of the Court of Justice in *Achmea* and investment protection in the EU.  *See infra* n.13 and accompanying text.

1

obtained against Spain, an EU Member State, on the basis of the Energy Charter Treaty ("ECT"), a multilateral treaty negotiated and signed in the 1990s to govern the EU's external energy policy.  The award at issue is premised on a fundamental misinterpretation of the ECT and a disregard for EU law, which should have governed the dispute.

The EU has a critical interest in ensuring that this Court proceeds based on a correct understanding of the EU law rules and principles at stake.  Accordingly, this brief explains the EU's official position that the ECT does not have intra-EU application.  In any event, EU law precludes investor-State arbitration for intra-EU disputes.  Such arbitration is contrary to Articles 267 and 344 of the TFEU and the fundamental principles of autonomy, full effectiveness, and mutual trust, which are the cornerstones of the EU legal order, as the Court of Justice confirmed in its judgment in *Slovak Republic v. Achmea B.V.*, Case C-284/16, 6 March 2018, ECLI:EU:C:2018:158.  Thus, even if the ECT were to be interpreted as applying intra-EU, its investor-State arbitration provision (and hence any arbitration award issued under that provision) would violate higher-ranking and more recently reaffirmed norms of EU law in force between EU Member States, and would, consequently, be inapplicable as between those Member States.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Commission understands that Spain argues here that any standing offer of arbitration in ECT Article 26 is invalid under prevailing EU law.  That conclusion deprives this Court of subject-matter jurisdiction under the Foreign Sovereign Immunities Act.  It also means that the award is not entitled to full faith and credit, thus precluding enforcement under 22 U.S.C. § 1650a.  The Commission agrees that there was no valid offer of arbitration in Article 26 and that enforcement should be denied, for three reasons.

*First*, customary international law rules of treaty interpretation compel the conclusion that the ECT (including Article 26, its dispute-settlement provision) does not apply to intra-EU

disputes.  *Second*, even if Article 26 could be interpreted to encompass intra-EU disputes, such an interpretation would conflict with the EU Treaties.  That conflict must be resolved in favor of EU law.  The resulting inapplicability of Article 26 under EU law means that no valid arbitration agreement exists between Plaintiffs and Spain.  *Third*, principles of international comity favor dismissal.  This dispute has no connection with the United States, and the United States has no interest in adjudicating this controversy in its courts.  By contrast, the EU has an overwhelming interest in this dispute and the fundamental questions of EU law that it raises.

Rather than insert itself into the EU's internal affairs, this Court should permit this intra-EU dispute to be decided within the EU judicial system, which offers a complete and effective system of judicial redress before an international court—i.e., the Court of Justice.

## RELEVANT LEGAL BACKGROUND

### A.    The nature and special characteristics of the EU legal order

At present, the EU Treaties are the Treaty on the Functioning of the European Union ("TFEU"), Oct. 26, 2012, 2012 O.J. (C 326) 47 and the Treaty on European Union ("TEU"), Oct. 26, 2012, 2012 O.J. (C 326) 13 (collectively, the "EU Treaties").  While the EU retains an international character—its Member States remain the "masters of the Treaties"—the EU also represents the most ambitious project of economic, political, and social integration hitherto known in international law.  Under the EU Treaties, the Member States have transferred legislative, regulatory, and enforcement competences in many fields to the EU and its institutions.  This has created a "new legal order of international law," Case 26-62, *Van Gend & Loos v. Netherlands Inland Revenue Administration*, [1963] E.C.R. 1, 12, and has "given rise to a structured network of principles, rules and mutually interdependent legal relations binding the EU and its Member States reciprocally and binding its Member States to each other,"  Court of Justice Opinion 2/13, 18 December 2014 (ECLI:EU:C:2014:2454), ¶ 167; *Achmea*, ¶ 33.

3

A central purpose of the EU Treaties is the establishment and proper functioning of the "internal market," defined as "an area without internal frontiers in which the free movement of goods, persons, services and capital is ensured."  TFEU art. 26(2).  The internal market rules—contained in the Treaties, EU legislation, and the case law of the Court of Justice—cover all cross-border economic activities, including investment.  They secure to EU investors directly enforceable rights throughout the investment cycle, but also impose obligations, including compliance with EU competition law and various regulatory standards designed to ensure that the internal market functions as a level, integrated playing field.[3]  The EU Treaties charge the Commission with the enforcement of EU competition law, including investigation and control of any public subsidy or subsidy-like schemes of Member States (known as "State aid") that distort or threaten to distort competition in the internal market.  TFEU arts. 107 & 108.

The EU judicial system, composed of Member State courts and the Court of Justice, safeguards the integrity of the EU legal order and the internal market.  The keystone of that system is the preliminary ruling procedure set forth in TFEU Article 267.  National courts may (and, where they are courts of final instance, must) refer any relevant question of interpretation and application of EU law raised in proceedings before them to the Court of Justice for a preliminary ruling.  In addition, TFEU Article 344 prohibits Member States from creating dispute settlement mechanisms other than those set out in the EU Treaties on any matters implicating EU law.  The Court of Justice thus has exclusive jurisdiction to issue final and binding interpretations of EU law, with a view to ensuring the correct and uniform application of

---

[3] For an overview of the EU internal market rules, see Commission Communication to the European Parliament and Council on Protection of intra-EU investment (July 19, 2018), COM(2018) 547, at 3–4, https://bit.ly/2XtniBb [hereinafter "*Protection of intra-EU investment*"].

EU law.  In this way, TFEU Articles 267 and 344 "ensure that the specific characteristics and the autonomy of the EU legal order are preserved."  Opinion 2/13, ¶ 174; *Achmea*, ¶ 35.

In accordance with doctrines established by the Court of Justice as far back as the 1960s, EU law enjoys primacy over any competing rules generated by EU Member States, whether by domestic legislation or international treaty.  The primacy of EU law, recognized and accepted by all Member States, is fundamental to achieving the ambitious goals set out in the EU Treaties. Permitting Member States to deviate from the Treaties through conflicting domestic measures or international agreements would severely undermine those goals.  In other words, EU law has a mandatory character for EU Member States and their nationals and can only be changed in the manner set forth in the EU Treaties.

Finally, relations between EU Member States are governed by the principle of "mutual trust," including trust in each other's judiciaries, which, in the words of the Court of Justice, is what "allows an area without internal borders to be created and maintained."  Opinion 2/13, ¶ 191.  The principles of autonomy, primacy, effective implementation of EU law, and mutual trust are central to a proper understanding of the issues in dispute in this case.

### B.    The Energy Charter Treaty ("ECT")

The ECT[4] was essentially the brainchild of the EU, concluded on the EU's initiative, based on the European Energy Charter prepared by the EU, at a conference convened and funded by the EU.  The ECT's purpose was to create a framework for energy cooperation between the EU on the one hand, and the former communist countries of Central and Eastern Europe on the other.  That framework was intended to facilitate those countries' transition to the market economy, prepare them for eventual accession to the EU, and enhance energy security, efficiency

---

[4] Energy Charter Treaty and its Protocol on Energy Efficiency and Related Environmental Aspects, *adopted* Dec. 17, 1994, *entered into force* April 16, 1998, 2080 U.N.T.S 95 (1995) ("ECT").

and cooperation throughout Europe and its immediate vicinity by extending the free-market principles of the EU's existing internal market and energy policy beyond the EU's borders.[5]

The ECT was thus an instrument of the EU's external energy policy, in which the EU and its Member States acted together as a single block.[6]  The EU and its Member States jointly invited other States and international organizations to negotiate the European Energy Charter and the ECT.  Ex. A.[7]  And the ECT itself specifically recognizes as contracting parties "Regional Economic Integration Organizations," *i.e.*, organizations, like the EU, that are "constituted by states to which they have transferred competence over certain matters a number of which are governed by [the ECT], including the authority to take decisions binding on them in respect of those matters."  ECT art. 1(2) & (3).  Thus, in entering into the ECT together, the EU and its Member States acted as a single entity of public international law,[8] bound by treaty obligations to other contracting parties but not as between themselves.[9]

As the Court of Justice has explained, when the EU and Member States enter into a multilateral international agreement together, and "it appears that the subject-matter of [the]

---

[5] *See generally* Johann Robert Basedow, *The European Union's international investment policy* 135-65 (Nov. 2014) (unpublished Ph.D. dissertation, London School of Economics), https://core.ac.uk/download/pdf/46519956.pdf.

[6] The ECT was signed by the EU as well as its Member States because at the time, the EU did not possess full, exclusive external competence over all matters to which the ECT applied.

[7] Exhibit A contains draft invitations to the negotiating conference.  The relevant parts state: "The Presidency of the Council and the Commission of the European Communities … refer to the organization of a conference to negotiate the European Energy Charter, decided by the Council of the Community. … The European Community would like to invite your government to participate in the Conference."  (courtesy translation by the Commission).  The Presidency of the Council represents the Member States; the Commission represents the EU.

[8] *See, e.g.*, Albert Bleckmann, *The Mixed Agreements of the EEC in Public International Law*, *in* David O'Keeffe & Henry G. Schermers, *Mixed Agreements* 155, 158 (1983) (noting "the general presumption that when the EEC and its Member States cooperate in the conclusion of … mixed agreements … [they] act as a unity vis-à-vis the third States"); Vera Rodenhoff, *Die EG und ihre Mitgliedstaaten als völkerrechtliche Einheit bei umweltvölkerrechtlichen Übereinkommen* [*The EC and its member states as entity of public international law in international environmental agreements*] 26-27 (2008) (referring to the concept of the "entity of public international law"); Eleftheria Neframi, *The Duty of Loyalty*, 47 Common Market L. Rev. 323, 335 n.45 (2010) ("the European group (EU and Member States) appears as a single contracting party").

[9] Bleckmann, *supra* n.8, at 163.

agreement or contract falls in part within the competence of the Community and in part within that of the Member States," the EU and Member States assume a "duty of cooperation" that "results from the requirement of *unity in the international representation* of the Community." Court of Justice Opinion 2/91, [1993] E.C.R. I-01061, ¶ 36 (emphasis added).  That is, in acceding to a multilateral agreement together, the EU and its Member States act as a single unit in pursuit of a common purpose.  Court of Justice jurisprudence makes clear that, in such situations, the EU and Member States have complementary responsibilities in implementing obligations owed to other contracting parties, *see* Ruling 1/78, [1978] E.C.R. 2151 ¶ 36 (delineating the respective responsibilities of the EU and Member States in implementing shared treaty obligations); they share the duty to carry out treaty obligations they have assumed together vis-à-vis third parties, but have no obligations *inter se*.

Consistent treaty practice reflects the international community's long-standing acceptance and understanding of the notion of the EU as a "Regional Economic Integration Organization"—and of the fact that the EU and its Member States act as one entity "for the realization of common purposes" in entering into an international agreement.  United Nations, *Handbook: Final Clauses of Multilateral Treaties* 22 (2003), https://bit.ly/2sw2HSl.  Indeed, nearly all members of the United Nations are signatories to at least one treaty (many of which pre-date the ECT) to which the EU and its Member States are parties.[10]  The ECT's contracting parties were thus aware of the EU's special features as a Regional Economic Integration Organization, and that the EU and its Member States assume no *inter se* obligations when they enter into a treaty together.  The logic applies with even greater force with respect to the ECT,

---

[10] Examples include the Convention on the Law of the Sea, Dec. 10, 1982, 1833 U.N.T.S. 397; the Convention on Long-Range Transboundary Air Pollution, Nov. 13, 1979, 1302 U.N.T.S. 217; and the Convention on Biological Diversity, June 5, 1992, 1760 U.N.T.S. 79.  For a comprehensive list, *see* Rodenhoff, *supra* n.8, at 187-96.

for which the EU and its Member States were the driving force.

Hence, the ECT was designed to govern the EU's energy policy vis-à-vis other, non-EU States.  The EU and its Member States never intended the ECT to affect intra-EU relations.  The EU Treaties do not permit EU Member States (or, indeed, the EU itself) to modify or replace EU law by an international treaty such as the ECT; nor was it ever the Member States' intention to do so.  On the contrary, the ECT makes clear that acts of EU law are binding on EU Member States as a matter not only of EU law, but also of the ECT itself.  Specifically, Article 1(3) of the ECT recognizes that certain contracting states have "transferred competence" to a "Regional Economic Integration Organization" such as the EU, "over certain matters a number of which are governed by [the ECT], including the authority to take decisions binding on them in respect of those matters."  Art. 1(3).  In other words, it was clear from the outset that EU Member States had already delegated authority to the EU to regulate the internal energy market, as well as competition law and "State aid" control.[11]

Article 1(3) also recognizes the dynamic nature of contracting states' transfer of competences and decision-making to regional organizations like the EU.  EU Member States are subject to and bound by an evolving body of EU law.  In this regard, the Court of Justice has recognized that, as a result of the Renewable Energy Directive—Spain's implementation of which is the subject of the underlying arbitration here—the EU has exclusive external competence for renewable energy policy.  Case C-66/13, *Green Network SpA v. Autorità per l'energia elettrica e il gas*, 26 Nov. 2014, EU:C:2014:2399, ¶ 65.

In sum, the ECT created rights and obligations vis-à-vis third countries, not within the EU's internal energy market, which is governed by the EU Treaties.

---

[11] For more on State aid, see *infra* pp.16-17.

### C.     The *Achmea* Judgment

Intra-EU investor-state arbitration is a relatively recent phenomenon, born of the 2004 accession to the Union of ten Central and Eastern European States that had bilateral investment treaties ("BITs") with existing EU Member States.  Intra-EU investor-State arbitration essentially channels disputes concerning acts of EU Member States and involving EU law to private arbitrators.  Those arbitrators "cannot properly apply EU law, in the absence of the indispensable judicial dialogue with the EU Court of Justice."  *Protection of intra-EU investment*, at 2.

One such proceeding was *Achmea B.V. v. Slovak Republic*. The arbitral tribunal exercised jurisdiction and awarded damages against the State.  The Slovak Republic challenged the award in Germany, where the arbitration was seated.  Pursuant to TFEU Article 267, the *Bundesgerichtshof* (Federal Court of Justice, the highest civil court in Germany) sought a ruling from the EU Court of Justice on whether TFEU Articles 267 and 344 precluded the arbitration provision at issue.  *See* Ex. B.[12]

The Court of Justice, sitting as a Grand Chamber of fifteen distinguished judges—a configuration reserved for matters of high precedential importance—answered that question in the affirmative.  Noting that there is no mechanism to ensure that disputes before private arbitral tribunals will be "resolved in a manner that ensures the full effectiveness of EU law," *Achmea*, ¶ 56, it held that TFEU Articles 267 and 344 "must be interpreted as precluding a provision in an international agreement concluded between Member States" that permits "an investor from one of those Member States … in the event of a dispute concerning investments in the other Member States, [t]o bring proceedings against the latter Member State before an arbitral tribunal … ,"  *id.* ¶ 60.  In other words, the Court of Justice confirmed that the TFEU prohibits Member States

---

[12] Attached as Exhibit B is a copy of *Bundesgerichtshof* Order, *Slovak Republic v. Achmea B.V.* (Oct. 31, 2018), I ZB 2/15 (English translation).

from offering to resolve intra-EU investor-State disputes before arbitral tribunals.

Following the *Achmea* judgment, the *Bundesgerichtshof* duly annulled the underlying

award at its seat, on the grounds that no valid arbitration agreement existed.  Ex. B.

### D.     EU Member States' declarations on the legal consequences of the *Achmea* Judgment and termination of intra-EU BITs

On January 15 and 16, 2019, all EU Member States issued, in substance, the same

declaration setting forth the EU's position on the legal consequences of the *Achmea* judgment for

intra-EU BITs.  In particular, they confirmed the long-standing principle of primacy of EU law

over intra-EU agreements and explained that "all investor-State arbitration clauses contained in

bilateral investment treaties concluded between Member States are contrary to Union law and

thus inapplicable."  Ex. C, at 1; *see also* Ex. D at 1; Ex. E, at 1.[13]

Twenty-two out of 28 Member States (including Spain and France) further noted that

"[a]rbitral tribunals have interpreted the [ECT] as also containing an investor-State arbitration

clause applicable between Member States.[14]  Interpreted in such a manner, that clause would be

incompatible with the [EU] Treaties and thus would have to be disapplied."  Ex. C, at 2.  Those

Member States also undertook to inform investment tribunals about the legal consequences of

the *Achmea* judgment in all pending intra-EU investment arbitrations (whether based on BITs or

the ECT), and to request all state courts—including courts outside the EU—to set aside or

decline to enforce intra-EU investment arbitration awards due to lack of valid consent to

---

[13] Attached as Exhibits C, D, and E are the Declaration of the Representatives of the Governments of the Member States, of 15 January 2019, on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, https://bit.ly/2QXx36m; the Declaration of the Representatives of the Governments of the Member States, of 16 January on the Enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, https://bit.ly/2Xi4C7H; and the Declaration of the Government of Hungary, of 16 January 2019, on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, https://bit.ly/3hFXcWg.

[14] The United Kingdom, which signed this declaration, was a Member State in January 2019 but has since withdrawn from the Union.

arbitration.  Ex. C, at 3-4.[15]

## ARGUMENT

I.    **The Energy Charter Treaty, properly interpreted under the rules of customary international law on treaty interpretation, does not apply intra-EU.**

Customary international law requires the ECT to be "interpreted in good faith, in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."  Vienna Convention on the Law of Treaties art. 31(1), *opened for signature* May 23, 1969, 1155 U.N.T.S. 331 ("VCLT").  Furthermore, the law *requires* the interpreter to take into account (i.e., prohibits the interpreter to disregard) "any instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty" and "any relevant rules of international law applicable in the relations between the parties."  *Id.* art. 31(3)(c).  Any remaining ambiguities or obscurities in the meaning of the treaty may be resolved by recourse to, inter alia, the circumstances of the treaty's conclusion.  *Id.* art. 32.  Treaty interpretation is a "single combined operation" without any hierarchy between interpretative elements.  Sir Humphrey Waldock (Special Rapporteur on the Law of Treaties), *Sixth Report on the Law of Treaties*, UN Doc. A/CN.4/186 and Add.1-7, [1966] 2 Y.B. Int'l L. Comm'n, 95 & 219.

As described *supra* pp. 5–9, the ECT's historical context clearly indicates that it was not intended to bind EU Member States *inter se*.  This also follows from the ECT's text, which, among other things, acknowledges the EU's powers to make binding decisions in respect of its Member States, ECT art. 1(3), and provides that the EU and its Member States shall vote at the

---

[15] Five Member States issued a separate declaration, refraining from taking a position on the status of the ECT, given that the issue was being litigated in national courts in the EU.  Ex. D, at 3.  Hungary issued an individual declaration opining that "the *Achmea* judgment concerns only intra-EU bilateral investment treaties" and "is silent on the investor-state arbitration clause in" the ECT.  Ex. E, at 3.

11

Energy Charter Conference as a single block, *id.* art. 36(7).  *See supra* pp. 7–9.

Furthermore, with specific regard to investor-State arbitration under the ECT, the EU and its Member States submitted a declaration showing that they envisaged that provision would be used for claims by *third-country* investors (in which case, the EU and the Member States reserved the right to designate the proper respondent, depending on the internal division of competences between the Member States and the Union).  Statement submitted by the European Communities to the Secretariat of the Energy Charter Treaty pursuant to Article 26(3)(b)(iii) of the Energy Charter Treaty, [1998] O.J. L69/115.  The vast majority of the Member States reconfirmed this position in the declarations issued on 15 and 16 January 2019, *see supra* pp.10–11, as did the Council of the EU when it was informed of the Commission's intention to file of this brief, *see supra* p.1.  The Contracting Parties' post-ratification interpretations of an international treaty are entitled to deference.  *See Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 (1982).[16]

Against this backdrop, ECT Article 26 creates jurisdiction over "Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former."  Article 1 defines the terms "Investor," "Contracting Party," and "Area."  In light of the ECT's context, object, and purpose, *see supra* pp. 5–9, these provisions must be understood to exclude EU "Investors" investing in the "Area" of the EU.  Such investors are not "Investor[s] of another Contracting Party."  Rather, they are "Investors" of one "Contracting Party" (the EU), making investments in the "Area" of that same Contracting Party.  Such investors thus invest in "their own economic area," Opinion of Advocate General Bot,

---

[16] That the ECT, properly interpreted, does not apply intra-EU disposes of any perceived incongruity in the fact that the Commission has not commenced proceedings charging Member States that refuse to withdraw from the ECT with violating EU law.  Such proceedings are unnecessary because, properly interpreted, the ECT presents no conflict with EU law.

Court of Justice Opinion 1/17, Request for an opinion by the Kingdom of Belgium (ECLI:EU:C:2019:72), ¶ 207, and are not "foreign" investors for whom the ECT's investor-State mechanism was intended.[17]

Another Advocate General recently made the same point in an opinion in a case referred by the Italian courts to the CJEU, which raised questions about the interpretation of ECT Article 10.  Opinion of Advocate General Saugmandsgaard Øe, *Anie v. Ministero dello Sviluppo Economico, Gestore dei servizi energetici (GSE) SpA*, Case Nos. C-798/18, C-799/18, 29 Oct. 2020 (ECLI:EU:C:2020:876).  Noting that, "with respect to regional economic integration organisations like the EU," the ECT defines the term "area" as "the areas of the Member States of such Organisation," *id.* ¶ 92 n.53, he opined that "Article 10 of the [ECT] is intended to provide protection, within the EU legal system, for investors of other contracting parties—or in other words of third States which are also parties to the [ECT]—throughout the territory of the Union," *id.* ¶ 92.  He concluded that "it does not seem to me that [ECT Art. 10] can be relied on by investors of the Union as against institutions of the Union or Member States."  *Id.*

That the ECT does not specifically provide that Article 26 is inapplicable to intra-EU disputes (by means of a so-called "disconnection clause") is irrelevant.  Disconnection clauses inform non-EU contracting parties that EU law will apply as between EU Member States that are parties to the same treaty.  They have no bearing on intra-EU relations.  The "failure to [include a disconnection clause in a multilateral treaty] would not alter the Union law obligation whereby Union law takes precedence as regards Member States' relations *inter se*."  M. Cremona, *Disconnection Clauses in EU Law and Practice*, in *Mixed Agreements Revisited* 166 (2010).

---

[17] Advocates General provide impartial, independent submissions in certain cases before the Court of Justice.

This is particularly so in agreements concluded jointly by the EU and its Member States.[18]  The WTO Agreement—like the ECT, an agreement that lacks a disconnection clause—illustrates the point.  Despite the lack of a disconnection clause, because the EU's internal market rules govern intra-EU trade, "there can hardly have been any misunderstanding about the intention of the Community and its Member States to negotiate exclusively obligations with third States and not between Member States *inter se*." Pieter J. Kuijper, *The Conclusion and Implementation of the Uruguay Round Results by the European Community*, 6 Eur. J. Int'l L. 222, 228 (1995).

The text, history, and context of the ECT thus make clear that Article 26, properly interpreted, does not apply to intra-EU disputes.  None of the contracting parties envisaged that Article 26 would permit EU investors to initiate arbitration against another Member State.  Indeed, the contrary interpretation requires assuming that, by signing the ECT, individual Member States not only acted in complete disregard of the fact that they had already transferred competence to the EU in the area of energy, but also intended to sign away the primacy of EU law in their relations *inter se* in that area, even though they have always viewed this principle as fundamental to the EU legal order.  That cannot be correct.

## II.     The EU Treaties preclude arbitration of intra-EU disputes under the Energy Charter Treaty

In the alternative, even assuming the ECT could be interpreted to apply intra-EU, applying ECT Article 26 to intra-EU disputes would be contrary to the TFEU as interpreted by the Court of Justice in *Achmea*.  Given the prevalence of the TFEU over all other international

---

[18] *See also* Maja Smrkolj, *The Use of the 'Disconnection Clause' in International Treaties* 9 (May 14, 2008) (paper presented at GARNET Conference), https://bit.ly/2IYldIT (disconnection clauses are "completely unnecessary"); Rafael Gil Nievas, *A New Approach to Intra-EU ISDS*, Kluwer Arbitration Blog (April 5, 2019), http://arbitrationblog.kluwerarbitration.com/2019/04/05/a-new-approach-to-intra-eu-isds/ (absence of disconnection clauses is a common practice of international law and has never been objected to by third countries).

agreements between EU Member States, any offer of intra-EU arbitration in the ECT is invalid and ineffective and cannot have given rise to a valid arbitration agreement.

### A.  Intra-EU application of ECT Article 26 conflicts with the EU Treaties and fundamental principles of EU law

The *Achmea* judgment is not limited to the specific BIT at issue in that dispute. The Court of Justice in *Achmea* was concerned with the interpretation of *EU law*—specifically, TFEU Articles 267 and 344.  That binding interpretation is not (and, as a matter of EU law, cannot be) "limited" to the particular facts in the case which gave rise to it.  It applies *erga omnes*, and how it affects a particular set of factual circumstances—including a particular treaty at issue in a given case—is a matter for the adjudicator of fact.  Here, the interpretation of TFEU Articles 267 and 344 adopted in *Achmea* applies to intra-EU arbitration under the ECT with at least the same force as it does to intra-EU investor-state arbitration under a BIT.

As Court of Justice Advocate General Bot observed in his opinion concerning the EU/Canada Comprehensive Economic and Trade Agreement (CETA), the *Achmea* judgment is primarily based on

> the idea that the judicial system of the European Union, in so far as it is based on mutual trust and sincere cooperation between Member States, is inherently incompatible with the possibility of Member States establishing, in their bilateral relations, a parallel dispute settlement mechanism which may concern the interpretation and application of EU law.

Bot, Opinion 1/17, ¶ 105.  The Court of Justice agreed, underscoring that investor-State dispute settlement is only permissible in treaties between the EU and third countries, where, unlike in the intra-EU situation of *Achmea*, the principle of mutual trust does not apply.[19]  Court of Justice Opinion 1/17, 30 April 2019 (ECLI:EU:C:2019:341), ¶¶ 120–129.  Even then, such dispute

---

[19] Thus, the Court of Justice clarified that ¶¶ 57 and 58 of the *Achmea* judgment (on which arbitration tribunals have previously relied to hold that the *Achmea* judgment does not apply to the ECT), carve out from *Achmea*'s scope only relations with third countries, not a possible intra-EU application.

settlement is only permissible if the interpretation and application of EU law is expressly excluded from the tribunals' jurisdiction and such jurisdiction is specifically limited to preserve the EU's right to legislate in the public interest without investor-State tribunals interfering with its functions, especially in the field of competition law.  *Id.* ¶¶ 106–161, 184–18.

Like disputes arising from intra-EU investments under a BIT, disputes arising from intra-EU investments under the ECT do not involve third-country investors. They are also "liable to relate to the interpretation or application of EU law," which forms part of the international law applicable in any such dispute. *Achmea*, ¶ 39; ECT art. 26(6).[20]  But ECT arbitral tribunals are no more a part of the EU judicial system than are BIT tribunals.  Their pronouncements on EU law (or failure to take EU law into account) threaten the autonomy of the EU legal order and the principles of sincere cooperation and mutual trust between the EU and its Member States.

The case before this Court illustrates the problem in two ways.  *First*, enforcing the award would disrupt the EU's internal laws on government support, known as State aid.  To ensure fair competition in the internal market, TFEU Article 107 prohibits Member States from providing undertakings with *any* public support, unless such support was first notified to and approved by the Commission.  The Commission is the EU's State aid regulator and the sole authority on whether a given measure constitutes permissible State aid.

Plaintiffs' claims in the underlying arbitrations concerned Spain's measures to support renewable energy pursuant to the EU's Renewable Energy Directive.  Plaintiffs asserted that Spain denied them a level of government support to which they claimed to be entitled, and thereby breached its obligation under the ECT to provide foreign investors "fair and equitable

---

[20] This is in contrast to, for example, the Comprehensive Economic and Trade Agreement (CETA) between Canada and the EU and its Member States.  Given that Canada is not party to the EU Treaties, in CETA context, EU law is merely "domestic law of a Party" and may only be considered as a matter of fact, in accordance with the prevailing interpretation of EU courts. Opinion 1/17 (CETA), ¶¶ 21, 130-134.

treatment."

In a binding decision on the matter issued during the pendency of the underlying arbitration, the Commission pointed out that, in accordance with established EU State aid law, an investor cannot rely on legitimate expectations to receive State aid that had not been notified to and approved by the Commission before being granted.  Ex. F ¶¶ 155-58.10.[21]  This rule could not be circumvented by relying on Article 10 of the ECT, because, in an intra-EU situation, the fair and equitable treatment standard in that provision must be interpreted in conformity with EU law.  *Id.* ¶ 164.  The Commission further reiterated that any provision for investor-State arbitration between two Member States is contrary to EU law, including "the general principles of Union law of primacy, unity and effectiveness of Union law, of mutual trust and of legal certainty."  *Id.* ¶ 160. Finally, the Commission pointed out that any compensation based on an arbitral award granted to an EU investor under the ECT on the basis that Spain has modified its support scheme would in itself amount to State aid, and that any payment of such awards by Spain without prior notification to, and approval by, the Commission would itself be unlawful as a matter of EU law.  *Id.* ¶ 165.  Investors could have challenged this decision in European courts but did not.  The Commission's State aid decision is thus binding EU law.

Spain brought these issues to the tribunal's attention, Decision on Jurisdiction, Liability, and Partial Decision on Quantum, ECF No. 1-2 ¶ 41, 94 ("Decision"), but the tribunal nevertheless ruled as though EU State aid law (which is also binding under Article 1(3) of the ECT) did not exist, ordering Spain to pay Cube compensation for the subsidies Cube had claimed.  But as a result of Plaintiffs' requests for enforcement in this Court, Spain now faces extra-EU judicial proceedings that could place it in the perilous position of choosing between

---

[21] Attached as Exhibit F is a copy of the Commission's Decision on State Aid, SA.40348, slip op. (Nov. 10, 2017).

complying with an order of this Court or violating its obligations under EU and international law.[22]

As for the second way in which these cases illustrate the incompatibility of intra-EU arbitration under the ECT with EU law, enforcing the awards would ratify a fundamental misinterpretation of EU law propounded by arbitral tribunals—a misinterpretation that the EU judicial system has no opportunity to correct.  Spain argued before the tribunal that EU law deprived the tribunal of jurisdiction, because the arbitration provision in ECT Article 26, applied intra-EU, would conflict with TFEU Article 344.  But the tribunal rejected that argument, on the ground that "the words found in Article 26(1) ECT do not differentiate between different classes of Contracting Parties."  Decision ¶ 124.  The tribunal ignored the ample historical evidence discussed above, *supra* pp. 5–8, indicating that, in entering into the ECT, the EU and its Member States never envisioned the treaty to apply as between EU Member States.

The tribunal also stated that the judgment of the Court of Justice in *Achmea* was "inapposite."  According to the tribunal, it was significant that the *Achmea* arbitration was seated in Germany and thus was "under the jurisdiction of the EU legal order,"  Decision ¶ 143, whereas the proceedings before the tribunal were "outside the jurisdiction of any of the three States involved," *id.* ¶ 146.  But this is precisely the problem—as the Court of Justice in *Achmea* noted, TFEU 267 and 344 preclude Member States from allowing intra-EU investor-State disputes to be heard outside the EU judicial system.  The tribunal stated that *Achmea* was "confined … to th[e] specific constellation" of "a bilateral BIT that had been concluded between two EU Member States.  *Id.* ¶ 152.  This conclusion is erroneous for the reasons explained *supra*

---

[22] Spain raised the State aid issue before the tribunal, Decision ¶ 92, but the tribunal did not address it.  The Commission also sought to intervene in the annulment proceedings as a non-disputing party in order to present its views on the intra-EU objection, as well as on State aid.  The ad hoc committee, however, rejected the Commission's request to intervene.  ECF No. 1-7.

p. 15, and constitutes a manifest misinterpretation of rules of EU law.  Given the impossibility of rectifying this failure through the EU's judicial system, this outcome is the precise challenge to the autonomy and effectiveness of EU law that the Court of Justice in *Achmea* sought to prevent.

Questions of retroactivity are no obstacle to applying *Achmea*'s reasoning here.  It is well-established that the CJEU's judgments apply *ex tunc*.  Case 24/86, *Blaizot v. University of Liège*, [1988] E.C.R. 379, ¶ 27; Case C-676/19 P, *Gollnisch v. European Parliament*, 12 Nov. 2020, ECLI:EU:C:2020:916, ¶ 48; *see also Access to German Minority Schools in Upper Silesia*, 1931 P.C.I.J. Series A/B, No. 40, at 19 ("[I]n accordance with the rules of law, the interpretation given by the Court to the terms of the Convention has retrospective effect—in the sense that the terms of the Convention must be held to have always borne the meaning placed upon them by this interpretation … .").  Only "exceptionally" will the CJEU impose temporal limitations on an interpretation of EU law, *Blaizot* ¶ 28, and the CJEU found no such circumstances in *Achmea*.[23]

## B.     The conflict must be resolved in favor of EU law.

Resolution of the conflict between ECT Article 26 and the EU Treaties must be in favor of EU law.  First, the issue of treaty conflict is an issue of international law.  Where two or more treaties impose conflicting obligations, customary international law governs the resolution of those conflicts.  While customary international law provides residual rules for the resolution of treaty conflict, *see* VCLT arts. 30 & 59, it is well recognized that sovereign States may regulate the relationship between present and future international treaties between those same States by special rules, including by entering into a treaty that takes precedence over all others, *see, e.g.*, Report of the Study Group of the Int'l Law Comm'n, *Fragmentation of International Law*, UN Doc. No. A/CN.4/L.682 (2006), ¶ 470; O. Dörr & K. Schmalenbach, *Vienna Convention on the*

---

[23] The government of one Member State sought the imposition of such a limitation in the *Achmea* proceedings, but the Court of Justice did not grant that request.

*Law of Treaties: A Commentary* 546 (2018).

Member States' obligations under EU law are themselves international in nature.  The EU legal order derives from international treaties that create binding obligations between their Member States on the international plane. While the Court of Justice has treated the EU legal order as "special" given the far-reaching goals of the treaties, it never denied its international character.  *See, e.g.*, Case 26-62, *Van Gend & Loos*, [1963] E.C.R. at 12; *Achmea*, ¶ 41 (EU law "deriv[es] from an international agreement between the Member States").  International courts and tribunals have consistently confirmed that EU law is international law applicable between EU Member States. *See, e.g.*, Order No. 3, Ireland v. United Kingdom ("Mox Plant"), UNCLOS Arbitral Tribunal, June 23, 2003, ¶ 28.

Thus, where Member States' commitments under the EU Treaties conflict with other international obligations between those same Member States, customary international law permits the Member States to formulate special rules to resolve those conflicts, including by providing that a particular treaty shall have primacy over others.  EU Member States have done precisely that by means of the EU Treaties, which establish the primacy of EU law over Member States' other international obligations *inter se* (whenever concluded).  In other words, primacy of EU law is a special rule of conflict pursuant to international law.  As explained *supra* p.5, the principle of primacy applies equally to domestic law and intra-EU international treaties.  *See* TFEU art. 351.[24]  Indeed, for that purpose, "rules resulting from international agreements by

---

[24] Consistent Court of Justice case law confirms that TFEU Article 351 (which safeguards the effects of international obligations of EU Member States vis-à-vis third countries where such obligations predate the EU Treaties' entry into force) means that EU Member States' international obligations *inter se* are not protected from the effects of the EU Treaties and are subject to their primacy. *See infra* p. 22 (discussing *Commission v. Italy* and subsequent cases); *see also, e.g.*, Case 478/07, *Budějovický Budvar v. Rudolf Ammersin GmBH*, [2009] E.C.R. I-07721, ¶¶ 97–99; Case 121/85, *Conegate Ltd. v. HM Customs & Excise*, [1986] E.C.R. 01007, EU:C:1986:114, ¶ 25; Case 235/87, *Annunziata Matteucci v. Communauté française of Belgium*, [1988] E.C.R. 5589, ¶¶ 220-22.

which the Member State concerned is bound" form part of "domestic law."  Opinion of Advocate

General Mazák, *Bogiatzi v. Deutscher Luftpool et al.*, Case C-301/08, [2009] E.C.R. I-10185,

¶ 55; Marcus Klamert, *The Principle of Loyalty in EU Law* 180 (2014).  And in Declaration No.

17 to the 2007 Lisbon Treaty (amending the EU Treaties), the Member States expressly

confirmed the primacy of EU law over "domestic legal provisions, *however framed.*"  Ex. G.[25]

To be clear, primacy is not an escape hatch that allows the EU and Member States to

evade other international obligations.  Rather, in the context of intra-EU disputes like this one,

primacy is a principle for resolving conflicts between Member States' obligations under the EU

Treaties and any other international obligations in force between those same Member States, at

least where the rights of third countries are not affected.  *See* TFEU art. 351.  That such conflicts

are resolved in favor of the TFEU is uncontroversial.  The International Law Commission has

recognized the TFEU's "absolute precedence" over any intra-EU international agreements.

*Fragmentation of International Law*, UN Doc. No. A/CN.4/L.682 (2006), ¶ 283.  The German

Federal Supreme Court was likewise clear in setting aside the *Achmea* award:

> [B]y acceding to the EU, the Member States have limited their discretionary powers
> under international law and have mutually agreed to renounce the exercise of any
> international treaty rights which conflict with EU law. In view of this, the primacy
> of the provisions of EU law has the consequence that a rule in an intra-EU
> agreement between Member States which is incompatible with EU law is also
> inapplicable as a rule in an international treaty. The nationals of the Member States
> concerned cannot rely on the Member States' prior international law obligations
> that are contrary to EU law.

Ex. B, ¶ 41.  The tribunal in *Electrabel v. Hungary* also concluded that EU-inconsistent treaties

"do not survive" within the EU.  *Electrabel SA v. Republic of Hungary*, ICSID Case No.

ARB/07/19, Award, Nov. 25, 2015, ¶ 4.183.

---

[25] Attached as Exhibit G are Declarations Annexed to the Final Act of the Intergovernmental Conference which
Adopted the Treaty of Lisbon, 13 December 2007, 2008 O.J. C115/335, at 344.

The principle of primacy of EU law extends to any intra-EU application of multilateral treaties, even where third countries are also parties to those treaties. Based on Article 351 of the TFEU, the Court of Justice has held in a number of judgments—beginning with *Commission v. Italy*, Case 10-61, [1962] E.C.R. 1—that such treaties do not apply within the EU if they are contrary to any rule of EU law, unless they affect the rights of third countries. *Commission v. Italy* concerned the General Agreement on Tariffs and Trade ("GATT"), a multilateral treaty to which non-EU Member States were also party.  In later cases, the Court applied the rule set forth in *Commission v. Italy* to numerous other treaties.[26]  All obligations in these treaties, to the extent they conflicted with the EU Treaties, were inapplicable and had to be set aside within the EU.

There is no reason to treat the ECT differently. The *Achmea* judgment expressly applies to "international agreements concluded between the Member States"—the exact same term used in *Commission v. Italy* to refer to the intra-EU application of GATT.  *Compare Achmea ¶ 62 with Commission v. Italy*, [1962] E.C.R. at 10.  Multilateral treaties providing for intra-EU investment arbitration such as the ECT are thus clearly within the scope of *Achmea*, for the purposes of which they are no different from purely bilateral agreements.  For the same reason, EU law would, if necessary, also prevail over the ICSID Convention as applied among EU Member States.

Article 16(2) of the ECT, which provides that other treaties concerning investment promotion and protection and dispute resolution shall not "be construed to derogate" from the ECT, does not reverse the primacy of EU law and give precedence to the ECT instead.

By its own terms, Article 16(2) of the ECT is a rule of "construction," not conflict

---

[26] Case 286/86, *Ministère Public v. Deserbais*, [1988] E.C.R. 4907 (Stresa Convention on Cheeses); Joined Cases C-241/91 P and C-242/91 P, *RTE and ITP v. Commission*, [1995] E.C.R. I-743 (Berne Convention for the Protection of Literary and Artistic Works); Case 147/03, *Commission v. Austria*, [2005] E.C.R. I-5969 (Council of Europe Convention on the Equivalence of Diplomas); Case C-301/08, *Bogiatzi v. Deutscher Luftpool et al.*, [2009] E.C.R. I-10185 (Warsaw Convention on International Carriage by Air).

resolution.  The applicable rule for resolving a conflict between the ECT and the EU Treaties is the primacy of EU law.  Even if Article 16(2) could be interpreted as a conflict rule, it would yield to the primacy of the EU Treaties, which lies at the heart of the EU legal order.  As the *Electrabel* tribunal correctly observed, Article 16 is itself subject to the primacy of, and cannot trump, EU law.  ICSID Case No. ARB/07/19, ¶ 4.178.  In any event, the principle of primacy, which the Member States confirmed in Declaration No. 17 to the 2007 Lisbon Treaty, is later in time than any conflict rule in the ECT.

That the EU itself is a party to the ECT (whereas the BIT in *Achmea* involved only individual Member States) does not obviate the conflict between EU law and the ECT or render *Achmea* inapposite.  The CJEU's judgment in Case C-459/03, *Commission v. Ireland* ("*Mox Plant*"), 30 May 2006, ECLI:EU:C:2006:345, demonstrates the point.  There, the Court held that an inter-State arbitration provision in the UN Convention on the Law of the Sea could not be applied in a dispute between two EU Member States, because (as in *Achmea*) such application would violate TFEU Article 344 and the principle of autonomy of EU law.  That the EU was party to UNCLOS (just as it is party to the ECT) did not resolve the incompatibility.

In short, as regards intra-EU relations, the TFEU regulates its relationship with EU Member States' other *inter se* international obligations in favor of the absolute precedence of EU law in case of any conflict.  Article 26 of the ECT is thus inapplicable here and cannot have given rise to a valid arbitration agreement.

## III. At a minimum, international comity favors allowing the compatibility of intra-EU arbitration under the ECT to be decided within the EU judicial system.

Whether arbitration of Plaintiffs' dispute with Spain pursuant to ECT Article 26 is compatible with the EU Treaties raises significant questions that implicate not just EU law but also the structure of the EU legal order.  International comity—which permits U.S. courts to

dismiss or stay domestic actions based on the interests of the United States and a foreign government in resolving a dispute in a foreign forum—strongly favors permitting these questions to be addressed within the EU judicial system.  *See Mujica v. AirScan Inc.*, 771 F.3d 580, 599 (9th Cir. 2014); *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004).

The EU's position is that intra-EU arbitration under the ECT is incompatible with EU law—a conclusion that clearly follows from *Achmea*.  Nevertheless, controversy remains, within academic circles as well as in arbitral practice.  Resolving that controversy implicates matters of vital importance to the EU, including the role and jurisdiction of EU courts, the interpretation and application of EU law by non-EU adjudicatory bodies, and the future of investor-State arbitration within the EU.  As courts in this District have recognized, these questions are best addressed by EU courts within the EU judicial system.  *Novenergia II – Energy & Environment (SCA) v. Kingdom of Spain*, 2020 WL 417794, at *4 (D.D.C. Jan. 27, 2020); *CEF Energia, B.V. v. Italian Republic*, 2020 WL 4219786, at *7 (D.D.C. July 23, 2020).

Questions about the enforceability of intra-EU ECT awards are percolating in the EU. Spain has asked courts in Sweden (where a number of intra-EU ECT arbitrations have been seated) to refer the question to the CJEU.[27]  In addition, the CJEU recently heard argument on the issue in a case referred to it by the Paris Court of Appeal; an Advocate General will deliver an opinion on the question in March 2021, and the CJEU will likely issue a ruling in the case shortly thereafter.  And just last month, Belgium invoked the procedure for obtaining the CJEU's view on the compatibility of the intra-EU arbitration provisions of a draft revised version of the

---

[27] *See* Decl. of James Hope, *Foresight Luxembourg Solar 1 S.A.R.L. v. Kingdom of Spain*, No. 19-cv-3171 (S.D.N.Y.), ECF No. 12.  The intermediate appellate court has not granted the request at this stage—the request in *Foresight* remains pending, and the Swedish courts rejected another similar request in 2019, *see* Decision by the Svea Court of Appeal (Apr. 25, 2019), https://bit.ly/3jg1e6R.  Ultimately, however, the Swedish Supreme Court will be obliged to refer the matter to the CJEU.

ECT with EU law.  Press Release, Kingdom of Belgium, *Belgium requests an opinion on the intra-European application of the arbitration provisions of the future modernised Energy Charter Treaty* (Dec. 3, 2020), https://bit.ly/37LdJ6U; *see* TFEU art. 218(11).  Thus, the CJEU will soon provide an authoritative, final, and specific decision on the compatibility of intra-EU arbitration under the ECT with EU law.

While the EU's interests in these issues are immense, the United States has no interest in the answers to these questions, nor in the outcome of individual intra-EU investor-State disputes. None of the parties to this dispute are U.S. citizens, no U.S. property is at issue, and none of the underlying events took place on U.S. territory.  U.S. law is only implicated because Plaintiffs assert jurisdiction under the Foreign Sovereign Immunities Act and seek to enforce the award in the United States under the ICSID Convention and 22 U.S.C. § 1650a.  Rather than embroil itself in the EU's internal affairs, this Court should dismiss the petition so that the questions implicated by this dispute may be decided by the courts of the Member States and the the EU Court of Justice, which have a far greater stake in these issues than U.S. courts.

## CONCLUSION

For the foregoing reasons and those set forth in Spain's submissions, the Court should grant Spain's motion to dismiss and deny enforcement of the award.

Dated: January 4, 2021                    Respectfully submitted,

                                          */s/ R. Stanton Jones*
                                          R. Stanton Jones (D.C. Bar No. 987088)
                                          Sally L. Pei (D.C. Bar No. 1030194)
                                          ARNOLD & PORTER
                                            KAYE SCHOLER LLP
                                          601 Massachusetts Ave., NW
                                          Washington, DC  20001-3743
                                          T: (202) 942-5000
                                          F: (202) 942-5999
                                          stanton.jones@arnoldporter.com
                                          sally.pei@arnoldporter.com

                                          *Counsel for Amicus Curiae*

## INDEX OF EXHIBITS

**A**     Draft invitations to conference for the negotiation of the European Energy Charter and the Energy Charter Treaty (in French)

**B**     Order, *Slovak Republic v. Achmea B.V.* (Oct. 31, 2018), I ZB 2/15 (English translation)

**C**     Declaration of the Representatives of the Governments of the Member States, of 15 January 2019, on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union

**D**     Declaration of the Representatives of the Governments of the Member States, of 16 January, on the Enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union

**E**     Declaration of the Government of Hungary, of 16 January 2019, on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union

**F**     Decision on State Aid, SA.40348, slip op. (Nov. 10, 2017)

**G**     Declarations Annexed to the Final Act of the Intergovernmental Conference which Adopted the Treaty of Lisbon, 13 December 2007, 2008 O.J. C115/335 (excerpt)

**CERTIFICATE OF SERVICE**

I hereby certify that on January 4, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.

*/s/ R. Stanton Jones*
R. Stanton Jones