**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| CUBE INFRASTRUCTURE FUND SICAV, CUBE INFRASTRUCTURE MANAGERS S.A., CUBE ENERGY S.C.A. (NOW CUBE ENERGY S.À.R.L.), DEMETER PARTNERS S.A., and DEMETER 2 FPCI,<br><br>                Plaintiff,<br><br>        v.<br><br>THE KINGDOM OF SPAIN,<br><br>                Defendant. | Civil Action No. 1:20-cv-01708-EGS |

**<u>EXPERT DECLARATION OF PROFESSOR PIET EECKHOUT</u>**

## TABLE OF CONTENTS

I. Introduction and Background ..................................................................................3

II. Executive Summary .............................................................................................7

III. Background ..........................................................................................................8

    A. Relationship Between EU law and Public International Law ...........................8

    B. Mixed Agreements and the ECT ..................................................................15

IV. The *Achmea* Judgment and the ECT .................................................................20

    A. Scope of the ECJ's findings in the *Achmea* Judgment ................................21

    B. Opinion 1/17 on CETA and the ECT ...........................................................26

    C. Article 26 of the ECT is Valid as a Matter of EU Law ................................33

    D. Under International Law, Article 26 ECT Is Valid Regardless Of Whether It Complies With EU Law ...............................................................................38

    E. The *Achmea* Judgment Did Not Have a Direct Legal Effect on the Parties' Agreement to Arbitrate ...............................................................................42

    F. Conclusion: The *Achmea* judgment has no effect on the validity of the Parties' arbitration agreement .....................................................................43

V. The EC'S Communication and the First Declaration have No Effect on the ECT's Interpretation ........................................................................................................44

VI. Payment of the Award would not Violate EU Law ............................................46

VII. The Award is Immediately Enforceable ...........................................................50

## I.    INTRODUCTION AND BACKGROUND

1.    I, Piet Eeckhout, make this declaration based upon my personal knowledge, except as to those statements where I have expressly stated that my opinion is based upon information and belief, and I believe all such statements, and the information upon which they are based, to be true.

2.    I am a Belgian citizen, born on 30 January 1962.

3.    I am currently Professor of European Union ("**EU**") Law, and Executive Dean of the Faculty of Laws at University College London ("**UCL**").  I am also Academic Director of the UCL European Institute. Before joining UCL (in 2012), I taught at the Universities of Ghent and of Brussels (Belgium), and was Professor of European Law at King's College London, where I directed the Centre of European Law (between 1998 and 2012).  I also worked as a *référendaire* (law clerk) in the Chambers of Advocate General Francis G. Jacobs, at the European Court of Justice (the "**ECJ**"), between 1994 and 1998.  My academic interests revolve around EU law generally, and EU external relations law (including the interaction between EU law and public international law) more particularly.  I have published extensively in this field.  I am the sole author of a leading monograph, widely used in the field: *EU External Relations Law* (2nd ed, Oxford EU Law Library, 2011).  I am further co-editor of the Oxford EU Law Library, a series of monographs published by Oxford University Press and aimed at both academics and practitioners.  I am co-founder and co-editor of an open-access journal, *Europe and the World – A Law Review* (UCL Press).  I have also taught international trade law and have written on questions of public international law, particularly those connected to the relationship between EU law and public international law.  Next to my academic work, I regularly advise barristers and law firms in the context of litigation involving questions of EU law.  Mostly that litigation is before the ECJ.  The most noteworthy cases in which I have been involved are *Kadi*, on the relationship between United

Nations ("**UN**") law and EU law in the context of counterterrorism, and *Wightman and Others*, on the question of whether the United Kingdom could unilaterally revoke its notification to withdraw from the European Union.[1]  In both cases the ECJ fully endorsed the arguments I contributed to, and rejected the opposing positions of the EU Council of Ministers and of the European Commission.

4.      My CV, together with a list of my publications, is attached hereto as **Exhibit 1**.

5.      I am being compensated at a rate of GBP 500 per hour to prepare this expert declaration and, if required, to testify in this case.

6.      I have no familial or business relationship or affiliation with any of the parties in the above-captioned matter.  I have never provided legal advice to them or represented them in any capacity.

7.      I have been asked by counsel for the Plaintiff in the above-captioned action to provide an expert declaration on certain legal issues in this action by Cube Infrastructure Fund SICAV, Cube Infrastructure Managers S.A., Cube Energy S.C.A. (now Cube Energy S.À.R.L.), Demeter Partners S.A., and Demeter 2 FPCI ("**Plaintiffs**") to enforce the arbitral award entered in their favour against the Kingdom of Spain ("**Spain**") in *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain*, ICSID Case No. ARB/15/20 (July 15, 2019) (the "**Award**").[2]  In particular, I have been asked to give my expert opinion on the following issues:

---

[1]      Attachments to the Expert Declaration of Prof. Dr. Steffen Hindelang, ECF No. 11-2, are hereinafter referenced as "**Hindelang Exhibits**."; Joined Cases C-402/05 P *Kadi and Al Barakaat v Council and Commission* EU:C:2008:461, Dkt. No. 11-15, **Hindelang Exhibit 12**; Case C-621/18 *Andy Wightman and Others v Secretary of State for Exiting the European Union* EU:C:2018:999, **Exhibit 2**.

[2]      Award, Dkt. No. 1-1.

- the effect, if any, of the judgment of the ECJ on 6 March 2018 in *Slovak Republic v Achmea B.V.* (Case C-284-16) (the "*Achmea* **Judgment**")[3] on the arbitration of intra-EU disputes under Article 26 of the ECT;

- the effect, if any, of the *Achmea* Judgment on the validity of the arbitration agreement between Plaintiffs and Spain under the ECT;

- the effect, if any, of the following two statements on the interpretation that must be given to the ECT: (i) a communication of the European Commission (the "**EC**") addressing intra-EU investment dated 19 July 2018 (the "**EC's Communication**"); (ii) the joint declaration of twenty-two EU Member States on the Achmea Judgment dated 15 January 2019 (the "**First Declaration**");

- whether payment or enforcement of the Award would violate EU law on the basis that it would constitute unauthorized State Aid; and

- whether, if the Award did constitute unauthorized State Aid, that would impact the validity of the Award.

8.　　In addressing these topics, and having reviewed the arguments made by Spain in this case, I consider that it may assist this Court to provide some background on the relationship between EU law and international law and on the operation of agreements to which the EU and its Member States are all parties (so called mixed agreements), such as the ECT.

9.　　In addition to basing my opinion on my knowledge of the topics of international law, EU law and international investment law, I have reviewed the relevant parts of the documents listed below, including the Expert Declaration of Professor Dr. Steffen Hindelang, dated December 18, 2020 (the "**Hindelang Declaration**" or "**Hindelang Decl.**") that was submitted in support of Spain's motion to dismiss Plaintiffs' complaint seeking to enforce the Award.  I have been asked to comment, where appropriate, on the views expressed in the Hindelang Declaration, in addressing the above Questions in this Declaration.  In preparing my opinion I have reviewed the following documents:

---

[3]　　*Achmea* Judgment, Dkt. No. 11-7, **Hindelang Exhibit 4.**

- Complaint, dated June 23, 2020, in *Cube Infrastructure Fund SICAV et al. v. The Kingdom of Spain*, Civil Action No. 1:20-cv-01708, Dkt. No.1;

- Defendant Spain's Memorandum of Law in Support of the Kingdom of Spain's Motion to Dismiss the Complaint or Stay, dated December 18, 2020, in *Cube Infrastructure Fund SICAV et al. v. The Kingdom of Spain*, Civil Action No. 1:20-cv-01708 ("**Spain's Motion to Dismiss**"), Dkt. No. 11-1;

- Expert Declaration of Steffen Hindelang in Support of the Kingdom of Spain's Motion to Dismiss the Complaint, dated December 18, 2020, *Cube Infrastructure Fund SICAV et al. v. The Kingdom of Spain*, Civil Action No. 1:20-cv-01708, Dkt. No. 11-3;

- Expert Declaration of Steffen Hindelang in Support of the Kingdom of Spain's Motion to Dismiss Complaint for Lack of Jurisdiction or in the Alternative to Stay, dated January 15, 2020, *9REN Holding S.A.R.L. v. The Kingdom of Spain*, Civil Action No. 1:19-cv-01871-TSC (D.D.C.), Dkt. No. 11-2;

- Expert Declaration of Steffen Hindelang in Support of the Kingdom of Spain's Motion to Dismiss Petition to Enforce Arbitral Award, dated April 22, 2019, in *Masdar Solar & Wind Cooperatief U.A. v. The Kingdom of Spain*, Civil Action No. 1:18-cv-02254-JEB (D.D.C.), Dkt. No. 15;

- Expert Declaration of Professor Catherine Kessedjian, dated December 1, 2018, in *Novenergia II – Energy & Environment (SCA), Société d' Investissement à Capital Risque v. Kingdom of Spain*, Civil Action No. 1:18-cv-01148-TSC (D.D.C.), Dkt. No. 23;

- Expert Declaration of Andrea K. Bjorklund, dated January 14, 2019, in *Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L. v. Kingdom of Spain*, Civil Action No. 1:18-cv-01686-CKK (D.D.C.), Dkt. No. 24;

- Second Expert Declaration of Andrea K. Bjorklund, dated April 22, 2019, in *Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L. v. Kingdom of Spain*, Civil Action No. 1:18-cv-01686-CKK (D.D.C.), Dkt. No. 39;

- Expert Declaration of Sir Alan Dashwood, dated January 14, 2019, in *Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L. v. Kingdom of Spain*, Civil Action No. 1:18-cv-01686-CKK (D.D.C.), Dkt. No. 25;

- Second Expert Declaration of Sir Alan Dashwood, dated April 22, 2019, in *Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L. v. Kingdom of Spain*, Civil Action No. 1:18-cv-01686-CKK (D.D.C.), Dkt. No. 40;

- Expert Declaration of Conor Quigley, dated April 22, 2019, in *Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L. v. Kingdom of Spain*, Civil Action No. 1:18-cv-01686-CKK (D.D.C.), Dkt. No. 41; and

- Various intra-EU Awards under the ECT since the *Achmea* Judgment containing hyperlinks to awards or decisions in cases brought under the Energy Charter Treaty (1994), which have referenced the *Achmea* Judgment since the ECJ issued its judgment in that case.

## II.   EXECUTIVE SUMMARY

10.   In summary, my views are as follows:

(i).   I do not consider the *Achmea* Judgment to have any effect on the arbitration of intra-EU disputes under Article 26 of the ECT.   The objections in the *Achmea* Judgment against intra-EU arbitration are expressly confined to bilateral agreements between Member States that have not been concluded by the EU; they therefore do not extend to the ECT.   It is most remarkable that neither Spain nor Professor Hindelang even mentions the express distinction that the ECJ made in *Achmea* between agreements purely between EU Member States, versus agreements which also have the EU as a Contracting Party.   The latter type of agreements are an integral part of EU law, and they are valid, under EU law, for as long as the EU Courts have not declared them invalid.   That firm principle of EU law, which extends to all acts of the EU institutions, is not acknowledged at all by either Spain or Professor Hindelang.

(ii).   Even if the *Achmea* Judgment were to extend to the ECT, that would not preclude intra-EU arbitration under the ECT.   The validity of Article 26 ECT under international law would not be affected, nor would its interpretation and effect.

(iii).   If there were any conflict between the ECT and EU law as regards the permissibility of intra-EU arbitration under the ECT, the ECJ case law on the primacy of EU law would not regulate such a conflict.   It would be governed by Article 16 ECT, which gives precedence to the ECT.   There is no merit to the argument that Article 16 ECT is displaced by EU law.   Contrary to what Spain and Professor Hindelang argue, on the international plane the EU Treaties do not have primacy over international agreements, be they concluded by the EU itself or by the EU Member States.   The EU respects international law.   There are no authorities in either EU or international law for the above argument.

(iv).   In light of my conclusions (i)–(iii) above, the *Achmea* Judgment has no bearing on the validity of the arbitration agreement between Plaintiffs and Spain under the ECT.

(v).   As a matter of international law, the EC's Communication and the First Declaration have no bearing on the interpretation to be given to the ECT.

(vi).   Payment of the Award would not violate EU law.   There is no basis to the contentions of Spain or Professor Hindelang in this proceeding that the Award constitutes State Aid under EU law that requires notification to the EC before it can be paid or enforced.   Spain and Professor Hindelang completely fail to mention that the EU Commission's State Aid decision in *Micula* has been annulled by the EU

General Court, on the basis that an arbitral award does not constitute unlawful State Aid.

(vii).   Even if the Award did constitute unauthorised EU State Aid, that would not affect the validity of either the arbitration agreement between Plaintiffs and Spain or the Award, which, unless annulled, remains binding on Spain.

## III.   BACKGROUND

11.   As explained above, I consider it may assist the Court in following my analysis to provide some background information on: (i) the relationship between EU law and international law; and (ii) the operation of agreements to which the EU and its Member States are all parties (so called mixed agreements), such as the ECT.  Those topics are addressed in turn in this section.

### A.   RELATIONSHIP BETWEEN EU LAW AND PUBLIC INTERNATIONAL LAW

12.   The European Union is an organisation created by the conclusion of a series of international treaties — chiefly the Treaty on European Union ("**TEU**") and the Treaty on the Functioning of the European Union ("**TFEU**").  In that sense, the law of the European Union ("**EU law**") has its foundations in public international law, particularly treaty law. The EU respects international law.  Article 3(5) TEU provides that the EU shall, in its relations with the wider world, contribute to "the strict observance and the development of international law".[4]  The EU has legal personality,[5] which encompasses international legal personality.  It therefore has the capacity to act under international law, particularly by means of the negotiation and conclusion of international agreements.[6]  Article 216(2) TFEU provides that "[a]greements concluded by the Union are binding upon the institutions of the Union and on its Member States".  This provision

---

[4]   *See also* TEU, art. 21(2), Dkt. No. 11-11, **Hindelang Exhibit 8**.

[5]   TEU, art. 47, Dkt. No. 11-11, **Hindelang Exhibit 8**.

[6]   *See* Art. 216(1) TFEU, Dkt. No. 11-12, **Hindelang Exhibit 9**. EU law uses the term "agreements" in a generic sense, as encompassing any conventional instruments such as treaties, conventions, agreements, etc.

ensures that the EU complies with its international commitments, and respects international law. The EU institutions are bound by any agreements the EU has concluded, including in its legislative function. The ECJ has confirmed, on numerous occasions, that acts of the institutions, including legislative acts, need to comply with the EU's international obligations.[7] The Member States are equally bound, simply because agreements concluded by the EU are an integral part of EU law, which governs and restricts the acts of EU member states.[8] These points are significant for the present case because the ECT is an agreement concluded by the EU (together with its Member States),[9] a fact that materially distinguishes the ECT from the BIT which was in issue in the *Achmea*, which was concluded between two EU member states only.

13.     The fact that international agreements concluded by the EU prevail over acts of the EU institutions, including legislative acts, does not mean that such agreements take priority over the EU's founding treaties (TEU and TFEU) – at least not as a matter of EU law. In this respect the TEU and the TFEU are functionally equivalent to most States' constitutions, which do not allow the State's institutions to conclude international agreements which derogate from, or conflict with constitutional norms. The ECJ has held, in a very limited number of cases, that the provisions of a particular international agreement violate EU constitutional norms.[10] In such cases it will annul the EU's internal act by which the agreement was concluded, or declare that act invalid.[11]

---

[7]     *See e.g.*, Case C-344/04 *The Queen ex parte IATA v Department for Transport* EU:C:2006:10 ¶ 35, **Exhibit 3**; Case C-308/06 *Intertanko* EU:C:2008:312 ¶ 42, **Exhibit 4**.

[8]     Case 181/73 *Haegeman* EU:C:1974:41 ¶ 5, **Exhibit 5**.

[9]     *See infra* § III.B, IV.B.

[10]    *See e.g.* Case C-122/95 *Germany v Council* EU:C:1998:94, **Exhibit 6.**

[11]    Those two remedies – annulment and a declaration of invalidity – are equivalent. The difference lies in the judicial procedure by which the agreement is challenged before the ECJ: either in a (direct) action for annulment (Art.

It cannot, however, annul the agreement itself, quite simply because that is beyond its jurisdiction.[12]  The ECJ's jurisdiction is confined to EU law. International agreements concluded by the EU, or non-conventional international norms such as general principles and customary international law which are relevant to the EU's international activities, can be interpreted and relied upon by the ECJ.  However, the ECJ cannot, as the court of one of the parties to an international agreement, declare that agreement invalid as a matter of public international law. This is in conformity with Article 46 of the Vienna Convention on the Law of Treaties (hereafter "**VCLT**").[13]  Where a breach of the EU treaties is found, the executive institutions of the EU need to either renegotiate the EU's commitments or terminate them, so as to remove the breach.

14.     In order to avoid such difficulties, the drafters of the EU Treaties have, with great foresight, created a special procedure in Article 218(11) TFEU.  This provision allows any Member State, as well as the European Parliament, the Council or the Commission, to ask the ECJ whether an agreement which the EU *envisages* to conclude, but has not yet concluded, "is compatible with the Treaties".[14]  As the ECJ has stated, this procedure aims "to forestall complications which would result from legal disputes concerning the compatibility with the [EU Treaties] of international agreements binding upon the Community [now the EU]".[15]  It has been used for the Comprehensive Economic and Trade Agreement between Canada and the EU

---

263 TFEU); or on a reference from a Member State court asking whether the act concluding an agreement is invalid (indirect action – Art. 267 TFEU).

[12]   Case C-327/91 *France v Commission* EU:C:1994:305 ¶¶ 13-17, **Exhibit 7**.

[13]   Art 46 provides that "1. A State may not invoke the fact that its consent to be bound by a treaty has been expressed in violation of a provision of its internal law regarding competence to conclude treaties as invalidating its consent unless that violation was manifest and concerned a rule of its internal law of fundamental importance."  Vienna Convention on the Law of Treaties ("**VCLT**"), **Exhibit 32**.

[14]   TFEU, art. 218(11), Dkt. No. 11-12, **Hindelang Exhibit 9**.

[15]   Opinion 1/75 *re Understanding on a Local Cost Standard* EU:C:1975:145, at 1360, **Exhibit 8**.

("**CETA**"), resulting in Opinion 1/17, an ECJ ruling which is highly relevant for the purpose of answering some of the objections to the enforcement of the Awards in the present case.[16]   It is also worth noting that Article 218(11) TFEU confirms that the EU Treaties cannot, on the international plane, override any treaties or agreements the EU concludes.   It does so by stating that "[w]here the opinion of the Court is adverse, the agreement envisaged may not enter into force unless it is amended or the Treaties are revised".[17]   In other words, any incompatibilities need to be removed before the agreement can be concluded, and this may include a revision of the EU Treaties.   This is necessary to avoid a conflict between the EU's international commitments and the EU Treaties.   Such a conflict could be difficult to resolve if the third countries concerned were not amenable to renegotiating those commitments.

15.     The EU Member States continue to be international actors, capable of concluding international agreements with other States or with international organizations independently from the EU.   This includes agreements with other Member States.   A good example is double-taxation treaties.[18]   It is only in matters covered by so-called exclusive EU treaty-making competences that the Member States have lost this capacity.[19]   Trade policy (the "**common commercial policy**") is the most significant area of exclusive EU competence.[20]

16.     The EU Member States must comply with their EU law obligations when concluding international agreements, acting on their own.   There is in this sense no difference

---

[16]   Opinion 1/17 *re CETA* EU:C:2019:341, Dkt. No. 11-26, **Hindelang Exhibit 23**.

[17]   TFEU, art. 218(11), Dkt. No. 11-12, **Hindelang Exhibit 9**.

[18]   For the ECJ's recognition of such treaties, *see e.g.* Case C-648/15 *Austria v Germany* EU:C:2017:664, **Exhibit 9**.

[19]   *See* TFEU, art. 3, Dkt.  No. 11-12, **Hindelang Exhibit 9**.

[20]   *See* TFEU, arts. 3(1)(a), (e), Dkt. No. 11-12, **Hindelang Exhibit 9**.

between what the Member States may do within the four corners of their domestic laws, and what they may commit to internationally.  The ECJ may therefore establish that certain provisions in treaties or agreements concluded by one or more Member States violate EU law.  The *Achmea* Judgment is one such instance.[21]  Again, however, the ECJ is incapable of annulling or invalidating such a treaty or agreement on the international plane.  Where a breach is established, the relevant Member State is simply under an EU law obligation to remove the breach, by either renegotiating the relevant terms, or by denouncing or terminating the agreement in issue.

17.     A closer reading of the *Achmea* Judgment confirms this:  The ECJ in that case only established that the dispute settlement system in the Netherlands-Slovakia BIT was not in conformity with EU law.[22]  It is therefore completely orthodox that the European Commission has advised the Member States to terminate all intra-EU bilateral BITs:  the *Achmea* Judgment, however, cannot have any effect on the existence and validity of such agreements under international law.  For the EU-law incompatibility to be removed, the Member States need to act under international law, by either amending or terminating these BITs.  Moreover, the *Achmea* judgment, delivered pursuant to a preliminary reference from the German *Bundesgerichtshof*, could not, on its own, invalidate even that particular BIT.  All the ECJ did was to interpret EU law, in such a way as to assist the referring court when deciding whether to give effect to the set-aside application before it.  The ECJ ruled that the arbitration provisions of an agreement "such as" the Netherlands-Slovakia BIT are in breach of EU law.[23]  The *Bundesgerichtshof* then applied that EU

---

[21]   Regarding BITs, *see also* Case C-205/06 *Commission v Austria* EU:C:2009:118, **Exhibit 10**; Case C-249/06 *Commission v Sweden* EU:C:2009:119, **Exhibit 11**; and Case C-118/07 *Commission v Finland* EU:C:2009:715, **Exhibit 12**.

[22]   *See Achmea* Judgment ¶ 7(i), in operative part, Dkt. No. 11-7, **Hindelang Exhibit 4**.

[23]   *Id*.

law finding to the actual BIT, and more specifically to the application for the set aside of an award made under that BIT.[24]   That court — not the ECJ — issued the ruling ensuring that EU law was complied with, and that the award was not enforced, by ruling that there was no valid agreement to arbitrate.[25]

18.     The fact that the EU's founding Treaties, or EU law more generally, cannot invalidate treaties or agreements which the Member States have concluded, on their own, is confirmed by Article 351 TFEU.  That provision states, in relevant part:

> The rights and obligations arising from agreements concluded before 1 January 1958 [the date of entry into force of the original EEC Treaty] or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of the Treaties.

> To the extent that such agreements are not compatible with the Treaties, the Member State or States concerned shall take all appropriate steps to eliminate the incompatibilities established.

19.     As can be seen, this is not a provision that establishes a primacy rule in favor of EU law.  As Advocate General Mischo established in *Commission v Portugal*,[26] the first paragraph of this provision is merely declaratory, in the sense that it confirms the international law principle of *pacta sunt servanda*.  It is obvious that the EU Treaties cannot modify the obligations that Member States have entered into towards third countries.

---

[24]   The Bundesgerichtshof was empowered to consider the application for set aside because the arbitration had been conducted under the UNCITRAL Rules and was seated in Frankfurt, Germany. *See also id*.

[25]   Bundesgerichtshof [BGH] [Federal Court of Justice] Oct. 31, 2018, I ZB 2/15, *Slovak Republic v. Achmea B.V. (Ger.)*, Dkt. No. 11-8, **Hindelang Exhibit 5**.

[26]   Opinion of Mischo AG in Case C-62/98 *Commission v Portugal* EU:C:1999:509 ¶ 56, **Exhibit 13**.  This statement has strong judicial authority, in light of the role and function of Advocates General at the ECJ: they are full members of the Court, and their role is to deliver reasoned opinions in cases pending before the Court.  They are completely independent, and the Opinions of Advocates General are followed by the Court in a significant majority of cases.

20.    There is also extensive case law on Article 351 TFEU.[27]  It is worth highlighting that the provision does not apply to agreements between two Member States ("**intra-EU agreements**"), simply because those agreements are – from an EU law perspective[28] – superseded by the EU Treaties and do not confer any rights on third countries.[29]  However, as Advocate General Warner pointed out in *Henn and Darby*, a multilateral agreement concluded by Member States and third countries may create multilateral obligations between all the parties to it, so that third countries have a right to have its provisions observed, even in relations between EU Member States.[30]  The ECJ itself has never ruled on this point. The ECT is of course a multilateral agreement concluded by Member States and third countries – and indeed by the EU itself.

21.    At any rate, Article 351 TFEU is not applicable to this case.  The ECT is later in time than the EU Treaties, for both Spain and the EU Member States whose investors are involved in these proceedings.  Nor does Article 351 concern agreements to which the EU is itself a party, and which are themselves an integral part of EU law. Lastly, Article 351 TFEU is a provision of EU law, and not of general international law, even if it aims to give effect to general international law principle on successive agreements.  The ECJ case law on Article 351 is therefore internal to EU law.

---

[27]    *See* P. Eeckhout, EU External Relations Law (2nd ed, Oxford University Press 2011), at 421-434, **Exhibit 14**.

[28]    Not necessarily from an international law perspective.

[29]    *See e.g.*, Case C-546/07 *Commission v Germany* EU:C:2010:25 ¶ 44, Dkt. No. 11-38, **Hindelang Exhibit 35**.

[30]    Opinion of Warner AG in Case 34/79 Henn and Darby EU:C:1979:246, at 3833, **Exhibit 15**.

### B.    MIXED AGREEMENTS AND THE ECT

22.    It may also assist this Court to say a few words about the reasons for so-called mixed agreements (such as the ECT), and about some of the characteristics and effects of such agreements.

23.    Mixed agreements, *i.e.*, agreements which have the EU, one or more of its Member States, and third countries as contracting parties, are a prevalent phenomenon in the EU's foreign affairs.  The need for such agreements arises because the EU is not a sovereign state with full and complete treaty-making powers.  The EU's competences are limited by the principle of conferral: "the Union shall act only within the limits of the competences conferred upon it by the Member States in the Treaties to attain the objectives set out therein. Competences not conferred upon the Union in the Treaties remain with the Member States".[31]  This principle extends to the EU's external action (as it is called), including its treaty-making activities.  A mixed agreement is needed where the matters covered by the agreement do not all come within the EU's competence.

24.    The ECT is such a mixed agreement.   At the time of its conclusion, it was considered that not all of its provisions came within the EU's exclusive external competences. That continues to be the case, notwithstanding the further development of the EU's competences (*i.e.*, the fields in which the EU is authorized to operate, as defined by Articles 2-6 of the TFEU) in the field of energy.  It is indeed a fact that, since the conclusion of the ECT, the EU has adopted extensive legislation in energy matters, regulating its internal energy market.  It has also been conferred specific legislative competences.[32]  However, those competences are not exclusive of Member States' competences, but shared with them (Arts. 4(2)(a), (i) TFEU).  What that means is

---

[31]    TEU, art. 5(2), Dkt. No. 11-11, **Hindelang Exhibit 8**.

[32]    *See* TFEU, art. 194, Dkt. No. 11-12, **Hindelang Exhibit 9**.

that the EU is able to claim an exclusive treaty-making competence in the field of energy only where an international agreement affects EU legislation in such a way as to trigger Article 3(2) TFEU.[33]  It is clear that a range of aspects of international energy policy do not come within the EU's exclusive treaty-making competence, and that the ECT, if it was concluded today, would again, in all likelihood, be concluded as a mixed agreement.  Moreover, the ECJ recently established that provisions in an international agreement on investor-State dispute settlement which have the effect of excluding the jurisdiction of the ordinary courts of the Member States, in favour of international arbitration, are not within EU competence.[34]  It made that finding in its Opinion on the EU-Singapore Free Trade Agreement.  The dispute settlement provisions of that agreement in the sphere of investment protection are, in this respect, equivalent to those of the ECT.  This means that the dispute settlement provisions of the ECT continue to be a matter of mixed competence.

25.     When the EU and its Member States conclude a mixed agreement, there are, in theory, a number of options open to them.  They could identify, in the agreement itself, the parts or provisions which are concluded by, respectively, the EU, and by the Member States.  That option is rarely used, if at all.  They could also indicate the scope of their respective competences in some other way, for example by means of a "declaration of competences".  That is an option

---

[33]     Art. 3(2) of the TFEU provides that "[t]he Union shall also have exclusive competence for the conclusion of an international agreement when its conclusion is provided for in a legislative act of the Union or is necessary to enable the Union to exercise its internal competence, or in so far as its conclusion may affect common rules or alter their scope."  TFEU, Dkt. No. 11-12, **Hindelang Exhibit 9**.  In Case C-66/13 *Green Network SpA* EU:C:2014:2399, **Exhibit 16**, the ECJ established exclusive EU competence on the basis of EU Directive 2001/77, as regards the purchase of green electricity certificates.

[34]     Opinion 2/15 *re EU-Singapore FTA* EU:C:2017:376 ¶ 292, **Exhibit 17**.

which the EU and the Member States regularly employ.[35]  They have done so, for example, when concluding the UN Convention on the Law of the Sea ("**UNCLOS**").  It is also open to the EU and the Member States to negotiate a mixed agreement which operates in an essentially bilateral way.  This is the case for most of the free-trade agreements which the EU concludes.  Such agreements usually provide that they apply, on the one hand, in the territory of the third country (say Canada), and on the other, in the territory of the EU and its Member States.[36]  The EU could also negotiate a "disconnection clause," which would assert the non-applicability of certain provisions to treaty disputes exclusively between EU Member States.  Such a disconnection clause may be used where the EU considers there to be potentially overlapping obligations between an EU Member State's treaty obligations and its EU obligations, and therefore a "disconnection clause" is needed to express (and ensure) the primacy of EU law.

26.     None of those options were used in the case of the ECT.  Giving meaning to the ordinary meaning of the terms used, in their context and in the light of a treaty's object and purpose, is the first customary international law rule of treaty interpretation.[37]  A simple reading of the terms of the ECT, in their ordinary meaning, confirms that all of the Contracting Parties are bound by all of the ECT's provisions, and have entered into obligations towards all other Contracting Parties.  In other words, nothing suggests that the ECT does not apply in an intra-EU context.

---

[35]   *See* M. Cremona, "Disconnection Clauses in EU Law and Practice", in C Hillion and P Koutrakos (eds), *Mixed Agreements Revisited* (Oxford and Portland, Oregon: Hart Publishing, 2010) at 160–186, **Exhibit 18**.

[36]   *See e.g.*, CETA, art. 1.3, **Exhibit 19**; *see* Council Decision (EU) 2017/37 of 28 October 2016 on the signing on behalf of the European Union of the Comprehensive Economic and Trade Agreement (CETA) between Canada, *of the one part*, and the European Union and its Member States, *of the other part* (EU OJ 2017 L 11 at 1, italics added), **Exhibit 20**.

[37]   *See* Art. 31(1) of the Vienna Convention on the Law of Treaties, which is regarded as codifying the relevant customary international law rules, **Exhibit 32**.

27.     There is nothing extraordinary about this.  The EU and its Member States are parties to a range of mixed agreements which regulate, not only the relations between the EU and third countries, but also between EU Member States.  UNCLOS is again an example.  Many of its provisions (for example on territorial waters, exclusive economic zones, rights of passage, etc.) apply in an intra-EU context.  This is implicitly confirmed by the *Mox Plant* case.[38]  In that case, Ireland started UNCLOS proceedings against the United Kingdom for breach of a number of environmental provisions in UNCLOS.  The Commission then brought a successful action against Ireland in the ECJ, on the basis that Ireland had sought to include violations of EU environmental legislation in the UNCLOS dispute.  That constituted a breach of the autonomy of EU law, and of Article 344 TFEU, which provides for the ECJ's exclusive jurisdiction over disputes between Member States on EU law matters.  However, at no point did the Court suggest that Ireland could not have brought an UNCLOS dispute against the UK on UNCLOS provisions which are entirely within Member State competence — for example a dispute on territorial waters.  The Court's reasoning was carefully confined to UNCLOS provisions which are within EU competence and to Ireland's reliance on relevant EU legislation.

28.     As regards specifically the ECT, there is no inherent conflict between the application of EU law, particularly internal market law, in the relations between EU Member States, and the application of the ECT.  The objectives of the ECT are broadly aligned with the basic policy principles that guide EU economic regulation.[39]  The ECT provisions on investment protection are complementary to EU internal market law, in the sense that they provide an investor

---

[38]   *See* Case C-459/03 *Commission v Ireland (Mox Plant)*, EU:C:2006:345, Dkt. No. 11-27, **Hindelang Exhibit 24**.

[39]   *See e.g. Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015, **Exhibit 21**.

with additional protection.  Between the Member States, the right of establishment, the freedom to provide services and the free movement of capital offer significant guarantees against discriminatory treatment and unwarranted regulatory restrictions.  Those basic freedoms also underpin sector-specific legislation.  EU competition and State Aid policy ensure that distortions of competition caused by anti-competitive behaviour or government subsidies are combatted.  But none of this means that there is no room left for the ECT provisions, particularly those on investor protection.  The additional protection of those provisions is complemented by strong remedies, particularly as regards financial compensation.  Those remedies are arguably stronger than those for which EU law provides: It is only where a Member State has committed a "sufficiently serious" breach of EU law that an investor from another Member State is entitled to compensation ("**Member State liability**").[40]  It is not at all clear on what basis the Plaintiffs in this case  would have been able to obtain compensation in the Spanish courts pursuant to the EU law principles governing Member State liability.

29.     Spain insists that the applicable legal framework for resolving the dispute between Spain and the Plaintiffs is EU law.[41]  That is true, to the extent that any parts of that relationship come within the scope of EU law, or are expressly governed by EU law.  However, Spain's domestic laws also continue to apply to investors such as the Plaintiffs, and it is clear that the ECT proceedings were concerned with such domestic law issues – not with EU law.

30.     As a matter of policy, it is of course open to the EU to aim at the exclusive application of EU law in an intra-EU investment context.  The EU can ask the Member States not

---

[40]     *See e.g.*, Joined Case C-6/90 and C-9/90 *Francovich and Bonifaci* EU:C:1991:428, Dkt. No. 11-47, **Hindelang Exhibit 44**.

[41]     *See* Spain's Motion to Dismiss at 4-5.

to conclude *inter se* agreements, and to terminate their existing BITs; it could also ensure that multilateral agreements on investment protection do not apply within the European Union, even when they are mixed.  A simple disconnection clause — *i.e.* a clause confirming that the agreement does not create rights and obligations in the relations between the Member States — would achieve that objective.  But the ECT does not contain such a clause.  The glaring absence of a disconnection clause is striking and undermines the claim that the ECT cannot apply in an intra-EU context.[42]

## IV.    THE *ACHMEA* JUDGMENT AND THE ECT

31.    In this Section, I address whether the *Achmea* Judgment precludes intra-EU arbitration under the ECT.  In my opinion, it does not.  First, the *Achmea* Judgment does not address the ECT.  Second, even if the *Achmea* Judgment were to prohibit intra-EU arbitration under the ECT, that would not affect the consent to arbitration provided by EU Member States in Article 26 of the ECT under international law.  It is international law which governs the jurisdiction of a tribunal established under the ECT.  Therefore, any arbitration agreement formed between an EU Member State and an EU investor under the ECT would still be valid.

32.    My analysis is divided as follows: *First*, I address the scope of the *Achmea* Judgment's findings; *second*, I discuss Opinion 1/17 on CETA, which has clarified the position of investor-State arbitration in EU law; *third*, in light of the findings of both that ruling and the *Achmea* Judgment, I explain my view that intra-EU arbitration under Article 26 of the ECT remains possible under EU law; *fourth*, I explain why, even if EU law were to preclude intra-EU arbitration,

---

[42]    As another ICSID tribunal observed in *RREEF Infrastructure (G.P.) Ltd. et al. v. Kingdom of Spain*,

> If one or more parties to a treaty wish to exclude the application of that treaty in certain respect or circumstances, they must either make a reservation (excluded in the present case by Article 46 of the ECT) or include an unequivocal disconnection clause in the treaty itself. The attempt to construe an implicit clause into Article 26 of the ECT is untenable.

ICSID Case No. ARB/13/30, Decision on Jurisdiction, June 6, 2016 ¶¶ 84-85, **Exhibit 22**.

the consent to arbitration provided by EU Member States in Article 26 would remain valid (which is because international law — not EU law — is the applicable law).

A.    SCOPE OF THE ECJ'S FINDINGS IN THE *ACHMEA* JUDGMENT

33.    The *Achmea* Judgment is one of the latest ECJ rulings in a series in which the ECJ has imposed significant restrictions on the extent to which (a) the Member States can participate in, and (b) the EU can conclude, an agreement setting up systems of international dispute settlement which concern the interpretation or application of EU law.[43] Those restrictions are aimed at safeguarding what the Court describes as the "autonomy of EU law": An autonomy both from the laws of the Member States and from international law.  This autonomy includes the protection of the essential characteristics of EU law and of the essential powers of the EU institutions.  As far as the ECJ itself is concerned, it has highlighted its own role of ensuring the observance of EU law.[44]  The preliminary rulings system is aimed at guaranteeing such observance, particularly in the laws of the Member States.  Pursuant to Article 267 TFEU any court or tribunal of a Member State may refer questions of interpretation or validity of EU law to the ECJ, and courts or tribunals against whose decisions there is no judicial remedy under national law (*i.e.*, supreme and highest courts) are obliged to refer questions of EU law.  It is further worth noting that the principles of the direct effect and primacy of EU law oblige national courts and tribunals to give domestic effect to EU law.  Next to the preliminary-rulings procedure, Article 344 TFEU instructs the Member States "not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein".

---

[43]    *See* in particular Opinion 1/91 *re the EEA Agreement* EU:C:1991:490, Dkt. No. 11-21, **Hindelang Exhibit 18**; Opinion 1/00 *re the ECAA Agreement* EU:C:2002:231, Dkt. No. 11-22, **Hindelang Exhibit 19**; Opinion 1/09 *re Unified Patent Convention* EU:C:2011:123, Dkt. No. 11-23, **Hindelang Exhibit 20**; and Opinion 2/13 *re Accession to the ECHR* EU:C:2014:2454, Dkt. No. 11-24, **Hindelang Exhibit 21**.

[44]    *See* TEU, art. 19(1), Dkt. No. 11-3, **Hindelang Exhibit 3.**

34.    In *Achmea* the ECJ further expanded its case law on the autonomy of EU law.  It is important to highlight that the case concerned a BIT between the Netherlands and Slovakia, concluded before Slovakia's accession to the EU; and that Article 8(6) of this BIT provides that the arbitral tribunal "shall decide on the basis of the law", taking into account *inter alia* "the law in force of the Contracting Party concerned" and "any other relevant agreements between the Contracting Parties".

35.    In the *Achmea* Judgment, the ECJ first reiterated a number of general principles and past judicial statements about the autonomy of EU law and the principle of mutual trust.  It then applied those principles to the BIT in issue, and divided its analysis in three parts.

36.    First, and crucially, the ECJ examined whether an arbitral tribunal set up pursuant to Article 8 of the BIT was liable to rule on the interpretation or application of EU law.[45]  It found that EU law is both "the law in force of the Contracting Party" (as EU law is an integral part of the domestic laws of the Member States) and constitutes an agreement between the Parties. It followed that "on that twofold basis the arbitral tribunal . . . may be called on to interpret or indeed to apply EU law, particularly the provisions concerning the fundamental freedoms, including freedom of establishment and free movement of capital".[46]  This sentence is particularly significant, in light of the  differences between the definition of the applicable law in the BIT at issue and that definition in the ECT.  I discuss that difference further below.  Moreover, the insertion of the adverb "indeed" is noteworthy, as it shows that the ECJ was particularly concerned about a non-EU tribunal *applying* EU law to the relations between two Member States, and outside the EU

---

[45]    *Achmea* Judgment ¶¶ 39–42, Dkt. No. 11-7, **Hindelang Exhibit 4.**

[46]    *Id.* ¶ 42.

judicial system.  The ECT of course does *not* call for the application of EU law; nor does the Award in issue in this case address EU law in any way.

37.    In the second part of its reasoning, the ECJ established that the BIT arbitral tribunal is not situated within the EU judicial system: It is not a court or tribunal of the Member States, and is thus not capable of making a reference to the ECJ pursuant to Article 267 of the TFEU.[47]

38.    In the third part the ECJ examined to what extent an arbitral award giving effect to the BIT was "subject to review by a court of a Member State, ensuring that the questions of EU law which the tribunal may have to address can be submitted to the Court by means of a reference for a preliminary ruling".[48]  The ECJ established that this was not the case, in light of the limits which German law imposed on such review in the case at hand.  The ECJ concluded by finding that the dispute settlement system of this BIT could not guarantee the full effectiveness of EU law. But the ECJ did not stop there.  It added two further paragraphs, which are crucial for the present case.

39.    First, the ECJ recalled the principle that "an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the [ECJ], is not in principle incompatible with EU law".[49] The EU's external competence "necessarily entail[s] the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the EU and its legal order is respected".[50]

---

[47]    *Id.* ¶¶ 43-49.

[48]    *Id.* ¶ 50.

[49]    *Id*. ¶ 57.

[50]    *Id.*

40.     Second, and this finding is worth quoting in full:[51]

> In the present case, however, apart from the fact that the disputes falling within the jurisdiction of the arbitral tribunal referred to in Article 8 of the BIT may relate to the interpretation both of that agreement and of EU law, the possibility of submitting those disputes to a body which is not part of the judicial system of the EU *is provided for by an agreement which was concluded not by the EU but by Member States*.  Article 8 of the BIT is such as to call into question not only the principle of mutual trust between the Member States but also the preservation of the particular nature of the law established by the Treaties, ensured by the preliminary ruling procedure provided for in Article 267 TFEU, and is not therefore compatible with the principle of sincere cooperation. . . .

41.     In other words, the ECJ made a clear distinction between intra-EU BITs such as the one in issue in *Achmea*, and a system of dispute settlement set up in a mixed agreement that the EU itself has concluded.  That distinction means that the Court sought to confine its ruling to intra-EU BITs between Member States, and did not rule on an agreement like the ECT.  It cannot sensibly be argued that, having made that distinction, the ECJ intended for its ruling to apply to agreements between the EU and third countries, as opposed to agreements with exclusively intra-EU application:  Indeed, the ECJ's own Advocate General had pointed out in his Opinion in *Achmea* that the ECT applies in an intra-EU context.[52]  The Court was therefore clearly aware of

---

[51]     *Id.* ¶ 58 (emphasis added).

[52]     Opinion Advocate General Wathelet in Case C-284/16 *Slowakische Republik v Achmea* EU:C:2017:699 ¶ 43, **Exhibit 23**.  I further note that Spain and Professor Hindelang place undue weight on Advocate General Henrik Saugmandsgaard Øe's obiter dictum in *Federazione nazionale delle imprese elettrotecniche ed elettroniche (Anie), etc v. Ministero dello Sviluppo Economico, etc.* to assert that "the Energy Charter [Treaty] is entirely inapplicable to [intra-EU] disputes."  *See Federazione nazionale delle imprese elettrotecniche ed elettroniche (Anie) and Others (C-798/18), Athesia Energy Srl and Others, (C-799/18) v. Ministero dello Sviluppo Economico, Gestore dei servizi energetici (GSE) SpA, interveners: Elettricità Futura – Unione delle Imprese Elettriche italiane, Confederazione Generale dell'Agricoltura Italiana – Confagricoltura*, CJEU Joined Cases No. C-798/18 and C-799/18, ECLI:EU:C:2020:876, Opinion of Advocate General (at the ECJ) Henrik Saugmandsgaard Øe, 29 October 2020, ¶ 93, footnote 55, Dkt. No. 11-72, **Hindelang Exhibit 69**; *see also* Hindelang Decl. ¶¶ 22-23, 59; Spain's Motion to Dismiss at 8-9, 16-17.  First, an Advocate General's opinion is not binding and does not reflect the position of the ECJ unless the ECJ expressly adopts such opinion in its decision in a particular matter.  This *obiter dictum* can bear even less of the weight Spain seeks to place upon it because the *Federazione* dispute is an **intra-Italy** dispute not governed by the ECT, as Advocate General Saugsmansgaard Øe acknowledged in the same *dicta*.  *Id.*  The Italian Court asked the ECJ to clarify whether a particular domestic law was compatible with

the existence and potential intra-EU application of the ECT and had the opportunity to address it. It nevertheless distinguished Member State BITs from agreements concluded by the EU, making clear that agreements concluded by the EU were not intended to be covered by its ruling.  It is therefore in my opinion wholly incorrect to state, as do Spain and Professor Hindelang, that "*Achmea*'s reasoning applies to any 'international agreement concluded between Member States'", including the ECT.[53]  It is further remarkable to see that neither Spain nor Professor Hindelang explains the express distinction which the ECJ made in *Achmea*.

42.     The distinction is in my view explained, not just as an exercise in judicial economy or a desire to confine the ruling to the facts of *Achmea*, but by the ECJ's emphasis on the principle of mutual trust.  Where the Member States set up a system of dispute settlement that sits outside the EU Treaties and is nevertheless capable of interpreting and *indeed applying* EU law, they undermine the principle of mutual trust between them.  They undermine the principle that they must trust their respective domestic courts and tribunals to guarantee the full effectiveness of EU law.  By contrast, where the EU itself is a contracting party to an agreement, it takes a conscious decision to participate in, and to be bound by a new dispute settlement system.  That is not to say that this system cannot be contrary to the autonomy of EU law.  However, it does mean that the ruling in *Achmea* cannot be extended to the ECT, in the absence of a further ECJ ruling which is focused on the particular characteristics of that agreement.  There are moreover other, highly

---

EU law, but did not seek any guidance concerning the enforceability of Article 26 of the ECT.  Accordingly, Advocate General Saugsmansgaard Øe's obiter dictum concerning Article 26 of the ECT was wholly unnecessary. The Advocate General did not offer any reasons for this obiter dictum, and, with respect, misconstrued the findings in *Achmea* as he applied them to the ECT.  He considered that ECT art. 26 would "not [be] applicable to intra-Community disputes".  However, in *Achmea* the ECJ did not decide that intra-EU arbitration was "not applicable"; it found that EU law precluded such arbitration.  Its judgment was confined to EU law, whereas the Advocate General's statement suggests that EU law governs the interpretation and effect of the ECT under international law.

[53]     Spain's Motion to Dismiss at 16; Hindelang Decl. ¶ 69 ("The CJEU's reasoning in Achmea fully applies to the ECT and the situation in Cube v. Spain.").

relevant differences between the *Achmea*-type BIT and the ECT, including, for example, the law applicable to disputes under those treaties.  I address those differences below.

43.     It is also important to note that in *Achmea* the ECJ did not declare the Netherlands-Slovakia BIT invalid under international law.  What it established was that "Articles 267 and 344 must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement . . ."[54]  As analysed above, the ECJ's jurisdiction is limited to EU law, and the ECJ fully recognises this in the formulation of its final ruling.  The ECJ is incapable of making findings under international law as to the validity of an international agreement between two Member States.

## B.     OPINION 1/17 ON CETA AND THE ECT

44.     The above analysis of the distinction in *Achmea* between a BIT between Member States to which the EU is not a party, and an investment agreement concluded by the EU, is wholly confirmed and strengthened by the recent ECJ ruling in Opinion 1/17, on CETA.[55]  That Opinion (pursuant to Article 218(11) TFEU) was requested by Belgium, which raised a number of concerns about the compatibility of CETA's investment protection provisions, and the dispute settlement system which CETA sets up, with EU law.  One of those concerns related to the *Achmea* issue: The extent to which a CETA Tribunal could be called upon to interpret or apply EU law.

45.     Article 8.31 CETA defines the applicable law.  Article 8.31.1 provides that CETA must be applied, "as interpreted in accordance with the Vienna Convention on the Law of Treaties, and other rules and principles of international law applicable between the Parties".  Article 8.31.2 clarifies:

---

[54]   *Achmea* Judgment ¶ 62, Dkt. No. 11-7, **Hindelang Exhibit 4**.

[55]   *See supra* note 16.

> The Tribunal shall not have jurisdiction to determine the legality of a measure, alleged to constitute a breach of this Agreement, under the domestic law of a Party. For greater certainty, in determining the consistency of a measure with this Agreement, the Tribunal may consider, as appropriate, the domestic law of a Party as a matter of fact. In doing so, the Tribunal shall follow the prevailing interpretation given to the domestic law by the courts or authorities of that Party and any meaning given to domestic law by the Tribunal shall not be binding upon the courts or authorities of that Party.

46.    Belgium argued that these provisions were inadequate for safeguarding the autonomy of EU law.[56] It submitted that a CETA Tribunal would still, when ruling on whether an EU measure is compatible with CETA, "be compelled to interpret the effect of that measure", and would not necessarily be able to rely on a previous ECJ interpretation. Further, a CETA Tribunal would be empowered "to engage in the assessment of issues of substantive law that involve . . . EU primary law". Belgium further pointed out that a CETA Tribunal could not seek a preliminary ruling from the ECJ.

47.    The ECJ did not accept Belgium's objections. Its reasoning shows the limits of its ruling in *Achmea*, in the sense that the ruling does not extend to agreements which the EU itself concludes, with third countries, provided that the tribunals set up by those agreements do not have the power to interpret and apply EU law. As further analysed below, the ECT is in this respect similar to CETA.

48.    In Opinion 1/17 the ECJ first reiterates the relevant principles, revolving around the concept of the autonomy of EU law. It then accepts that the CETA dispute settlement mechanism

---

[56]    Opinion 1/17 *re CETA* EU:C:2019:341 ¶ 48, Dkt. No. 11-26, **Hindelang Exhibit 23**.

"stands outside the EU judicial system".[57]   However, that "does not mean, in itself, that that mechanism adversely affects the autonomy of the EU legal order".[58]

49.      The ECJ starts its analysis of why that is so by pointing out that the jurisdiction of the EU courts and tribunals (the ECJ itself and Member State courts, as referred to in Article 19 TEU) to interpret and apply an agreement concluded by the EU "does not take precedence over either the jurisdiction of the non-Member States with which those agreements were concluded or that of the international courts and tribunals that are established by such agreements".[59]   Even if such agreements may be the subject of preliminary references, "they concern no less those non-Member States and may therefore also be interpreted by the courts and tribunals of those States".[60] The ECJ then adds that it is "precisely because of the reciprocal nature of international agreements and the need to maintain the powers of the Union in international relations that it is open to the Union . . . to enter into an agreement that confers on an international court or tribunal the jurisdiction to interpret that agreement without that court or tribunal being subject to the interpretations of that agreement given by the courts or tribunal of the Parties".[61]   EU law therefore does not preclude the setting up of CETA Tribunals (and indeed the CETA Appellate Tribunal). But on the other hand, "since those Tribunals stand outside the EU judicial system, they cannot have the power to interpret or apply provisions of EU law other than those of CETA or to make awards that might have the effect of preventing the EU institutions from operating in accordance

---

[57]   *Id.* ¶ 113.

[58]   *Id.* ¶ 115.

[59]   *Id.* ¶ 116.

[60]   *Id.* ¶ 117.

[61]   *Id.*

with the EU constitutional framework".[62]   These findings further articulate the ECJ's fundamental acceptance of EU participation in international agreements providing for binding dispute settlement.

50.   In a subsequent section of the Opinion the ECJ establishes that the CETA Tribunals do not have jurisdiction to interpret and apply rules of EU law other than the provisions of CETA itself.[63]

51.   It first points out that a CETA Tribunal does not have jurisdiction to determine the legality of a measure under the domestic law of a Party.[64]   In that respect CETA must be distinguished from the draft agreement that was in issue in Opinion 1/09, which included directly applicable Community law (now EU law) in the applicable law.   It must also be distinguished from the investment agreement at issue in *Achmea*: "that agreement established a tribunal that would be called upon to give rulings on disputes that might concern the interpretation or application of EU law".[65]   And the ECJ also recalled that *Achmea* concerned an agreement between Member States, and this must be distinguished from agreements concluded "between the Union and a non-Member State".[66]   The principle of mutual trust applies between the Member States, and it implies that Member States accept that all the other Member States comply with EU law, including the right to

---

[62]   *Id.* ¶ 118.

[63]   *Id.* ¶¶ 120–136.

[64]   *See* CETA, art. 8.31.2, **Exhibit 19**.

[65]   Opinion 1/17 *re CETA* EU:C:2019:341 ¶ 126, Dkt. No. 11-26, **Hindelang Exhibit 23**.

[66]   *Id.* ¶ 127.

an effective remedy before an independent tribunal. That principle of mutual trust is not, however, "applicable in relations between the Union and a non-Member State".[67]

52.     The ECJ then accepts the limitations which CETA places on the extent to which a CETA Tribunal may take the domestic law of the Parties (and therefore EU law) into account.[68] The relevant section is worth quoting in full:[69]

> Those provisions serve no other purpose than to reflect the fact that the CETA Tribunal, when it is called upon to examine the compliance with the CETA of the measure that is challenged by an investor and that has been adopted by the investment host State or by the Union, will inevitably have to undertake, on the basis of the information and arguments presented to it by that investor and by that State or by the Union, an examination of the effect of that measure.
>
> That examination may, on occasion, require that the domestic law of the respondent Party be taken into account. However, as is stated unequivocally in Article 8.31.2 of the CETA, that examination cannot be classified as equivalent to an interpretation, by the CETA Tribunal, of that domestic law, but consists, on the contrary, of that domestic law being taken into account as a matter of fact, while that Tribunal is, in that regard, obliged to follow the prevailing interpretation given to that domestic law by the courts or authorities of that Party, and those courts and those authorities are not, it may be added, bound by the meaning given to their domestic law by that Tribunal.

53.     The ECJ further finds that, as the jurisdiction of the CETA Tribunals and Appellate Tribunal is limited to the interpretation of CETA, no provision needs to be made for preliminary references to the ECJ.[70]  It also finds that it is consistent with EU law for CETA not to allow for

---

[67]   *Id.* ¶ 129.

[68]   *See* CETA, art. 8.31.2, **Exhibit 19**; *see supra* ¶ 44.

[69]   Opinion 1/17 *re CETA* EU:C:2019:341 ¶ 131, Dkt. No. 11-26, **Hindelang Exhibit 23**.

[70]   *Id.* ¶ 134.

any re-examination of awards by domestic courts (including the ECJ), and not to allow the investor to bring parallel or subsequent proceedings before such courts.[71]

54.     The ECJ subsequently analyses other objections against CETA, discarding all of them, but those parts of the Opinion are less relevant to the issues that arise in the present proceedings.

55.     The ECT is analogous to CETA in the following respects.

56.     First, the ECT is, like CETA, an agreement between the EU and one or more third countries.  The ECT and CETA are both mixed agreements, with the EU and the Member States as contracting parties.  There is a difference as well here, because CETA is an essentially bilateral agreement, "between Canada, of the one part, and the European Union and its Member States, of the other part".[72]  I have been conscious of that in drawing conclusions from the ECJ's Opinion. Opinion 1/17 cannot be read as being confined to an agreement such as the one with Canada, which does not have intra-EU application.  What the ECJ did was to distinguish between *Achmea*, which "concerned . . . an agreement between Member States" and "an agreement between the EU and a non-Member State".[73]  The ECT is in the latter category.

57.     Second, the ECT defines the applicable law in an analogous way.  Article 26(6) ECT makes no reference whatsoever to the domestic laws of the Parties, nor to other treaties or agreements applicable between the Parties.  Its formulation is more succinct than the CETA provisions, but the underlying principle is clearly the same: The jurisdiction of an ECT tribunal is limited to interpreting and applying the ECT. That follows from the phrase: "shall decide the issues

---

[71]   *Id.* ¶ 135.

[72]   Council Decision (EU) 2017/37 of 28 October 2016, **Exhibit 20**.

[73]   Opinion 1/17 *re CETA* EU:C:2019:341 ¶ 127, Dkt. No. 11-26, **Hindelang Exhibit 23**.

in dispute in accordance with this Treaty and applicable rules and principles of international law". The "issues in dispute" are, according to Article 26(1), investment disputes "concerning an alleged breach of an obligation . . . under Part III" of the ECT.  EU law says nothing on the interpretation of the obligations under Part III of the ECT.  The only rules and principles of international law "applicable" to determining a dispute under the ECT are general principles and customary rules of international law, such as the customary international law rules on treaty interpretation.  EU law also cannot have been intended to form part of the "applicable rules and principles of international law", because it is not binding on the non-EU Contracting Parties to the ECT.

58.     These analogies are crucial for the present proceedings.  It is in my opinion most likely that, if the ECJ were ever asked whether the ECT provisions on investment arbitration are compatible with EU law, its answer would be affirmative because of those analogies.  While I explore this in the following subsection, I first address two points raised by Professor Hindelang in his declaration concerning the ECJ's opinion on the compatibility of the CETA Agreement with EU law.  First, Professor Hindelang is incorrect that "[t]he fact that CETA was a multilateral rather than a bilateral treaty and that the EU was a party to the said agreement was of no consequence for the Court's analysis."[74] Rather, as I explained above, the ECJ highlighted that CETA was distinct from the BIT at issue in *Achmea* in part because it "concerned . . . an agreement between Member States" and "an agreement between the EU and a non-Member State".[75]

59.     Second, Prof. Hindelang focuses on the ECJ's finding that CETA's dispute-mechanism had key safeguards including the fact that it had "no jurisdiction to interpret EU law

---

[74]     Hindelang Decl. ¶ 57.

[75]     Opinion 1/17 *re CETA* EU:C:2019:341 ¶ 127, Dkt. No. 11-26, **Hindelang Exhibit 23**.

and was limited to interpreting and applying only the provisions of CETA itself."[76]  But the ECT contains the same safeguards.  A tribunal constituted under the ECT merely has jurisdiction to interpret and apply the provisions of the ECT itself.[77]

### C.    ARTICLE 26 OF THE ECT IS VALID AS A MATTER OF EU LAW

60.    The ECJ judgment in *Achmea* establishes that arbitration provisions in BITs between Member States "such as" Article 8 of the Netherlands-Slovakia BIT are contrary to EU law.  The judgment applies *erga omnes*, and courts and tribunals in the EU Member States need to give effect to this finding in any cases involving such BITs.  However, as discussed above, the ECJ clearly distinguished these kinds of BITs, which do not have the EU itself as a contracting party, from agreements which do.  The clear and express distinction that the ECJ made in *Achmea* is confirmed by Opinion 1/17, in which it accepted the lawfulness of the CETA dispute settlement system.  CETA is a mixed agreement, like the ECT.

61.    To this date, the ECJ has not been asked to rule on the validity of the act by which the EU concluded the ECT.[78]  Acts of the EU institutions can be annulled or declared invalid only

---

[76] *Id.*

[77] *See supra* ¶ 56.

[78] What the ECJ has now been asked, by Belgium, is whether the envisaged modernisation of the ECT should preclude intra-EU arbitration.  *See* **Exhibit 33**, "Belgium requests an opinion on the intra-European application of the arbitration provisions of the future modernised Energy Charter Treaty", Press release, Dec. 3, 2020, *available at* https://diplomatie.belgium.be/en/newsroom/news/2020/belgium_requests_opinion_intra_european_application_arbitration_provisions.  The request was made pursuant to TFEU, art. 218(11).  *See supra* ¶ 14.  If the ECJ were to rule, in that Opinion, that intra-EU arbitration under the ECT is incompatible with EU law, the EU and the Member States would need to renegotiate the ECT in such a way as to exclude such intra-EU arbitration.  If such renegotiation were to fail, the EU would need to withdraw from the ECT.  However, the ECJ's Opinion would not, of itself, invalidate the act through which the EU concluded the ECT, and cannot affect the validity of the ECT under international law.

by the EU General Court and by the ECJ.[79]  Annulment actions need to be brought within a two-month period after the adoption of the pertinent act or law,[80] and that period has obviously expired in the case of the Council Decision concluding the ECT.[81]  However, any court or tribunal of a Member State may at any time ask the ECJ whether a particular act is invalid, and the ECJ could therefore still be requested to rule on the validity of the ECT under the EU Treaties.  But it is vital to add that in the *Foto-Frost* judgment the ECJ established that it has sole authority to declare an EU act invalid; Member State courts cannot make such a declaration.[82]  There is therefore a presumption of validity afforded to acts of the EU in any proceedings before courts in the EU Member States, and it is only once the ECJ has declared the relevant EU act invalid (in this case the act through which the EU Council concluded the ECT) that Member State courts may proceed on the basis that there is an incompatibility between the agreement in issue (here the ECT) and EU law.  It is in my opinion most remarkable that, in the present proceedings, this Court in a non-EU Member State is effectively asked to do what a court in a Member State could never do, on its own:  To rule on the invalidity of the ECT under EU law.  Spain argues that "[u]nder EU law, the Court of Justice has the authority to determine the scope of the Member States' ability to enter into arbitration agreements".[83]  In footnote 5 Spain compares this to the restrictions to the States' treaty-making powers under the U.S. Constitution.  This comparison is completely inapposite.  If Spain's

---

[79]   The General Court (the "**GC**") has jurisdiction over certain types of direct actions for annulment; its judgments can be appealed to the ECJ. Together the GC and the ECJ form the Court of Justice of the European Union ("**CJEU**") (although there is variable use of this terminology: the abbreviation CJEU is often used for the ECJ).

[80]   *See* TFEU, art. 263, Dkt. No. 11-12, **Hindelang Exhibit 9**.

[81]   *See* Council and Commission Decision on the conclusion, by the European Communities, of the Energy Charter Treaty and the Energy Charter Protocol on energy efficiency and related environmental aspects EU [1998] OJ L 69, at 1, **Exhibit 24**.

[82]   Case 314/85 *Foto-Frost* EU:C:1987:452, **Exhibit 25**.

[83]   Spain's Motion to Dismiss at 18.

statement is implying that an EU Member State must seek the ECJ's authorization, before entering into an agreement to arbitrate, that statement is wholly incorrect.  The ECJ's jurisdiction is confined to ruling, when asked, whether any international agreements concluded by the EU, or by an EU Member State, are compatible with EU law.

62.     The above means that there is no extant judicial authority whatsoever, in EU law, in support of the proposition that the ECT investment arbitration provisions are invalid in so far as intra-EU investments are concerned, or that such provisions are precluded.

63.     How the ECJ would rule on the validity of the ECT's provisions on investment arbitration, in so far as they apply between Member States, is a matter of conjecture.  In my opinion, the Court would be most unlikely to issue a ruling of invalidity, for the following reasons.

64.     First, the ECT defines the applicable law in essentially the same way as does CETA. ECT investment disputes do not extend to any violations of EU law, because the ECT does not include agreements between the parties, or the parties' domestic law, in the applicable law.[84]  An ECT tribunal must therefore treat EU law in the same way as a CETA Tribunal: As a factual matter. This is confirmed by the reference, in Article 26(6) ECT, to "the issues in dispute", which constitutes a cross-reference to Article 26(1), which is limited to "breach of an obligation under Part III", *i.e.*, the ECT provisions on Investment Promotion and Protection.[85]  As explained above, EU law is not relevant to the determination of whether there has been a violation of Part III of the ECT.  If that were the case, *any* international treaty or agreement that is binding on EU Member

---

[84]   I leave to one side the question whether, even if this finding were wrong, any use of "agreements between the parties" would need to be construed as the parties to the ECT rather than the parties to the dispute.  In the former case, the EU Treaties would of course not constitute applicable law either, as they do not bind the ECT Contracting Parties that are not EU Member States.

[85]   *See* the reasoning of the tribunal in *Vattenfall AB v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the Achmea Issue (Aug. 31, 2018) ¶ 116, **Exhibit 26**.

States involved in arbitration under the ECT would be part of the "*applicable rules and principles of international law*", including *e.g.*, the WTO Agreement, the European Convention on Human Rights, the UN Charter *etc*.  That is clearly not what Art. 26(6) ECT purports to establish, as it would constitute a very wide definition of the applicable law, and one that makes no sense whatsoever from the perspective of the jurisdiction of ECT tribunals, which is concerned with breach of an obligation under Part III of the ECT.

65.    Tribunals have indeed looked at EU law in cases where their very jurisdiction was challenged.[86]  It cannot be the case, however, that a challenge to a tribunal's jurisdiction as being contrary to EU law is sufficient to conclude that any decisions by such a tribunal violate EU law, because they interpret or apply it.  That would mean that, in any investment cases involving the EU or any of its Member States, it would be sufficient for these parties to challenge the tribunal's jurisdiction as being contrary to EU law for such a violation becoming the necessary outcome.  Such jurisdictional circularity or tautology can never be a good-faith interpretation of the relevant international law provisions.

66.    Moreover, and in line with the analysis above, there is in my opinion no inherent or necessary incompatibility between the ECT provisions, on the one hand, and EU internal market and EU energy law, on the other.  Both sets of provisions aim at free and open markets, and at undistorted competition.  Spain and Professor Hindelang are unable to point to any actual conflicts. Spain suggests that the investment benefits which Plaintiffs received in Spain, prior to the challenged Spanish measures which curtailed those benefits, constituted unlawful State Aid.[87] However, the EC never issued a State Aid decision on the 2007 Spanish regime.  It is only in its

---

[86]    *See* the Decision and the Award in issue in this case.

[87]    Spain's Motion to Dismiss at 9 -11, 22-23.

State Aid decision on the 2014 regime that the EC included some observations, not on the 2007 regime, but on arbitral awards that may be rendered under the ECT as a result of the modification of that regime.[88]  For the reasons set out below,[89] those observations are wholly inadequate, and do not constitute a proper EC State Aid decision.

67.    Nor is there an inherent or necessary incompatibility between the remedies available under the ECT and those that EU law offers.  As mentioned above, EU investors may claim damages for a Member State's sufficiently serious breach of EU law, including the TFEU provisions on the right of establishment or the free movement of capital.  An ECT Tribunal may of course also award compensation.

68.    There is also no incompatibility between the ECT and EU State Aid law, as Spain and the EC suggest.[90]  The thesis that an international arbitral award that compensates an investor for not having received fair and equitable treatment may constitute a State Aid has been firmly rejected by the EU General Court, in a judgment which articulates the requirements which need to be satisfied in order for an arbitral award to constitute State Aid.[91]  Specifically, the General Court confirmed an older ECJ judgment, *Asteris and Others*.  In that judgment the ECJ stated that "State Aid, that is to say measures of the public authorities favouring certain undertakings or certain products, is fundamentally different in its legal nature from damages that the competent national authorities may be ordered to pay to individuals in compensation for the damage they have caused

---

[88]    EC, State Aid SA.40348 (2015/NN) – Spain – Support for electricity generation from renewable energy sources, cogeneration and waste, C(2017)7384 final, Dkt. No. 11-61, **Hindelang Exhibit 58**.

[89]    *See infra* § VI.

[90]    *See* Spain's Motion to Dismiss at 15.

[91]    Case T-624/15 *European Food and Others v Commission* EU:T:2019:423, ¶ 104-106, Dkt. No. 11-63, **Hindelang Exhibit 60**.

to those individuals".[92]  The General Court built on this finding, by establishing that "compensation for damage suffered cannot be regarded as aid unless it has the effect of compensating for the withdrawal of unlawful or incompatible aid".  There is no suggestion in this case that Spain withdrew unlawful or incompatible aid.

69.    Nor is it easy to see in what way the non-applicability of the ECT in an intra-EU context would make sense from the perspective of avoiding any conflicts between the ECT's investment protection provisions and EU law. The ECT would continue to bind the EU and its Member States in relation to claims by investors from non-EU Contracting Parties.  Those claims could be identical to any intra-EU claims.  The nationality of an investor plays no role here. Moreover, an investor from an EU Member State, such as a company which has invested in another Member State, may well be owned or controlled by a national from a non-EU ECT Contracting Party.  To illustrate this further, if the Plaintiff were owned or controlled by such a non-EU national from an ECT Contracting Party, any claims by the latter investor would presumably not come within the intra-EU non-application — even if, in substance, the claim would be identical to the one which led to the present Award.

**D.    UNDER INTERNATIONAL LAW, ARTICLE 26 ECT IS VALID REGARDLESS OF WHETHER IT COMPLIES WITH EU LAW**

70.    Even if there were a conflict between the EU Treaties and the ECT (which, as I have explained above, there is not), that would not affect the validity of an EU Member State's offer to arbitrate under Article 26(3) of the ECT.  First, as I have explained, the *Achmea* ruling cannot change the fact that the ECT is still in force.

---

[92]    Joined Cases 106 to 120/87 *Asteris v Greece* EU:C:1988:457 ¶ 23, **Exhibit 27**.

71.     Second, EU law cannot affect the application of the offer to arbitrate extended by the Contracting Parties to the ECT in Article 26(3) of that treaty.  EU law is simply not applicable to that offer.  As explained above, the applicable law provision in the ECT (Article 26(6)) does not address EU law.  Even if it did, however, it is relevant only to the determination of the "issues in dispute" which, as I have also noted, constitutes a cross-reference to Article 26(1), and, as such, is limited to "breach of an obligation under Part III", *i.e.*, the ECT provision on Investment Promotion and Protection. Article 26(3) is in Part V of the ECT, on the Settlement of Disputes between an Investors and a Contracting Party.  Article 26(6) therefore has no relevance to it. [93]

72.     Third, in the event of any conflict between the ECT and EU law (deriving from the EU Treaties), the ECT would prevail.

73.     Customary international law rules govern the resolution of conflicts between treaties. These are enshrined in Article 30 of the VCLT. The general rule is: (i) that the provisions of the later treaty prevail (the *lex posterior* principle), [94] unless (ii) the treaties themselves indicate which one should take precedence. [95] In the case of the ECT and EU Treaties it is difficult to see how this rule could favour the EU Treaties. The ECT contains an express conflict rule in Article 16(2), which states that where two or more Contracting Parties have entered into another treaty, whose terms "*concern the subject matter of Part III or V of this Treaty*", the terms of Part III and Part V prevail, provided they are "*more favourable to the Investor or Investment.*" As explained above, I disagree that the EU Treaties (or EU law) conflict with Part III or Part V of the ECT (i.e. that there is subject matter coincidence).  If Spain were correct as to its interpretation of the *Achmea*

---

[93]   In the absence of any relevant choice of law clause, any questions regarding the interpretation of Article 26 would be considered applying international law principles of treaty interpretation.

[94]   VCLT, arts. 30(3), 30(4)(a), **Exhibit 32**.

[95]   *Id.*, art. 30(2).

Judgment, and there was such a conflict, EU law is clearly not more favourable to the investor, as it removes the opportunity for intra-EU arbitration.

74.     Spain argues that "by joining the EU, each Member State agreed that EU law takes precedence and overrides any conflicting domestic law, rule or governmental action" and that "[t]his principle of primacy is fundamental to the legal order within the European Union."[96] However, there is no rule that EU law prevails, or has primacy, over treaties concluded between EU Member States.  Even if there were, it would not take precedence over Article 16 of the ECT. Both Spain[97] and Professor Hindelang[98] argue that EU law prevails, or has primacy, over treaties concluded between EU Member States.  There is, however, no authority for that proposition.

75.     *First*, the ECJ has never used the term "primacy" for any such conflicts.  As described above, the ECJ's jurisdiction is limited to matters of EU law.  All parties in these proceedings agree that the EU Treaties form part of international law, even if according to the ECJ they set up an autonomous legal order.  The ECJ is the ultimate interpreter of those Treaties, and needs to ensure that they are properly enforced.  But the ECT does not give the ECJ jurisdiction to rule on any conflicts between its provisions and the EU Treaties, under international law, as opposed to EU law.  The ECJ is, for the purpose of interpreting and applying the ECT, simply not an international court.  It has the function of a supreme domestic court, no more.  It is, for purposes of the ECT, the highest court of one of the Contracting Parties, not the court tasked with enforcing the treaty between the Contracting Parties.

---

[96]   Spain's Motion to Dismiss at 4.

[97]   *Id*. 4.

[98]   Hindelang Decl. ¶ 44.

76.     The ECJ has never, to the best of my knowledge, made any statements to the opposite effect – in relation to the ECT, or to any other agreement to which the EU is a party, or to any agreements between EU Member States. It has in fact confirmed the limits on its own jurisdiction, in the seminal *Kadi* case, on the relationship between the UN Charter and EU law. That case (which, as I mentioned above, I was involved in) concerned a UN Security Council Resolution, imposing sanctions on Mr. Kadi *post* 9/11, for purposes of counterterrorism.  The ECJ established that Mr. Kadi's fundamental rights under EU law had been violated by the EU's attempt to implement the sanctions.  Crucially, however, it stated that "any judgment given by the Community judicature deciding that a Community measure intended to give effect to such a [UN] resolution is contrary to a higher rule of law in the Community legal order would not entail any challenge to the primacy of that resolution in international law".[99]  Instead, the ECJ characterizes any conflicts between a Member State's international commitments and EU law as a breach of EU law, thereby imposing on the relevant Member State an obligation to remove that breach,[100] for example by renegotiating the agreement or denouncing it.

77.     *Second*, that the "principle of the primacy of EU law" (which does exist as a principle under EU law) is exclusively concerned with the relationship between EU law and the *domestic* laws of the Member States is clear from the block citation from *Simmenthal II* provided in Professor Hindelang's opinion.[101]

---

[99]   *Kadi* ¶ 288, Dkt. No. 11-15, **Hindelang Exhibit 12**.

[100]   *See supra* ¶¶ 13-16.

[101]   Hindelang Declaration ¶ 40, referring to *Simmenthal II*.

78.     Neither Professor Hindelang nor Spain points to any international law authorities for their proposition that the primacy of EU law is a conflict rule applicable to resolve conflicts between treaties to which EU Member States are parties.[105]

79.     Indeed, the authorities cited by Professor Hindelang fully recognize that the EU is bound by international law.   Article 216(2) TFEU provides that international agreements are binding on the EU institutions and on the Member States.   Article 218(11) recognizes that, in case of a conflict between an envisaged international agreement and the EU Treaties, either the agreement must not be concluded, or the Treaties must be amended.   That provision would be unnecessary if EU law had primacy over an incompatible agreement.   Article 351 TFEU recognizes that Member State agreements predating their accession take priority over incompatible EU law.[102]   The *Germany v Council* judgment established an incompatibility between a WTO protocol on trade in bananas and EU law; but the protocol was renegotiated in recognition of the fact that the incompatibility had to be removed, and that EU law could not simply prevail on the international plane.[103]

### E.     THE *ACHMEA* JUDGMENT DID NOT HAVE A DIRECT LEGAL EFFECT ON THE PARTIES' AGREEMENT TO ARBITRATE

80.     I understand that no court has held that the arbitration agreements at issue in this case are void, or that they may not be performed, and without such a holding, the agreements to arbitrate remain valid.   While the ECJ has jurisdiction to rule on an issue of EU law placed before it, it does not have the power to "invalidate" a contract.   This is because preliminary rulings by the

---

[102]   It may be noted that the EU Treaties do not contain any provisions regulating the relationship between Member State agreements postdating their accession.   That however does not mean that the EU Treaties have primacy over such agreements.

[103]   Case C-122/95 *Germany v Council* EU:C:1998:94, **Exhibit 6.**

ECJ differ from rulings by American federal appellate courts in that they are not decisive of the outcome of the disputes before the ECJ.  Instead, the ECJ rules on a question of EU law put before it and leaves it to the national court that referred the question of EU law to: (a) determine whether the case at hand actually meets the criteria laid down by the CJEU and (b) establish the relevant facts in the case before applying the ECJ decision to those facts and issuing a judgment that binds and determines the rights of the parties.

### F. CONCLUSION: THE *ACHMEA* JUDGMENT HAS NO EFFECT ON THE VALIDITY OF THE PARTIES' ARBITRATION AGREEMENT

81.     For the reasons explained above, I do not consider that the *Achmea* Judgment has any bearing on intra-EU arbitration under the ECT.  As such, it has no effect on the validity of the arbitration agreement concluded between the Plaintiffs and Spain, and therefore on the enforcement of the Award which is the subject of these proceedings.

82.     To my knowledge, 28 ECT arbitral tribunals to date have addressed the "intra-EU" objection and examined in detail whether Article 26 of the ECT excludes arbitration between investors of an EU Member State and another EU Member State.  Each of these tribunals, with no exception, has rejected the position taken by Spain and Professor Hindelang in this case.

83.     Further, the *Achmea* Judgment cannot be applied to retroactively invalidate the parties' agreement to arbitrate this dispute.  So, even assuming *arguendo*, that the *Achmea* Judgment could be applied in the context of the ECT (which it cannot), it would not be capable of retroactively voiding Spain's consent to arbitrate the present dispute.  *Achmea* was not decided until March 2018 – nearly three years after the parties' agreement crystalized on April 16, 2015 with the Plaintiffs filing their request for arbitration under the ECT.[104]

---

[104]     *See* Request for Arbitration, Dkt. No. 1-5.

## V.   THE EC'S COMMUNICATION AND THE FIRST DECLARATION HAVE NO EFFECT ON THE ECT'S INTERPRETATION

84.     In this section, I address the effect, if any, that the following two communications

have on the interpretation to be given to the ECT:

- the EC's Communication issued to the European Parliament and European Council on 19 July 2018 on intra-EU investment.[105]  In that communication, the EC expressed its opinion that the reasoning of the ECJ in the *Achmea* Judgment applied to the dispute resolution clause of the ECT;[106] and

- the First Declaration, which was signed on 15 January 2019 by twenty-two EU Member States concerning the consequences of the *Achmea* Judgment.[107]  The First Declaration expressed the view that, in light of the *Achmea* Judgment, were the ECT to contain an investor-State arbitration clause applicable between Member States, it "*would have to be disapplied*",[108]  The twenty-two EU Member States agreed to inform tribunals in all pending intra-EU investment arbitration proceedings under the ECT of that position.[109]  In addition, they agreed to "*discuss without undue delay whether any additional steps are necessary to draw consequences from the Achmea judgment in relation to the intra- EU application of the Energy Charter Treaty*".[110]

85.     For the reasons explained above, I consider the views expressed in the EC's

Communication and the First Declaration to go far beyond the ECJ's findings in the *Achmea*

Judgment.[111]  I have seen that Spain claims that those views must be given effect.[112]  I understand

Spain's argument to be that, in light of the EC's Communication and the First Declaration, intra-

---

[105]   Communication from the Commission to the European Parliament and the Council: Protection of intra- EU investment, COM(2018)547 final, 19 July 2018, Dkt. No. 11-55, **Hindelang Exhibit 52**.

[106]   *Id.* at 4.

[107]   Declaration of the Representatives of the Governments of the Member States on the Enforcement of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union (15 January, 2019), Dkt. No. 11-9, **Hindelang Exhibit 6**.

[108]   *Id.* at 2.

[109]   *Id.* at 3 ¶ 1.

[110]   *Id.* at 4 ¶ 9.

[111]   This was also the finding of the tribunal in *Eskosol*.

[112]   Spain's Motion to Dismiss at 19.

EU arbitration under the ECT should be interpreted as being precluded. I disagree with that proposition. In my opinion, the EC's Communication and the First Declaration have no such effect.

86. The views of State signatories to a treaty on the interpretation of that treaty may be taken into account in the interpretation of a treaty.[113] However, they need to be agreed by all the parties to that treaty.[114]

87. Neither the EC's Communication nor the First Declaration represent interpretative declarations on the ECT agreed by all parties to the ECT. The EC's Communication is nothing more than a position paper, presenting the EC's opinion on the *Achmea* Judgment to other organs of the EU. It does not even represent the view of one Contracting Party to the ECT,[115] let alone all the Contracting Parties.

88. The First Declaration is of the same nature as the EC's Communication. It presents the views of a group of EU Member States on the *Achmea* Judgment. It has not been agreed by all EU Member States,[116] let alone all parties to the ECT. Accordingly, neither the EC's Communication nor the First Declaration is relevant in interpreting the ECT.[117]

---

[113] Pursuant to customary international law rules of treaty interpretation, as enshrined in VCLT, Articles 31(2) and 31(3)(a). It remains, however, only a factor to be considered in the treaty's interpretation. See, Report of the International Law Commission (ILC) A/66/10/Add.1, addressing the ICL's 2001 Guide to Practice on Reservations to Treaties, at 560, **Exhibit 28**.

[114] VCLT, arts. 31(2), 31(3)(a), **Exhibit 32**. *See also* ILC 2001 Guide to Practice on Reservations to Treaties ¶ 4.7.3 ("An interpretative declaration that has been approved by all the contracting States and contracting organizations may constitute an agreement regarding the interpretation of the treaty."), **Exhibit 28**.

[115] The EU is a party to the ECT, the EC (which is merely an organ of the EU) is not.

[116] Indeed, I am aware that six other EU Member States have issued declarations on the *Achmea* Judgment in which they have either declined to comment on its significance for the ECT, or rejected any significance entirely. *See* Dkt. **Nos. 11-48, 11-49, Hindelang Exhibits 45, 46** (declarations of Sweden, Luxembourg, Finland, Malta, Slovenia, and Hungary).

[117] As regards the First Declaration, the same view was expressed by the tribunal in *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Termination Request and Intra-EU Objection ¶¶ 219–

## VI.   PAYMENT OF THE AWARD WOULD NOT VIOLATE EU LAW

89.    Spain claims that the Award in issue before this Court constitutes unlawful State Aid,[118] and that as such Spain is prohibited by EU law from paying it without authorisation from the EC.  Professor Hindelang supports that claim.[119]  I disagree.  In order to constitute unauthorized State Aid, the Award must first constitute State Aid which requires authorization.  There is no authority confirming that that is the case, nor could there be because the Award does not meet the definition of a State Aid under EU law.

90.    Spain and Professor Hindelang refer to the Commission's State Aid decision concerning the 2014 support scheme for electricity generation from renewable energy sources, cogeneration and waste in Spain (hereafter the Decision).[120]  That Decision cannot, however, be construed as authority for their position.  The part cited is not binding under EU law and contains no reasoning for the position advanced.  Furthermore, applying principles established in a recent judgment of the EU General Court, one can only find that the Award does not constitute State Aid requiring notification to the Commission.

91.    The Decision, as its name indicates, concerned the 2014 support scheme for electricity generation from renewable energy sources, cogeneration and waste in Spain.  In it, the Commission found the 2014 scheme to be aid that is compatible with the internal market pursuant

---

221, **Exhibit 29**.  As the tribunal did in that case, I also question whether the First Declaration could properly be construed as presenting an interpretation of the ECT in any event.  I do not need to consider that issue, however, since the fact that the First Declaration is not agreed by all members of the ECT is sufficient to conclude that it has no bearing on the ECT's interpretation.  The *Eskosol* tribunal was not required to address the EC's Communication.

[118]  Spain's Motion to Dismiss at 10-11, 22-23.

[119]  Hindelang Decl. ¶¶ 70-78.

[120]  Spain's Motion to Dismiss at 10-11; Hindelang Decl. ¶ 73, referring to European Commission Decision 2017/7384, State Aid Case SA.40348 – Spain: Support for electricity generation from renewable energy sources, cogeneration and waste, Nov. 10, 2017, C(2017) 7384 final, Dkt. No. 11-61, **Hindelang Exhibit 58**.

to Article 107(3)(c).[121]   However, it also opined about any awards which arbitral tribunals could potentially issue in relation to the 2007 scheme (*not* the 2014 scheme which was the object of the Decision), under either the ECT or under intra-EU BITs (*e.g.*, in cases such as *Plaintiffs*).  At the time of the Decision no awards had been made yet.  Nevertheless, the Commission concluded that "any compensation which an Arbitration Tribunal were to grant to an investor on the basis that Spain has modified the premium economic scheme [*i.e.*, the 2007 scheme] would constitute in and of itself State Aid" and "would be notifiable . . . pursuant to Article 108(3) TFEU."[122]   That is the part of the Decision relied on by Spain  and Professor Hindelang.

92.   Spain suggests that this statement in the Decision is binding.[123]   That is wrong as a matter of EU law.  The Decision is binding insofar as it relates to the 2014 scheme.  The comments made regarding arbitral awards are not, since they do not comply with EU State Aid rules.

93.   Articles 107 to 109 TFEU contain the basic provisions governing EU State Aid policy.  Article 107(1) declares that "[s]ave as otherwise provided in the Treaties, any aid granted by a Member State or through State resources in any form whatsoever which distorts competition by favouring certain undertakings or the production of certain goods shall, in so far as it affects trade between Member States, be incompatible with the internal market".  Article 107(2) and (3) define certain types of aid which, respectively, "shall be compatible with the internal market" and "may be considered to be compatible with the internal market".  Article 108 lays down the essence of the powers of the Commission as regards State Aids. Article 108(3) provides that the Commission must be informed by Member States "of any plans to grant

---

[121]   Art. 107(3)(c) covers "aid to facilitate the development of certain economic activities or of certain economic areas, where such aid does not adversely affect trading conditions to an extent contrary to the common interest".

[122]   Decision ¶ 165.

[123]   Spain's Motion to Dismiss at 10.

or alter aid". If the Commission "considers that any such plan is not compatible with the internal market . . . it shall without delay initiate the procedure provided for in paragraph 2".  The latter provides that "[i]f, after giving notice to the parties concerned to submit their comments, the Commission finds that aid granted by a State or through State resources is not compatible with the internal market . . . it shall decide that the State concerned shall abolish or alter such aid within a period of time to be determined by the Commission".  Further detail on this review procedure can be found in EU Regulation 2015/1589.[124]

94.    It is clear that, insofar as it addressed arbitral awards under the ECT, the Decision was not adopted in accordance with Article 108 TFEU and Regulation 2015/1589.   There was, at the time of the Decision, no "aid granted" (Article 108(2) TFEU) by virtue of an arbitral award.  The Commission has no authority to issue State Aid decisions in purely hypothetical cases.

95.    The Decision is, in any case, wrong that the Award constitutes State Aid requiring authorization. Notably, the Decision did not provide any analysis of the issue.[125]   Professor Hindelang has sought to justify it by reference to the Commission decision on another arbitration award in the case of *Micula v Romania*.[126]   The circumstances underlying that decision, however, would make it inapposite in these proceedings.  It is not necessary to go into detail on that, however, since in any case, the decision has been recently annulled by the EU General Court, in a

---

[124]   Council Regulation (EU) 2015/1589 of 13 July 2015, laying down detailed rules for the application of Article 108 of the Treaty on the Functioning of the European Union [2015] EU OJ L 248, at 9, **Exhibit 30**.

[125]   Decision ¶ 165.

[126]   Hindelang Decl. ¶¶ 77-78 referring to EC Decision 2015/1470.

judgment which articulates the requirements which need to be satisfied in order for an arbitral award to constitute State Aid.[127]

96.     Specifically, the GC confirmed an older ECJ judgment, *Asteris and Others*.[128]  The GC built on this judgment, by establishing that "compensation for damage suffered cannot be regarded as aid unless it has the effect of compensating for the withdrawal of unlawful or incompatible aid."  The GC noted that, in its impugned decision, the Commission had indicated its awareness of that principle.  However, the GC held that it had been applied incorrectly, because there was no authority for the fact that the measure in respect of which compensation  was allegedly granted in fact constituted State Aid (indeed, it could not have done, because the measure was in place before the relevant State entered the EU, *i.e.*, before that State became subject to EU State Aid law).[129]

97.     This judgment, therefore, establishes two principles.  First, it is only where an arbitral award compensates for unlawful or incompatible State Aid that it comes within EU State Aid law.  Second, the Commission cannot simply assume that the State measures, the cancellation of which are compensated through an award, constitute State Aid.  It needs to show this.  Both these principles need to be complied with, and that is not the case in so far as this Award is concerned.  First, the award does not offer compensation directly equivalent to the benefits that the Plaintiffs' subsidiaries would have received under the 2007 regime (*i.e.*, it does not compensate for State Aid).  It provides for compensation to the Plaintiffs reflecting the losses they have

---

[127]   European Commission Decision 2015/1470, State Aid Case SA.38517 – Arbitral Award, Micula v. Romania of 11 December 2013, Mar. 30, 2015, 2015 O.J. (L 232) 43, Dkt. No. 11-62, **Hindelang Exhibit 59**.

[128]   Joined Cases 106 to 120/87 Asteris v Greece EU:C:1988:457 ¶ 23, **Exhibit 27**.

[129]   *European Food and Others* ¶¶ 104–106, Dkt. No. 11-63, **Hindelang Exhibit 60**.

suffered as a result of Spain's breach of its obligations under Article 10(1) of the ECT.[130]  Secondly,

even if the Award did compensate for withdrawn State Aid, there has never been any ruling that

the 2007 regime constituted unlawful or incompatible State Aid (indeed, the 2007 regime has never

been reviewed under EU State Aid law at all).[131]  Accordingly, there is no basis for concluding that

the Award is notifiable State Aid.[132]

## VII.    THE AWARD IS IMMEDIATELY ENFORCEABLE

98.    If, notwithstanding the position above, the Award were to constitute unauthorized

State Aid, I do not follow at all Spain's position that this would mean the tribunal rendered an

"*ultra vires* Award."[133]  First, I do not agree with Spain's argument that the Tribunal's jurisdiction

was restricted by EU law, for the reasons explained above.  Second, even if it were, and the

Tribunal had acted "*ultra vires*," that would not render the Award void.  It may mean the Award

could be subject to an application for annulment under Article 52(1)(b) of the Convention on the

Settlement of Investment Disputes between States and Nationals of Other States (the "ICSID

Convention") (on the basis that the Tribunal had manifestly exceeded its powers).  Whether or not

that application was valid would, however, be for the determination of an ICSID *ad hoc* committee

constituted under Article 52 of the ICSID Convention.  Unless and until such a determination is

---

[130]    Award ¶ 48.

[131]    This Court is, in effect, being asked, in a case on the enforcement of an ICSID Award, to be the first judicial or other authority to rule on whether either the Award or the 2007 regime constitutes unlawful State Aid.

[132]    In addition, the *travaux préparatoires* of the ECT also makes clear that Contracting Parties to the ECT cannot invoke provisions of their internal law as justification for failing to perform a treaty.  European Energy Charter Conference Secretariat, Note from the Secretariat, 42/94, CONF 115 (Jan. 6, 1995), Annex 1 ("Note of Chairman"), **Exhibit 31** (recalling the EEC's request to include an explanatory note that no ECT "party may not invoke the provisions of its internal law as justification for its failure to perform").

[133]    Spain's Motion to Dismiss at 23.

made by an ICSID *ad hoc* committee, the Award remains binding on the parties under ICSID Article 53(1).

99.     I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on January 18, 2021 in Ghent, Belgium.

Piet Eeckhout

**Index of Exhibits for Expert Opinion of Professor Piet Eeckhout**

| Ex. | Description |
|---|---|
| 1. | CV of Professor Piet Eeckhout |
| 2. | Case C-621/18 *Andy Wightman and Others v Secretary of State for Exiting the European Union* EU:C:2018:999 |
| 3. | Case C-344/04 *The Queen ex parte IATA v Department for Transport* EU:C:2006:10 |
| 4. | Case C-308/06 *Intertanko* EU:C:2008:312 |
| 5. | Case 181/73 *Haegeman* EU:C:1974:41 |
| 6. | Case C-122/95 *Germany v Council* EU:C:1998:94 |
| 7. | Case C-327/91 *France v Commission* EU:C:1994:305 |
| 8. | Opinion 1/75 *re Understanding on a Local Cost Standard* EU:C:1975:145 |
| 9. | Case C-648/15 *Austria v Germany* EU:C:2017:664 |
| 10. | Case C-205/06 *Commission v Austria* EU:C:2009:118 |
| 11. | Case C-249/06 *Commission v Sweden* EU:C:2009:119 |
| 12. | Case C-118/07 *Commission v Finland* EU:C:2009:715 |
| 13. | Opinion of Mischo AG in Case C-62/98 *Commission v Portugal* EU:C:1999:509 |
| 14. | P. Eeckhout, EU External Relations Law (2nd ed, Oxford University Press 2011) |
| 15. | Opinion of Warner AG in Case 34/79 Henn and Darby EU:C:1979:246 |
| 16. | Case C-66/13 *Green Network SpA* EU:C:2014:2399 |
| 17. | Opinion 2/15 *re EU-Singapore FTA* EU:C:2017:376 |
| 18. | M Cremona, "Disconnection Clauses in EU Law and Practice", in C Hillion and P Koutrakos (eds), *Mixed Agreements Revisited* (Oxford and Portland, Oregon: Hart Publishing, 2010) |
| 19. | Comprehensive Economic and Trade Agreement ("**CETA**") |

| Ex. | Description |
|---|---|
| 20. | Council Decision (EU) 2017/38 of 28 October 2016 on the signing on behalf of the European Union of the Comprehensive Economic and Trade Agreement (CETA) between Canada, *of the one part*, and the European Union and its Member States, *of the other part* (EU OJ 2017 L 11 at 1, italics added) |
| 21. | *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015 |
| 22. | ICSID Case No. ARB/13/30, Decision on Jurisdiction, June 6, 2016 |
| 23. | Opinion Advocate General Wathelet in Case C-284/16 *Slowakische Republik v Achmea* EU:C:2017:699 |
| 24. | Council and Commission Decision on the conclusion, by the European Communities, of the Energy Charter Treaty and the Energy Charter Protocol on energy efficiency and related environmental aspects EU [1998] OJ L 69 |
| 25. | Case 314/85 *Foto-Frost* EU:C:1987:452 |
| 26. | *Vattenfall AB v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the Achmea Issue (Aug. 31, 2018) |
| 27. | Joined Cases 106 to 120/87 *Asteris v Greece* EU:C:1988:457 |
| 28. | Report of the International Law Commission (ILC) A/66/10/Add.1, addressing the ICL's 2001 Guide to Practice on Reservations to Treaties |
| 29. | *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Termination Request and Intra-EU Objection |
| 30. | Council Regulation (EU) 2015/1589 of 13 July 2015, laying down detailed rules for the application of Article 108 of the Treaty on the Functioning of the European Union [2015] EU OJ L 248 |
| 31. | European Energy Charter Conference Secretariat, Note from the Secretariat, 42/94, CONF 115 (Jan. 6, 1995), Annex 1 ("**Note of Chairman**") |
| 32. | Vienna Convention on the Law of Treaties art. 32, *opened for signature* May 23, 1969, 1155 U.N.T.S. 331. ("**VCLT**") |
| 33. | "Belgium requests an opinion on the intra-European application of the arbitration provisions of the future modernised Energy Charter Treaty", Press release, Dec. 3, 2020, *available at* https://diplomatie.belgium.be/en/newsroom/news/2020/belgium_requests_opinion_intra_european_application_arbitration_provisions |