**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CUBE INFRASTRUCTURE FUND SICAV, CUBE INFRASTRUCTURE MANAGERS S.A., CUBE ENERGY S.C.A. (NOW CUBE ENERGY S.À.R.L.), DEMETER PARTNERS S.A., and DEMETER 2 FPCI, <br><br> *Plaintiffs*, <br><br> v. <br><br> KINGDOM OF SPAIN, <br><br> *Defendant*. | Civil Action No. 1:20-cv-01708-EGS-MAU <br><br> **Hon. Emmet G. Sullivan** <br><br><br> **Oral Argument Requested** |

**THE KINGDOM OF SPAIN'S OBJECTIONS TO THE**
**<u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>**

Jonathan M. Landy (D.C. Bar No. 467847)
Benjamin W. Graham (D.C. Bar No. 1044724)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, DC  20024
Tel.:    (202) 434-5000
Fax:    (202) 434-5029
Email:   jlandy@wc.com

Csaba M. Rusznak (D.C. Bar No. 1030310)
SOVEREIGN ARBITRATION ADVISORS LLC
1050 Connecticut Avenue, N.W., Ste. 66255
Washington, DC  20035
crusznak@sovereignarbitration.us

*Counsel for the Kingdom of Spain*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

TABLE OF EXHIBITS ..................................................................................................... v

INTRODUCTION ........................................................................................................... 1

LEGAL STANDARD....................................................................................................... 2

BACKGROUND ............................................................................................................ 3

    A.    The Parties ......................................................................................... 4

    B.    The Applicable Legal Framework ........................................................ 4

        1.    The legal order of the European Union...................................... 4

        2.    The impermissibility of international arbitration by Member States
            concerning matters of EU law................................................... 6

        3.    The European Commission's State-aid decision regarding Spain........... 10

ARGUMENT ............................................................................................................... 12

I.    THE COURT LACKS SUBJECT-MATTER JURISDICTION. ..................................... 12

    A.    The Report's Analysis Is Incorrect. ...................................................... 13

        1.    The Report Misconstrues the Law on Arbitrability. ................................. 13

        2.    The Report Misstates the Role of the EU Court of Justice in
            Determining EU Law. ................................................................. 16

        3.    The Report Misunderstands the Relationship Between the Energy
            Charter Treaty and the European Treaties. ................................. 17

    B.    The "Arbitration Exception" in Section 1605(a)(6) Does Not Apply. ................. 18

II.    THE AWARD IS NOT ENTITLED TO FULL FAITH AND CREDIT. ........................ 21

III.    THE COMPLAINT SHOULD BE DISMISSED UNDER THE FOREIGN
    SOVEREIGN COMPULSION DOCTRINE..................................................... 22

IV.    IN THE ALTERNATIVE, THE CASE SHOULD BE DISMISSED UNDER THE
    DOCTRINE OF *FORUM NON CONVENIENS*................................................. 24

V.    THE REPORT ERRS IN CONCLUDING THAT THE COURT SHOULD
    ENTER SUMMARY JUDGMENT. ............................................................... 25

CONCLUSION............................................................................................................. 26

## TABLE OF AUTHORITIES

Cases

*9REN Holding S.A.R.L. v. Kingdom of Spain*,
  2023 WL 2016933 (D.D.C. Feb. 15, 2023) ............................................................2, 15, 16, 26

*Air France v. Saks*,
  470 U.S. 392 (1985)......................................................................................................20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................................3

*Balkan Energy Ltd. v. Ghana*,
  302 F. Supp. 3d 144 (D.D.C. 2018) .............................................................................13

*BCB Holdings Ltd. v. Belize*,
  650 F. App'x 17 (D.C. Cir. 2016).................................................................................24

*Blasket Renewable Invs., LLC v. Kingdom of Spain*,
  2023 WL 2682013 (D.D.C. Mar. 29, 2023)........................................................ *passim*

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
  137 S. Ct. 1312 (2017)...................................................................................................26

*Chevron Corp. v. Ecuador*,
  795 F .3d 200 (D.C. Cir. 2015).....................................................................................15

*Dist. No. 1 v. Liberty Mar. Corp.*,
  815 F.3d 834 (D.C. Cir. 2016)................................................................................13, 14

*F.T.C. v. Compagnie de Saint-Gobain-Pont-à-Mousson*,
  636 F.2d 1300 (D.C. Cir. 1980).....................................................................................22

*Givens v. Bowser*,
  2022 WL 4598576 (D.D.C. Sept. 30, 2022) ...................................................................2

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
  561 U.S. 287 (2010).......................................................................................................21

*Hulley Enterprises Ltd. v. Russian Fed'n*,
  211 F. Supp. 3d 269 (D.D.C. 2016) ..............................................................................26

*In re Sealed Case*,
  825 F.2d 494 (D.C. Cir. 1987).......................................................................................23

*Koch Mins. Sarl v. Bolivarian Republic of Venezuela*,
  2021 WL 3662938 (D.D.C. Aug. 18, 2021) ..................................................................25

*Lamps Plus, Inc. v. Varela,*
    139 S. Ct. 1407 (2019) ................................................................................................21, 22

*LLC SPC Stileks v. Republic of Moldova,*
    985 F.3d 871 (D.C. Cir. 2021) ..............................................................................................15

*Mar. Int'l Nominees Estab. v. Republic of Guinea,*
    693 F.2d 1094 (D.C. Cir. 1982) ...........................................................................................21

*Matsushita Elec. Indus. Co. v. Epstein,*
    516 U.S. 367 (1996) ..............................................................................................................21

*Medellin v. Texas,*
    552 U.S. 491 (2008) ..............................................................................................................20

*Micula v. Gov't of Romania,*
    104 F. Supp. 3d 42 (D.D.C. 2015) .......................................................................................12

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela,*
    863 F.3d 96 (2d Cir. 2017) ..............................................................................................12, 26

*Nat'l R.R. Passenger Corp. v. B&M Corp.,*
    850 F.2d 756 (D.C. Cir. 1988) .............................................................................................14

*Nemariam v. Fed. Democratic Republic of Ethiopia,*
    491 F.3d 470 (D.C. Cir. 2007) .............................................................................................12

*Newco Ltd. v. Belize,*
    650 F. App'x 14 (D.C. Cir. 2016) ........................................................................................24

*NextEra Energy Global Holdings B.V. v. Kingdom of Spain,*
    2023 WL 2016932 (D.D.C. Feb. 15, 2023) ......................................................2, 15, 16, 26

*Permanent Mission of India to the U.N. v. City of New York,*
    551 U.S. 193 (2007) ..............................................................................................................12

*Pitney Bowes, Inc. v. U.S. Postal Serv.,*
    27 F. Supp. 2d 15 (D.D.C. 1998) ...........................................................................................3

*Rent-A-Ctr., W., Inc. v. Jackson,*
    561 U.S. 63 (2010) ................................................................................................................14

*Republic of Austria v. Altmann,*
    541 U.S. 677 (2004) ..............................................................................................................24

*Richards v. Duke Univ.,*
    480 F. Supp. 2d 222 (D.D.C. 2007) .......................................................................................3

*Rong v. Liaoning Provincial Gov't*,
  362 F. Supp. 2d 83 (D.D.C. 2005) ........................................................................3

*S.E.C. v. Banner Fund Int'l*,
  211 F.3d 602 (D.C. Cir. 2000) ...........................................................................17

*Saint-Gobain Performance Plastics Eur. v. Bolivarian Republic of Venezuela*,
  2021 WL 326079 (D.D.C. Feb. 1, 2021) ..........................................................25

*Saudi Arabia v. Nelson*,
  507 U.S. 349 (1993) ...........................................................................................12

*Smith-Haynie v. District of Columbia*,
  155 F.3d 575 (D.C. Cir. 1998) .............................................................................3

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
  559 U.S. 662 (2010) .....................................................................................21, 22

*TECO Guatemala Holdings, LLC v. Republic of Guatemala*,
  414 F. Supp. 3d 94 (D.D.C. 2019) .....................................................................25

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*,
  411 F.3d 296 (D.C. Cir. 2005) .....................................................................24, 25

*Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n*,
  455 U.S. 691 (1982) ...........................................................................................21

*Vanover v. Hantman*,
  77 F. Supp. 2d 91 (D.D.C. 1999), *aff'd*, 38 F. App'x 4 (D.C. Cir. 2002) ...............3

*W.S. Kirkpatrick & Co. v. Envt'l Tectonics Corp., Int'l*,
  493 U.S. 400 (1990) ...........................................................................................24

Statutes and Rules

22 U.S.C. § 1650a ...................................................................................1, 12, 21

Federal Rule of Civil Procedure 12(b)(1) ...........................................................2

Federal Rule of Civil Procedure 12(b)(6) .......................................................2, 3

Federal Rule of Civil Procedure 72(b)(2) ...........................................................2

Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.* ........... *passim*

# TABLE OF EXHIBITS

*Achmea B.V. v. Slovak Republic*,
    EU Court of Justice, Case No. C-284/16, ECLI:EU:C:2018:158 (2018) .................... **Ex. A**

*Republic of Moldova v. Komstroy LLC*,
    EU Court of Justice, Case No. C-741/19, ECLI:EU:C:2021:164 (2021) ................... **Ex. B**

*Opinion 2/13 of the Court* ("*In re ECHR*"),
    EU Court of Justice, ECLI:EU:C:2014:2454 (2014).................................................. **Ex. C**

*Budějovický Budvar v. Rudolf Ammersin GmbH*,
    EU Court of Justice, Case No. C-478/07, ECLI:EU:C:2009:52 (2009) ..................... **Ex. D**

*Puligienica Facility Esco SpA (PFE) v. Airgest SpA*,
    EU Court of Justice, Case No. C-689/13, ECLI:EU:C:2016:199 (2016) ................... **Ex. E**

*Slovak Republic v. Achmea B.V.*,
    German Federal Court of Justice, Case No. I ZB 2/15 (2018) ................................... **Ex. F**

*Republic of Poland v. CEC Praha et al.*,
    Paris Court of Appeal, Case No. 20/14581 (2022) ................................................... **Ex. G**

*Communication from the Commission to the European Parliament and the Council:*
    *Protection of intra-EU investment*, COM (2018) 547 (July 19, 2018)....................... **Ex. H**

*Declaration of the Representatives of the Governments of the Member States on the Legal*
    *Consequences of the Judgment of the Court of Justice in Achmea and on Investment*
    *Protection in the European Union* (Jan. 15, 2019)..................................................... **Ex. I**

European Commission Decision 2017/7384, State Aid SA.40348 (2015/NN) – Spain,
    Support for electricity generation from renewable energy sources ............................ **Ex. J**

## INTRODUCTION

The Kingdom of Spain objects to the Magistrate Judge's Report and Recommendation, ECF No. 63, (the "Report") and requests *de novo* review of its arguments in favor of dismissal.

*First*, the Court lacks jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"). The Kingdom of Spain is presumptively immune from the jurisdiction of U.S. courts, and none of the exceptions to the FSIA applies because there was no agreement to arbitrate. The Report reached the opposite conclusion, but the analysis misapprehends the applicable legal framework, the role of the EU Court of Justice, and the nature of the EU Member States' treaty obligations. To the contrary, the text of the Energy Charter Treaty ("ECT"), the interpretation of its signatories, and the binding case law of the EU Court of Justice all reach the same conclusion: Spain lacked the capacity to make a valid offer of arbitration to nationals of other Member States. Thus, there was no arbitration agreement and the Court lacks jurisdiction. *See* **Part I**.

*Second*, the Complaint should be denied because the Award is not entitled to "full faith and credit." 22 U.S.C. § 1650a(a). An arbitral award is entitled to full faith and credit only if it would be recognized as "a final judgment of a court of general jurisdiction of one of the several States." *Id.* But federal courts decline to enforce judgments where, as here, the tribunal or court lacked jurisdiction. The Report is incorrect in concluding that the Tribunal had jurisdiction, and thus erred in its recommendation to recognize the award. *See* **Part II**.

*Third*, enforcing the Award would violate the foreign sovereign compulsion doctrine. Under EU law, payment of the award is unlawful because it would (i) constitute State aid that has not been approved by the European Commission and which Spain is therefore prohibited from paying; and (ii) compel Spain to violate decisions of the EU Court of Justice. Comity requires that U.S. courts not take action that would cause the violation of another nation's laws. The Report recommends that this defense be denied because Spain had "willfully" subjected

1

itself to arbitration.  But that mistakes both the facts and the law.  Spain did not consent to arbitration, and it objected throughout to the award of State aid.  *See* **Part III**.

*Fourth*, if there were any question about the EU law above (Spain submits there is none), the Court should dismiss the Complaint under the doctrine of *forum non conveniens*.  The Report again relies on the notion that Spain had consented to arbitration, and that the doctrine is unavailable in actions to enforce against assets in the United States.  That analysis falters on the same grounds above:  There was no agreement to arbitrate.  *See* **Part IV**.

*Finally*, the Report errs in recommending that Plaintiffs' motion for summary judgment be granted.  The Report did not consider Judge Leon's opinion in *Blasket Renewable Invs., LLC v. Kingdom of Spain*, 2023 WL 2682013, (D.D.C. Mar. 29, 2023), which issued just two days earlier.  Judge Leon considered and rejected the same arguments on which the Report is based, including Judge Chutkan's recent decisions in *NextEra* and *9REN*.  Those three decisions are now on appeal before the D.C. Circuit.  Even assuming the Court were inclined to deny Spain's Motion to Dismiss, the proper course is to stay these proceedings and allow the appellate process to resolve the case-dispositive issue of Spain's sovereign immunity.  *See* **Part V**.

## LEGAL STANDARD

The District Court reviews a magistrate judge's report and recommendation *de novo*.  Fed. R. Civ. P. 72(b)(2); *see also Givens v. Bowser*, 2022 WL 4598576, at *3 (D.D.C. Sept. 30, 2022) (Sullivan, J.).  The Report and Recommendation addresses Spain's Motion to Dismiss, which seeks dismissal both for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and pursuant to the affirmative defense of foreign sovereign compulsion under Federal Rule of Civil Procedure 12(b)(6).

When ascertaining jurisdiction under Rule 12(b)(1), "a court is not limited to the allegations in the complaint, but may also consider material outside of the pleadings in its effort

to determine whether the court has jurisdiction in the case." *Rong v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83, 90 (D.D.C. 2005) (collecting cases), *aff'd*, 452 F.3d 883 (D.C. Cir. 2006). "Because subject matter jurisdiction focuses on the Court's power to hear a claim, however, the Court must give the plaintiff's factual assertions closer scrutiny when reviewing a motion to dismiss for lack of subject matter jurisdiction" and "no presumption of truthfulness applies to the factual allegations" in the Complaint. *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 231–32 (D.D.C. 2007) (internal quotation marks omitted). "The plaintiff bears the burden of persuasion to establish subject matter jurisdiction by a preponderance of the evidence." *Pitney Bowes, Inc. v. U.S. Postal Serv.*, 27 F. Supp. 2d 15, 19 (D.D.C. 1998).

Under Rule 12(b)(6), the Court must accept well-pleaded allegations in the Complaint as true, but need not accept asserted inferences or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court may also consider documents that are "referred to in the complaint" or are "central to plaintiff's claim." *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999) (considering materials produced and pleadings submitted in underlying administrative proceeding), *aff'd*, 38 F. App'x 4 (D.C. Cir. 2002). The Court may grant a motion to dismiss under Rule 12(b)(6) on the basis of an affirmative defense "when the facts that give rise to the defense are clear from the face of the complaint." *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998).

## BACKGROUND

This enforcement action arises out of an investment arbitration initiated by Plaintiffs against the Kingdom of Spain in April 2015, alleging various violations of the ECT. That proceeding was administered by the International Centre for the Settlement of Investment Disputes ("ICSID") and registered as Case No. ARB/15/20. The Tribunal issued an Award on July 15, 2019. *See* ECF No. 1-1 (the "Award"). Plaintiffs filed this action on June 23, 2020.

### A.   The Parties

Defendant is the Kingdom of Spain, a foreign sovereign and a Member State of the European Union.  Compl. ¶ 4.  Plaintiffs are Cube Infrastructure Fund SICAV, Cube Infrastructure Managers S.A., Cube Energy S.C.A., Demeter Partners S.A., and Demeter 2 FPCI (collectively "Plaintiffs").  *Id.* ¶¶ 2, 3.  The Cube entities are established under the laws of the Grand Duchy of Luxembourg; the Demeter entities, under the laws of the French Republic.  *Id.*  Collectively, Plaintiffs "are investment and private equity funds" in Europe that invest in energy projects.  *Id.* ¶ 8.  Plaintiffs structure those investments through a web of subsidiaries, including entities in France, Luxembourg, the Netherlands, and Spain.  *See* Decision on Jurisdiction, Liability, and Partial Decision on Quantum (the "Decision"), ECF No. 1-2, ¶¶ 69, 70.

### B.   The Applicable Legal Framework

#### 1.   The legal order of the European Union

Spain is one of the twenty-seven Member States of the European Union ("EU").  Decl. of Prof. Steffen Hindelang ("Hindelang Decl.") (May 6, 2022), ECF No. 43-2, ¶ 29.[1]  Plaintiffs are citizens of Luxembourg and France, both of which are also Member States.

The highest laws in the European Union—to which all of the Member States and their citizens are subject—are the Treaty on European Union (the "TEU") and the Treaty on the Functioning of the European Union (the "TFEU").  *Id.*  The EU is composed of several branches of government.  These include the European Council, which defines the EU's overall political direction and priorities; the European Parliament, which enacts legislation; the European Commission, which "oversee[s] the application of Union law under the control of the Court of Justice of the European Union"; and the EU Court of Justice, which is the final authority on

---

[1]  Steffen Hindelang is a Professor at Uppsala University in Sweden, where he specializes in EU and public international law.  He has written extensively on the relationship between EU law and international investment treaties.  His resume is attached to his declaration as Exhibit 1.

issues of EU law.  *See* TEU, Arts. 14(1), 15(1), 17(1), 19.

EU law applies throughout the EU and within each Member State.  By joining the EU, each Member State agreed that EU law takes precedence and overrides any conflicting domestic law, rule, or governmental action.  This principle of primacy is fundamental to the legal order within the Europe Union.  Hindelang Decl. ¶¶ 34, 46–52.

EU law also trumps incompatible rules of law that EU Member States may have purported to create, including in international agreements or treaties concluded among them. Hindelang Decl. ¶ 50.  The EU Court of Justice has held that, as a matter of the Member States' delegation of sovereignty and the primacy of the EU Treaties, "an international agreement cannot affect the allocation of power fixed by the EU [Treaties] or, consequently, the autonomy of the EU legal system." *In re ECHR*, CJEU Op. 2/13 ¶ 201 (Exhibit C).[2]  Thus, treaty provisions that "concern two Member States . . . cannot apply in the relations between those States if they are found to be contrary to the rules of the [EU Treaties]." *Budějovický Budvar*, CJEU Case No. C-478/07, ¶ 98 (Exhibit D).

The EU Court of Justice is the supreme judicial authority on EU law.  Hindelang Decl. ¶ 83.  It has exclusive jurisdiction to determine the content, scope, and application of the EU's foundational documents.  *Id.*  It is composed of twenty-seven judges, one from each Member State.  TFEU, Art. 253.  The EU Treaties oblige the Member States to support the jurisdiction of the EU Court of Justice and require they do nothing to circumvent or hamper its authority.

The EU Treaties implement a regime to ensure the Court of Justice alone is empowered to interpret EU law.  *See* Hindelang Decl. ¶ 38.  This principle of autonomy is fundamental to the

---

[2]  Spain has attached the European legal authorities cited and discussed in this Objection as Exhibits A–J for ease of reference.  Each of those authorities is further discussed and authenticated in the Hindelang Declarations.  *See* ECF No. 43.2 & 56.1

legal order of the European Union, and the EU Treaties protect that principle in two ways.  *First*, Article 267 of the TFEU requires that the highest national court of each Member State "shall" refer questions on EU law to the EU Court of Justice for a preliminary ruling.  The EU Court of Justice's decision is "binding on the national court," which is further "required to do everything necessary to ensure that that interpretation of EU law is applied."  *Puligienica Facility*, CJEU Case No. C-689/13, ¶¶ 37–38, 42 (Exhibit E).  *Second*, Article 344 of the TFEU forbids EU Member States from submitting "a dispute concerning the interpretation or application of the Treaties [EU law] to any method of settlement other than" their national courts.  As a result, EU Member States lack authority to establish dispute-resolution bodies, including arbitral tribunals that might be called upon to interpret or apply EU law outside the EU judicial system.  *In re ECHR*, CJEU Op. 2/13 ¶¶ 212–13; *see* Hindelang Decl. ¶ 73 & n.81.

## 2. The impermissibility of international arbitration by Member States concerning matters of EU law.

Consistent with these foundational principles of delegated sovereignty under the EU Treaties, the EU Court of Justice, the European Commission, and the European Union itself have consistently opined that Member States may not offer or submit to arbitration that may touch upon matters of EU law.

### a. The ruling of the Court of Justice in *Achmea v. Slovak Republic*

In 2018, the EU Court of Justice issued a seminal decision in *Slovak Republic v. Achmea B.V.*, CJEU Case No. C-284/16, (Exhibit A), which addresses the ability of Member States to submit disputes to international arbitration.

*Achmea* concerned an investment arbitration between the Slovak Republic and a Dutch claimant.  The investor initiated proceedings under the dispute-resolution mechanism in a bilateral investment treaty ("BIT") between the Netherlands and the Slovak Republic, by which

each state made a standing offer to arbitrate disputes with investors of the other state.  *Achmea* ¶ 6.  The treaty was signed in 1991.  On May 1, 2004, the Slovak Republic became a member of the EU, thereby ceding sovereignty to the EU and binding itself to comply fully with EU law.  *Id.*  In 2008, the Dutch company initiated arbitration under the BIT.  *Id.* ¶ 9.  The Slovak Republic objected to the tribunal's jurisdiction, arguing that its accession to the EU rendered the arbitration clause invalid and unenforceable.  *Id.* ¶¶ 11, 14.  The tribunal disagreed, exercised jurisdiction in the case, and eventually rendered an award in favor of the investor.  *Id.* ¶ 12.

The Slovak Republic moved to set aside the award at the arbitral seat in Germany, arguing that the treaty's dispute-resolution mechanism was invalid under EU law and therefore could not be exercised by the national of another EU Member State.  Recognizing that the case presented a question of EU law, the German court referred the case to the EU Court of Justice for a preliminary determination.  The Court of Justice assigned the case to its Grand Chamber for hearing[3] and received submissions from the parties, the European Commission, and sixteen EU Member States.

After deliberation, the Court issued a unanimous opinion:  The EU Treaties "preclud[e] a provision in an international agreement concluded between Member States, such as Article 8 of the [applicable bilateral investment treaty], under which an investor from one of those Member States may . . . bring proceedings against [another] Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept."  *Achmea* ¶ 62.  The Court of Justice's reasoning is straightforward:  Under the EU Treaties, Member States lack authority to submit disputes that may require the interpretation of EU law to adjudication outside the judicial

---

[3]  The EU Court of Justice ordinarily sits in panels of three or five judges.  Significant cases are assigned to a Grand Chamber of 15 judges, including the Court's President and Vice President.

system of the European Union (e.g., to arbitral tribunals). Thus, any putative offer to arbitrate such disputes was void *ab initio*. Hindelang Decl. ¶¶ 45, 60.

On remand, the German Federal Court of Justice was presented with the same question as this Court: whether the arbitral award was enforceable following *Achmea*. *See* Hindelang Decl. ¶ 53. Under German law, an arbitral award will not be enforced if "the arbitration agreement is not valid" or "absen[t]" under the applicable law. *Achmea*, Case No. I ZB 2/15, ¶ 15 (Nov. 8, 2018) (Exhibit F). The German court observed that the claimant attempted to create an arbitration agreement through Article 8 of the BIT, which appears to "contain[] an offer by the contracting states to conclude arbitration agreements with investors" of the other state. *Id.* ¶ 17. But under EU law, the Slovak Republic lacked the ability to make a legally binding offer to arbitrate: "by acceding to the [European] Union, the member states have restricted their international powers . . . and have waived among themselves the exercise of international contractual rights that conflict with Union law." *Id.* ¶ 41. *Achmea* held that the BIT's arbitration clause conflicts with EU law. Thus, the German court held that "[*t*]**here is therefore no offer** to conclude an arbitration agreement" in the BIT. *Id.* ¶ 28 (emphasis added). And because there was no valid offer for the claimant to accept, "**there is no arbitration agreement** in the relationship between the parties." *Id.* ¶ 14 (emphasis added).

The German court held that the award was unenforceable and dismissed the case. And the German court is not alone among the European courts: Just last year, the Paris Court of Appeal relied on *Achmea* and annulled an intra-EU investment award, noting that the putative offer of arbitration in the treaty "cannot be the basis for the jurisdiction of the arbitral tribunal even if [the respondent state] has consented to the arbitration procedure[.]" *Poland v. CEC Praha*, Op. No. 49/2022 ¶ 69 (Exhibit G). *Achmea* thus stands for the binding proposition— recognized and enforced across the European Union, including in the courts from Plaintiffs'

respective home jurisdictions in France and Luxembourg—that EU Member States cannot make

valid offers to arbitrate disputes with nationals of other Member States.

**b.      The reception of *Achmea* among the European Commission,
the European Union, and the Member States**

Following *Achmea*, the European Commission formally notified the European Parliament

and the European Council of the Court of Justice's holding, explaining that investors governed

by EU law "cannot have recourse to arbitration tribunals established" under investment treaties,

including "under the Energy Charter Treaty."  *Communication from the Commission to the*

*European Parliament and the Council: Protection of intra-EU investment*, COM (2018) 547

(July 19, 2018) at 26 (Exhibit H).

Consistent with the Commission's view, nearly all EU Member States, including Spain,

have since confirmed their understanding of the EU Treaties—i.e., that an arbitration agreement

cannot be formed under multilateral treaties like the ECT that apply between an EU Member

State and a national of another Member State.  On January 15, 2019, twenty-two EU Member

States, including Spain, jointly declared that pursuant to *Achmea* an "arbitral tribunal established

on the basis of investor-State arbitration clauses" in bilateral investment treaties between EU

Member States "lacks jurisdiction, due to a lack of a valid offer to arbitrate."  *Declaration of the*

*Representatives of the Governments of the Member States on the Legal Consequences of the*

*Judgment of the Court of Justice in Achmea and on Investment Protection in the European*

*Union* (Jan. 15, 2019) (the "Joint Declaration") at 1 (Exhibit I).  This declaration was made

specifically inclusive of the ECT, under which Plaintiffs initiated the underlying proceedings in

this case:  "For the Energy Charter Treaty, its systemic interpretation in conformity with the

[EU] Treaties precludes intra-EU investor-State arbitration."  *Id*. at 2 n.2.

9

### c. The ruling of the Court of Justice in *Moldova v. Komstroy*

On September 2, 2021, the Grand Chamber of the EU Court of Justice issued its decision in *Republic of Moldova v. Komstroy LLC*.  *See* Exhibit B.  Rather than the bilateral investment treaty that had been at issue in *Achmea*, the Court of Justice confronted the validity of an award arising out of an arbitration conducted under the multilateral Energy Charter Treaty—the same treaty at issue in this case.  In addition to the parties themselves, the Court of Justice accepted submissions from the European Union, the European Commission, and nine Member States, including both Spain and France.  *Id.* at 1.

The EU Court of Justice held that the dispute-resolution mechanism in Article 26 of the ECT is incompatible with EU law and thus "not . . . applicable to disputes between a Member State and an investor of another Member State."  *Id.* ¶ 66.  The Court explained that arbitral tribunals lack jurisdiction over such disputes "[i]n the precisely same way as the arbitral tribunal at issue . . . in *Achmea*."  *Id.* ¶ 52.  As decided in *Achmea* and confirmed in *Komstroy*, "a putative offer to arbitrate extended by an EU Member State to an investor from another EU Member State, like Article 26 of the ECT, is rendered inapplicable and cannot be accepted to form an agreement to arbitrate."  Hindelang Decl. ¶ 24.

### 3. The European Commission's State-aid decision regarding Spain

Arbitral awards that purport to require payment from one Member State to an investor of other Member States conflict with a second aspect of EU law:  Paying such an award without prior approval from the European Commission constitutes unlawful State aid.

The EU Treaties prohibit Member States from granting subsidies to private actors— referred to as "State aid"—that "might disrupt or threaten to distort competition" in any economic sector.  Hindelang Decl. ¶ 87.  The European Commission has the sole authority to

permit an EU Member State to pay such subsidies, and it alone is empowered to review and evaluate such measures to determine their legality under EU law.

On November 10, 2017, the European Commission issued a binding decision regarding Spain's regulatory scheme for providing support in the electricity sector. *See* State Aid Decision 2017/7384 (Exhibit J). That decision was the result of an independent proceeding commenced on December 22, 2014, by the European Commission regarding Spain's renewable energy policy, in which interested parties, including investors like Plaintiffs and a trade association representing renewable energy producers, made written submissions. *See id.* ¶ 1.

The European Commission's decision highlights two aspects of EU law that are relevant here. *First*, it determined that the subsidies for renewable energy production—the ones that formed the basis of Plaintiffs' claim in the underlying arbitration—"constitute State aid within the meaning of Article 107(1) TFEU." *Id.* ¶ 88. It also determined that Spain's implementation of the subsidy regime, in part because it benefited investors like Plaintiffs, was "in breach of Article 108(3) TFEU," which governs "all systems of aid existing in [the Member] States." *Id.* at 34; *see also id.* ¶ 89 ("The aid granted until the adoption of this decision is unlawful aid").

*Second*, observing that investors were bringing claims against Spain under the ECT, the Commission explained that "any compensation which an Arbitration Tribunal were to grant to an investor" in respect of the subsidies that were the subject of Spain's regulatory reforms in the energy sector "would constitute in and of itself State aid." *Id.* ¶ 165. As a result, Spain, as an EU Member State, cannot pay any such award without the European Commission's prior review and authorization. To dispel any possible misunderstanding on the issue, the European Commission explained that its decision "is part of Union law" and therefore "binding on Arbitration Tribunals, where they apply Union law." *Id.* ¶ 166. The decision is also binding on

private parties, like Plaintiffs, who are nationals of the European Union and are subject to enforcement actions by the European Commission if they receive unlawful state aid.

Courts in the European Union decline to enforce arbitral awards when, as here, doing so would violate State-aid laws.  For example, the Swedish claimants in the *Micula* arbitration sought to enforce an ICSID award against Romania in the courts of Luxembourg, Sweden, and Belgium.  Hindelang Decl. ¶ 96.  "The Brussels Court of Appeal stayed the enforcement of the award and referred questions on the lawfulness of its enforceability under the EU law to the EU Court of Justice."  *Id.*  "[T]he Luxembourg Court of Appeal and the Swedish Nacka District Court refused to enforce the award because to do so would violate EU law on State aid."  *Id.* None of the courts was willing to enforce the awards in violation of EU law.

## ARGUMENT

## I.     THE COURT LACKS SUBJECT-MATTER JURISDICTION.

This action should be dismissed for lack of subject-matter jurisdiction.  As a sovereign state, Spain is entitled to immunity under the Foreign Sovereign Immunities Act, which provides the sole basis for obtaining jurisdiction over a foreign state in federal court.  *See Permanent Mission of India to the U.N. v. City of New York*, 551 U.S. 193, 197 (2007).[4]  Under the FSIA, a foreign state is "presumptively immune from the jurisdiction of United States courts."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).

The FSIA specifies certain exceptions, but "[i]n the absence of an applicable exception, the foreign sovereign's immunity is complete—the district court lacks subject matter jurisdiction over the plaintiff's case."  *Nemariam v. Fed. Democratic Republic of Ethiopia*, 491 F.3d 470,

---

[4]  The federal statute that implements the ICSID Convention, 22 U.S.C. § 1650a, does not provide a separate basis of jurisdiction.  *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 112 (2d Cir. 2017); *Micula v. Gov't of Romania*, 104 F. Supp. 3d 42, 44 (D.D.C. 2015) (ICSID awards must be enforced by plenary action in accordance with the FSIA).

474 (D.C. Cir. 2007).  "Because 'subject matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity' laid out in the FSIA, as a 'threshold' matter in every action against a foreign state, a district court 'must satisfy itself that one of the exceptions applies.'"  *Balkan Energy Ltd. v. Ghana*, 302 F. Supp. 3d 144, 150–51 (D.D.C. 2018) (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493–94 (1983)).

The Report concludes that Spain is not entitled to sovereign immunity under Section 1605(a)(6) of the FSIA because the Award arises out of a valid "agreement to arbitrate" between Spain and Plaintiffs.  *See* R&R at 22.  That conclusion is incorrect.  As discussed below (**Part I.A**), the Report misapprehends the applicable legal framework, the role of the EU Court of Justice, and the nature of the EU Member States' treaty obligations.  When analyzed under the correct framework (**Part I.B**), it is clear that there was no valid arbitration agreement and that Spain is immune from this Court's jurisdiction.[5]

### A.    The Report's Analysis Is Incorrect.

#### 1.    The Report Misconstrues the Law on Arbitrability.

The Report misconstrues the difference between the arbitrability of a particular claim (so-called "breadth disputes") and the existence of a valid arbitration agreement (so-called "formation disputes").  *See* R&R at 17.  That error results in the misapplication of Supreme Court and D.C. Circuit precedent.

The D.C. Circuit explains the distinction succinctly:  "In considering how to apply this [arbitrability] framework, we have used '[a] trichotomy among the disputes that arise in arbitrability cases.'"  *Dist. No. 1 v. Liberty Mar. Corp.*, 815 F.3d 834, 844 (D.C. Cir. 2016) (quoting *Nat'l R.R. Passenger Corp.*, 850 F.2d 756, 761 (D.C. Cir. 1988)):

---

[5]  The Report does not reach the waiver exception under Section 1605(a)(1).  *See* R&R at 12, n.4.

> There are (1) "disputes over the formation of an agreement to arbitrate"; (2) "disputes over the breadth of an arbitration clause, where the parties disagree over whether a certain issue falls within or without the subject matter coverage of an undoubted agreement to arbitrate"; and (3) disputes that "relate[ ] to the length, rather than the breadth, of an arbitration clause." In other words, three types of arbitrability disputes typically arise: (1) *formation disputes*; (2) *breadth disputes*; and (3) duration disputes.

*Id.* (internal citations omitted; emphases added).

The type of arbitrability dispute has clear repercussions for the Court's analysis. "It is settled that a formation dispute is 'generally for courts to decide.'" *Id.* (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010)); *accord Henry Schein, Inc.*, 139 S. Ct. at 530 ("before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists"). Conversely, "parties may agree to arbitrate questions of breadth, so long as they do so plainly," through a delegation clause. *Dist. No. 1*, 815 F.3d at 844 (internal quotation marks omitted); *see also Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010) ("If a party challenges the validity . . . of the precise agreement to arbitrate at issue, the federal court must consider the challenge . . . ," including where that agreement contains a "delegation provision" reserving questions of the agreement's "enforceability" to the tribunal).[6]

In sum, *formation disputes cannot be delegated*. Delegation clauses cannot empower an arbitrator to resolve a dispute about the formation or existence of a valid arbitration agreement. The Court alone must decide that issue. Where parties "'disagree as to whether they ever entered into any arbitration agreement at all, the court must resolve that dispute'" on its own accord and without reliance on the underlying decision of the tribunal because "if there was never an agreement to arbitrate, there is no authority to require a party to submit to arbitration." *Nat'l*

---

[6] For this reason, the Report's further analysis about "whether the parties clearly and unmistakably delegated questions of arbitrability to the Tribunal," R&R at 20, is irrelevant.

*R.R. Passenger Corp. v. B&M Corp.*, 850 F.2d 756, 761 (D.C. Cir. 1988) (quoting *Bhd. of Teamsters Loc. No. 70 v. Interstate Distrib. Co.*, 832 F.2d 507, 832 (9th Cir. 1987)).

The Report misapplies this framework, particularly in its analysis of *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, (D.C. Cir. 2021) and *Chevron Corp. v. Ecuador*, 795 F .3d 200 (D.C. Cir. 2015).  Both cases stand for the proposition that "the arbitrability of a dispute"— i.e., a breadth dispute under the D.C. Circuit's framework—"is not a jurisdictional question under the FSIA."  *Stileks*, 985 F.3d at 878 (citing *Chevron*, 795 F.3d at 205–06).  But that is because neither case concerned the validity or formation of an arbitration agreement.  In *Stileks*, the parties did not dispute whether a valid arbitration agreement was ever formed.  Rather, the parties disagreed whether the specific investment at issue fell within the scope of the ECT by nature of the type of investment.  *See Stileks*, 985 F.3d at 878.  In *Chevron*, Ecuador likewise agreed that there was a valid arbitration agreement under the BIT, but it argued that Chevron's claim fell outside the scope of that agreement because the investment was made before the bilateral investment treaty came into effect.  *Chevron*, 795 F.3d at 206–07.  Those are disputes about the breadth or scope of the arbitration agreement, not its validity or existence.  The Report is thus incorrect to conclude that "the very existence of an agreement to arbitrate is a question of arbitrability, not one of jurisdiction under the FSIA."  R&R at 18.

The Report appears to have further been led into this error by Judge Chutkan's recent decisions in *NextEra* and *9REN*.  *See* R&R at 19 (citing *NextEra Energy Global Holdings B.V. v. Kingdom of Spain*, 2023 WL 2016932 (D.D.C. Feb. 15, 2023) and *9REN Holding S.A.R.L. v. Kingdom of Spain*, No. 19-cv-01871, 2023 WL 2016933 (D.D.C. Feb. 15, 2023)).  Judge Chutkan relied "principally on *Chevron*, *Stileks*, and *Tethyan*" to conclude that "the argument

that a party lacked a legal basis to enter an agreement as a question of arbitrability and therefore

an issue of the award's merits." *Id.* at 20 (internal quotation marks omitted).

Unfortunately, the Report appears not to have considered Judge Leon's subsequent

opinion, issued on March 29, 2023, which considered and rejected the *NextEra* and *9REN*

analyses.  As Judge Leon concluded:

> Both *Stileks* and *Chevron* resolved questions about the
> "scope of arbitrability." . . .  In both cases, our Circuit Court held
> that the district court before which the petition to enforce the award
> was brought must defer to the tribunal's determination that the
> underlying dispute fell within the four comers of the agreement to
> arbitrate.  *See Stileks*, 985 F.3d at 878-79; *Chevron*, 795 F.3d at 207-
> 08.  As such, these decisions merely stand for the proposition that a
> reviewing court must defer to an arbitral tribunal's judgment that a
> particular investment fell within the scope of an arbitration
> provision that applies to disputes between two parties to that
> agreement.
>
> However, neither challenge was predicated on an argument
> that, under the law applicable to them, the parties were *incapable* of
> entering into an agreement to arbitrate anything at all. Deference to
> the tribunal in such a case effectively assumes away the antecedent
> question of whether the parties could have agreed to do so in the first
> instance. *See Buckeye Check Cashing*, 546 U.S. at 445-46; *Granite
> Rock Co.*, 561 U.S. at 296. Spain's challenge, by contrast, turns on
> that exact question.

*Blasket*, 2023 WL 2682013, at *5 (D.D.C. Mar. 29, 2023).  Judge Leon's analysis is correct.

This case presents a formation dispute, which is the antecedent question that the Court alone

must address.  The Tribunal had no authority to decide whether an arbitration agreement existed.

The Report thus misapprehends the applicable legal framework.

### 2.    The Report Misstates the Role of the EU Court of Justice in Determining EU Law.

The Report reasons that Spain to argue that "this Court is bound to accept and defer to the

CJEU's decisions [in *Achmea* and *Komstroy*] given principles of international comity."  R&R at

16.  But the question of EU law is not simply one of comity.  Comity is "the degree of deference

that a domestic forum must pay to the act of a foreign government ***not otherwise binding*** on the forum." *S.E.C. v. Banner Fund Int'l*, 211 F.3d 602, 612 (D.C. Cir. 2000) (internal quotation marks omitted; emphasis added). But "[t]he Supreme Court has held that a decision of a foreign jurisdiction's highest court as to the meaning of that state's law ***is binding on federal courts***[.]" *Blasket Renewable Invs., LLC v. Kingdom of Spain*, 2023 WL 2682013, at *6 (D.D.C. Mar. 29, 2023) (citing *Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1874 (2018)). Thus, as to the effect of the European Treaties on Member States of the European Union, this Court is bound to accept the decisions of the EU Court of Justice—not just out of comity and respect for foreign courts, but because the Supreme Court requires it.

That mistake has significant consequences for the resolution of this case. Plaintiffs must concede that the EU Court of Justice has held that Article 26 of the ECT does not contain a valid offer from Spain to arbitrate a dispute with a national of another EU Member State.

### 3. The Report Misunderstands the Relationship Between the Energy Charter Treaty and the European Treaties.

The Report worries that "Spain is essentially seeking a ruling from this Court that at best modifies, and at worst, nullifies, its treaty obligations under the ECT." R&R at 16. That is incorrect. The ECT is a multilateral treaty which, as relevant here, includes mutual obligations among Spain, Luxembourg, and France. Each of those states signed the ECT on 17 December 1994.[7] In so doing, Spain committed to Luxembourg to France to make a standing offer to arbitrate disputes with nationals of those two countries (and *vice versa*). None of Spain, Luxembourg, France, or any other signatory to the ECT made any commitment to any particular investor; the obligations run exclusively between sovereign states.

---

[7] *See* https://www.energycharter.org/treaty/contracting-parties-and-signatories/

17

Spain, Luxembourg, and France are also signatories to the TEU and TFEU, which govern the mutual obligations among the various Member States of the European Union.  In those treaties, the Member States agreed to the principle of primacy, which means that their obligations under the TEU and TFEU prevail over any conflicting rule of law within or between the Member States.  As the EU Court of Justice has held, where "the [treaties] at issue now concern two Member States, their provisions cannot apply in the relations between those States if they are found to be contrary to the rules of the [EU Treaties]."  Hindelang Decl. ¶ 50 (citing *Budějovický Budvar* ¶ 98).  Consistent with that principle of primacy, the EU Court of Justice held in *Achmea* and *Komstroy* that the arbitration provisions of the ECT are incompatible with the European Treaties thus "not . . . applicable to disputes between a Member State and an investor of another Member State."  *Komstroy* ¶ 66.  The EU Court of Justice was interpreting the application of EU law to the mutual obligations among Spain, Luxembourg, and France, and it concluded that the undertaking in Article 26 of the ECT to arbitrate disputes with nationals of other Member States is invalid.

The Report is therefore incorrect to conclude that Spain is asking this Court to "modif[y]" or "nullif[y] its treaty obligations under the ECT."  R&R at 16.  The EU Court of Justice has already addressed—with binding authority—the scope of the EU Member States' mutual obligations under the ECT.  If the Court were to follow the Report, however, it would be nullifying the Member States' obligations under both the ECT and the European Treaties.  The United States is not a signatory to any of those treaties, and its courts should not purport to modify them.

## B.    The "Arbitration Exception" in Section 1605(a)(6) Does Not Apply.

The arbitration exception does not give this Court subject-matter jurisdiction because there was no valid agreement to arbitrate.

*First*, EU law precludes Spain from making an offer to arbitrate matters that may require the interpretation or application of EU law where, as here, the putative claimants are nationals of EU Member States.  Under *Achmea*, *Komstroy*, and *PL Holdings*, a Member State's putative offer to submit to arbitration under a treaty that removes jurisdiction from the courts of Member States is void *ab initio*.  Hindelang Decl. ¶¶ 45, 60.  The Member States cannot make offers to arbitrate claims against nationals of other Member States; they lost that ability when they acceded to the EU.

In this case, it is undisputed that the ECT removes disputes from the jurisdiction of EU courts; that is the very nature of arbitral process.  It is undisputed that the Tribunal understood itself to be adjudicating a dispute between one Member State and nationals of another.  And it is undisputed that the Tribunal was called upon to resolve "disputes which may concern the application or interpretation of EU law."  *Achmea* ¶ 55.  The ICSID Convention requires tribunals to "decide a dispute in accordance with such rules of law as may be agreed by the parties."  ICSID Convention, Art. 42(1).  Under the ECT, the contracting parties agreed that an arbitral tribunal is bound to decide the dispute in accordance with the ECT "and applicable rules and principles of international law."  ECT, Art. 26(6).  The EU Treaties are international law. Hindelang Decl. ¶¶ 62.  As the Court of Justice held in *Achmea*, *Komstroy*, and *PL Holdings*, Member States cannot make valid offers to arbitrate with investors of other Member States under national legislation, bilateral investment treaties, or multilateral treaties, including the ECT.

*Second*, as Judge Leon observed, "the text of the ECT . . . precludes a tribunal constituted under its authority from disregarding EU law invalidating the purported agreement to arbitrate between an EU Member State signatory and other EU nationals."  *Blasket*, 2023 WL 2682013, at *5.  The text in Article 26(6) of the ECT requires a tribunal "to decide the issues in dispute in

accordance with this Treaty and applicable rules and principles of international law."  "As such, when resolving a dispute between an EU Member State and another EU national, the tribunal must apply 'rules and principles' derived from the EU treaties—sources of international law—as those rules are 'applicable' to the parties before it."  *Id.* at *6.  "Because the agreement to arbitrate between Spain and the [Plaintiffs] was invalid under EU law . . . , there was no valid agreement to arbitrate as defined by the ECT itself."  *Id.*

 *Third*, that reading of the ECT is supported by the "conduct of parties to [the ECT] and the subsequent interpretation of the signatories" to clarify the meaning of its terms.  *Air France v. Saks*, 470 U.S. 392, 403 (1985); *see also Medellin v. Texas*, 552 U.S. 491, 507 (2008).  Judge Leon concluded that "the 2007 Lisbon Treaty and a 2019 declaration issued by 22 EU Member States" were evidence of the subsequent interpretation of the signatories that "that arbitration provisions in both bilateral investment treaties and multilateral investment treaties like the ECT were illegal as applied to intra-EU disputes given the CJEU's decision in *Achmea*."  *Blasket*, 2023 WL 2682013, at *6; *see also* Declaration (Exhibit I).  Additionally, "[t]he *amicus* brief filed by the European Commission in its official capacity as a representative of the EU as an entity in this litigation provides further support for this proposition."  *Id.*; *see also* ECF No. 46 (*amicus* brief submitted by the European Commission in this proceeding).

 Thus, "the bottom line is straightforward."  *Blasket*, 2023 WL 2682013, at *7.  "Spain lacked the legal authority to make a standing offer to arbitrate to the [Plaintiffs] under the law that applies to both parties."  *Id.*  "Because there was no valid offer to arbitrate, there is no arbitration agreement," and the Court lacks subject-matter jurisdiction.  *Id.*

## II.     THE AWARD IS NOT ENTITLED TO FULL FAITH AND CREDIT.

The Report also errs in concluding that the Award is entitled to full faith and credit,

relying on the same mistaken analysis about the existence of a valid arbitration agreement.  *See*

Obj. at 21–22.

Under the statute implementing the ICSID Convention, the Award only receives "the

same full faith and credit as if the award were a final judgment of a court of general jurisdiction

of one of the several States."  22 U.S.C. § 1650a(a); *Mar. Int'l Nominees Estab. v. Republic of

Guinea*, 693 F.2d 1094, 1103 n.14 (D.C. Cir. 1982).  But not all state-court judgments are

enforceable.  "[B]asic limitations on the full-faith-and-credit principles" require that "'the court

in the first State had power to pass on the merits—had jurisdiction, that is, to render the

judgment.'"  *Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar.

Ass'n*, 455 U.S. 691, 704 (1982) (quoting *Durfee v. Duke*, 375 U.S. 106, 110 (1963)).  Thus,

"where the rendering forum lacked jurisdiction over the subject matter or the parties, full faith

and credit is not required."  *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 386 (1996).

The Tribunal lacked jurisdiction in two ways.  *First*, there was no valid agreement to

arbitrate.  "[T]he first principle that underscores all of [the Supreme Court's] arbitration

decisions" is that "[a]rbitration is strictly a matter of consent."  *Granite Rock Co. v. Teamsters*,

561 U.S. 287, 299 (2010) (collecting authority for this "foundational" principle).  Absent

agreement and consent of the parties, the Tribunal is powerless and without jurisdiction; its

members are only three jurists expressing an unenforceable opinion on a dispute.

*Second*, the Tribunal's award of unlawful state aid exceeded its authority.  "[A]rbitrators

wield only the authority they are given."  *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407 (2019).

"[T]hey derive their powers" from the particular terms of the parties' agreement.  *Id.*; *see also

Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010).  The Tribunal's

jurisdictional mandate here was limited to "decid[ing] the issues in dispute in accordance with

[the ECT] and applicable rules and principles of international law."  ECT, Art. 26(6).  As

explained above, EU law forms part of those "applicable rules and principles of international

law," thereby excluding from the Tribunal's jurisdiction matters that may not be decided by

arbitration under EU law.  Under EU law, the authorization of state aid is the exclusive province

of the European Commission.  *See* TFEU, Arts. 107(1), 108(3).  Arbitral tribunals may not award

state aid.  *Id.* at Arts. 108(2)–(3); State Aid Decision 2017/7384 ¶¶ 165, 166 (noting that this

"[d]ecision is part of Union law, and as such also binding on Arbitration Tribunals, where they

apply Union law.").  By trespassing on the European Commission's exclusive jurisdiction, the

Tribunal rendered an *ultra vires* award that exceeds any jurisdiction it could have under Article

26 of the ECT.  The Report considers this argument in a footnote, R&R at 23 n.8, concluding

only that the Court "cannot disturb the findings of the Tribunal."  But that misunderstands the

role of arbitral tribunals; the Report does not engage with the bedrock principles of *Lamps Plus*,

*Stolt-Nielsen*, and the long line of Supreme Court precedent confirming that arbitration is a

creature of contract and that tribunals wield only the powers they are given.

## III.   THE COMPLAINT SHOULD BE DISMISSED UNDER THE FOREIGN SOVEREIGN COMPULSION DOCTRINE.

The Report errs in suggesting that Spain's affirmative defense under the foreign

sovereign compulsion doctrine should be denied.

Under the foreign sovereign compulsion doctrine, a U.S. court should refrain from

entering an order that would compel a party to act in contravention of the laws of a foreign

sovereign.  The D.C. Circuit instructs that "[p]rinciples of international comity require that

domestic courts not take action that may cause the violation of another nation's laws."  *F.T.C. v.*

*Compagnie de Saint-Gobain-Pont-à-Mousson*, 636 F.2d 1300, 1327 n.150 (D.C. Cir. 1980); *see*

*also In re Sealed Case*, 825 F.2d 494, 498–99 (D.C. Cir. 1987) ("We have little doubt . . . that our government and our people would be affronted if a foreign court tried to compel someone to violate our laws within our borders.").  The doctrine thus provides a "foreign party" with "protection from being caught between the jaws of [a U.S. court] judgment and the operation of laws in foreign countries."  Restatement of the Foreign Relations Law of the United States 3d § 441 (1987), reporters' notes 1.

The Report rejects Spain's argument for two reasons.  *First*, on the theory that the doctrine applies only in "the antitrust context."  R&R at 24.  There is no authority for that proposition.  Courts tend to apply the doctrine in the context of antitrust because multinational business can be subject to competing obligations.  But nothing limits it to that context.  *Second*, the Report reasons that "Spain cannot claim compulsion where it has willfully submitted to and participated in the ICSID process."  *Id.*  That is simply incorrect.  Spain did not willfully submit to the arbitration—it objected at every stage to the Tribunal's exercise of jurisdiction and its rendering of an award in violation of EU State aid law.

The Court should reject the Report's analysis and dismiss the Complaint under the foreign sovereign compulsion doctrine.  The EU is a sovereign entity; it makes law and issues judgments to which Spain is subject.  Ordering Spain to comply with the Award would violate EU law in two ways:  *First*, *Achmea* holds that investment arbitration that may require the interpretation or application of EU law is incompatible with EU law.  Ordering Spain to comply with the Award would require Spain to recognize and validate an arbitration that contravenes EU law.  *Second*, ordering Spain to pay a judgment resulting from the Award would require Spain to make unlawful payments in violation of EU staid-aid law because the European Commission has not authorized its payment.

For purposes of this case, the Court is bound by the EU Court of Justice decision and the pronouncements of the European Commission.  The acts of foreign sovereigns become "a principle of decision binding on federal and state courts alike."  *W.S. Kirkpatrick & Co. v. Envt'l Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990).  This is not a "vague doctrine of abstention." *Id.*  The court may not "question the validity of public acts (acts *jure imperii*) performed by other sovereigns within their own borders, even when such courts have jurisdiction over a controversy in which one of the litigants has standing to challenge those acts."  *Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004).

## IV.  IN THE ALTERNATIVE, THE CASE SHOULD BE DISMISSED UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*.

The legal arguments above are dispositive of this case.  Settled EU law demands that this Court dismiss the Complaint.  But if there were any question about EU law and its application to this case, then the Court should dismiss under the doctrine of *forum non conveniens*.

The Report's analysis of *forum non conveniens* errs in two ways.  *First*, the Report concludes that the doctrine is categorically unavailable in this case, relying on the D.C. Circuit's decision in *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296 (D.C. Cir. 2005). R&R at 25.  *Second*, the Report concludes in any event that the doctrine must apply because it had already "assured itself of jurisdiction."  *Id.*  Both conclusions are incorrect.

In *TMR Energy*, the court held that dismissal under *forum non conveniens* was improper because a "court of the United States" is the only available forum for an action to "attach the commercial property of a foreign nation located in the United States."  *Id.*[8]  This case presents a different, antecedent issue—i.e., whether jurisdiction is proper given the impact of EU law.

---

[8]  *See also BCB Holdings Ltd. v. Belize*, 650 F. App'x 17, 19 (D.C. Cir. 2016) ("In *TMR* . . . we held that . . . *forum non conveniens* does not apply to actions in the [U.S] to enforce arbitral awards against foreign nations."); *Newco Ltd. v. Belize*, 650 F. App'x 14, 16 (D.C. Cir. 2016).

Notably, the respondent in that case *did* "*not dispute* that [the] case [came] within . . . the exception to immunity for any action brought to confirm an arbitration award" under Section 1605(a)(6) of the FSIA. *TMR Energy*, 411 F.3d at 324 (emphasis added). By contrast, Spain vigorously contests the Court's jurisdiction. For the reasons above, the Report errs in concluding that jurisdiction lies.

The Report does not engage with Spain's arguments with respect to the application of the doctrine and the *Gulf Oil* factors. *See* Mem., ECF No. 43-1 at 27–30. For the reasons set forth in Spain's prior briefing, those factors favor dismissal.

## V.   THE REPORT ERRS IN CONCLUDING THAT THE COURT SHOULD ENTER SUMMARY JUDGMENT.

The Report also recommends that the Court enter summary judgment in favor of Plaintiffs. *See* R&R at 25–26. That conclusion is misplaced.

For the reasons above, the Court lacks jurisdiction over Spain, and the Award is not entitled to full faith and credit. Thus, any entry of judgment is improper. But even assuming *arguendo* that the Court were inclined to find jurisdiction under Section 1605(a)(6), the proper course is nonetheless to stay entry of judgment pending Spain's appeal to the D.C. Circuit.

Tellingly, in cases the Report cites as authority for entering summary judgment, none of the sovereign defendants had invoked the defense of sovereign immunity. *See* R&R at 26 (citing *Valores Mundiales, S.L. v. Bolivarian Republic of Venezuela*, 2022 WL 17370242, (D.D.C. Aug. 3, 2022) (default judgment; no defense of immunity); *Koch Mins. Sarl v. Bolivarian Republic of Venezuela*, 2021 WL 3662938, (D.D.C. Aug. 18, 2021) (no discussion of sovereign immunity); *TECO Guatemala Holdings, LLC v. Republic of Guatemala*, 414 F. Supp. 3d 94 (D.D.C. 2019) (same); *Saint-Gobain Performance Plastics Eur. v. Bolivarian Republic of Venezuela*, 2021 WL 326079, at *4 (D.D.C. Feb. 1, 2021) (same); *Tethyan Copper Co. Pty Ltd. v. Islamic Republic of*

*Pakistan*, Case No. 1:19-cv-02424, (D.D.C. 2022) (case dismissed by joint stipulation); *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 99 (2d Cir. 2017) (reversing *ex parte* proceeding that rendered judgment without presence of foreign sovereign).

By contrast, the better approach would be to stay further proceedings and allow the D.C. Circuit to resolve the issue of Spain's sovereign immunity. Spain has the "right to take an immediate appeal" for denial of immunity under the collateral-order doctrine. *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1323 (2017) (collecting cases). Recognizing the importance of Spain's immunity defense, Judge Chutkan decided not to "not rule on [Plaintiffs'] Motion for Summary Judgment at this time" and instead to "give Spain a chance to appeal the court's rulings on the other motions, including the court's jurisdictional holdings." *NextEra*, 2023 WL 2016932, at *15 (D.D.C. Feb. 15, 2023).

A stay is the prudent course here. Case-dispositive jurisdictional issues are currently pending before the D.C. Circuit on appeal in *Blasket*, *NextEra*, and *9REN*. Allowing decisions to issue in those appeals "will likely narrow the issues in the pending cases and assist in the determination of the questions of law involved." *Hulley Enterprises Ltd. v. Russian Fed'n*, 211 F. Supp. 3d 269, 276 (D.D.C. 2016) (internal quotation marks omitted). It would also "avoid potentially 'fractured and disorderly' and unnecessary litigation and best preserve judicial and parties' resources." *Id.* (quoting *Seneca Nation of Indians v. U.S. Dep't of Health & Hum. Servs.*, 144 F. Supp. 3d 115, 120 (D.D.C. 2015)).

## CONCLUSION

For these reasons, Spain respectfully requests the Court enter an order dismissing the Complaint for lack of subject-matter jurisdiction; dismissing the Complaint under the doctrine of *forum non conveniens*; or denying Plaintiffs' claims on the merits under either the foreign sovereign compulsion doctrine or the full-faith-and-credit requirement

Dated:  April 14, 2023

Respectfully submitted,

  /s/ Jonathan M. Landy

Jonathan M. Landy (D.C. Bar No. 467847)
Benjamin W. Graham (D.C. Bar No. 1044724)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, DC  20024
Tel.:     (202) 434-5000
Fax:      (202) 434-5029
Email:    jlandy@wc.com

Csaba M. Rusznak (D.C. Bar No. 1030310)
SOVEREIGN ARBITRATION ADVISORS LLC
1050 Connecticut Avenue, N.W., Ste. 66255
Washington, DC  20035
crusznak@sovereignarbitration.us

*Counsel for the Kingdom of Spain*

27

**CERTIFICATE OF SERVICE**

I hereby certify that on April 14, 2023, I caused the foregoing to be filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all registered participants.

_/s/ Jonathan M. Landy_
Jonathan M. Landy
