# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CUBE INFRASTRUCTURE FUND SICAV, CUBE INFRASTRUCTURE MANAGERS S.A., CUBE ENERGY S.C.A. (NOW CUBE ENERGY S.Á.R.L.), DEMETER PARTNERS S.A. (NOW DEMETER INVESTMENT MANAGERS S.A.), and DEMETER 2 FPCI, <br><br> Plaintiffs, <br><br> v. <br><br> KINGDOM OF SPAIN, <br><br> Defendant. | Civ. No. 1:20-cv-01708 (EGS) (MAU) |

## PLAINTIFFS' OPPOSITION TO SPAIN'S OBJECTIONS TO
## THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

James E. Berger (D.C. Bar 481408)
Charlene C. Sun (D.C. Bar 1027854)
Joshua S. Wan (*Pro Hac Vice*)
Erin Collins (D.D.C. Bar NY0359)

DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 556-2200
Fax: (212) 556-2222
1251 Avenue of the Americas
New York, NY 10020
james.berger@us.dlapiper.com
charlene.sun@us.dlapiper.com
joshua.wan@us.dlapiper.com
erin.collins@us.dlapiper.com

*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

I.    Preliminary Statement.................................................................................................1

II.   Legal Standard .........................................................................................................2

III.  Factual Background....................................................................................................4

    A.    The Applicable Legal Framework .......................................................................4

    1.    The Energy Charter Treaty ..............................................................................4

    2.    The ICSID Convention ....................................................................................6

    3.    Neither the EU Treaties nor the Decisions of the Court of Justice
        of the European Union form Part of the Applicable Law Under the
        ECT .........................................................................................................7

    B.    The ICSID Arbitration and Annulment Proceeding ...........................................12

IV.   Argument .................................................................................................................15

    A.    The Report and Recommendation Correctly Determined that this
        Court Has Subject Matter Jurisdiction ...............................................................15

    1.    Spain's Arbitrability Objection Goes to Scope and Not Formation
        of an Agreement to Arbitrate..........................................................................15

    2.    The R&R Properly Determined that Spain Delegated Its
        Arbitrability Objections to the ICSID Tribunal ............................................19

    3.    Even on *De Novo* Review, Spain Has Not Rebutted the
        Presumption of an Agreement to Arbitrate with Plaintiffs ...........................22

    4.    Even if *Achmea* and *Komstroy* Were Applicable, Those Decisions
        Could Not Be Applied to Invalidate an Already Performed
        Arbitration Agreement ...................................................................................33

    B.    The Award is Entitled to Full Faith and Credit.................................................34

    C.    The Report and Recommendation Correctly Determined that the
        Foreign Compulsion Doctrine Did Not Preclude Enforcement.......................38

    D.    The Report and Recommendation Correctly Found Forum Non
        Conveniens to be An Unavailable Defense.......................................................42

    E.    The Report and Recommendation Correctly Concluded that
        Summary Judgment is Warranted, and a Stay of This Case Pending
        Appeals in Three Other Cases is Unwarranted ...............................................43

V.    Conclusion .................................................................................................................45

## **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*,
   485 A.2d 199 (D.C. 1984) ...................................................................................29

*9REN Holding S.À.R.L. v. Kingdom of Spain*,
   Civ. No. 19-cv-01871 (TSC), 2023 WL 2016933 (D.D.C. Feb. 15, 2023) ................15, 37, 45

*Am. Int'l Grp., Inc. v. Islamic Republic of Iran*,
   493 F. Supp. 522 (D.D.C. 1980) .........................................................................42

*Bank of Am. v. Solis*,
   Civ. No. 09–2009 (EGS), 2014 WL 4661287 (D.D.C. July 2, 2014)........................35, 41, 43

*BCB Holdings Ltd. v. Gov't of Belize*,
   650 F. App'x 17 (D.C. Cir. 2016).........................................................................42

*BG Grp. PLC v. Republic of Argentina*,
   572 U.S. 25 (2014)...........................................................................................23

*Blasket Renewable Invs.Invs., LLC v. Kingdom of Spain*,
   Civ. No. 21-3249 (RJL), 2023 WL 2682013 (D.D.C. Mar. 29, 2023) .......................16, 43, 45

*Chan v. Korean Airlines*,
   490 U.S. 122 (1989).........................................................................................24

*Chevron Corp. v. Republic of Ecuador*,
   795 F.3d 200 (D.C. Cir. 2015) ................................................................... *passim*

*Chevron Corp. v. Republic of Ecuador*,
   949 F. Supp. 2d 57 (D.D.C. 2013) .......................................................................44

*Chevron Corp. v. Republic of Ecuador,*
   987 F. Supp. 2d 82 (D.D.C. 2013) .......................................................................44

*Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*,
   697 F. Supp. 2d 46 (D.D.C. 2010) .......................................................................43

*Durfee v. Duke*,
   375 U.S. 106 (1963).........................................................................................36

*Entes Indus. Plants, Constr. & Erection Contracting Co. v. Kyrgyz Republic*,
   Civ. No. 18-2228 (RC), 2019 WL 5268900 (D.D.C. Oct. 17, 2019) ......................................43

*In re Exec. Off. of President*,
   215 F.3d 20 (D.C. Cir. 2000)..............................................................................16

ii

*Hulley Enters. Ltd. v. Russian Federation*,
   2022 WL 1102200 (D.D.C. Apr. 13, 2022) ............................................................45

*Int'l Bhd. of Painters & Allied Trades v. Hartford Acc. & Indem*. Co.,
   388 A.2d 36 (D.C. 1978) .....................................................................................29

*Kass v. William Norwitz Co*.,
   509 F. Supp. 618 (D.D.C. 1980) ...........................................................................24

*Landis v. N. Am. Co*.,
   299 U.S. 248 (1936)...............................................................................................45

*LLC SPC Stileks v. Republic of Moldova*,
   985 F.3d 871 (D.C. Cir. 2021) ....................................................................... *passim*

*M.O. v. District of Columbia*,
   20 F. Supp. 3d 31 (D.D.C. 2013) ..............................................................3, 35, 39, 43

*McFadden v. Nationstar Mortg. LLC*,
   Civ. No. 20-166 (EGS), 2022 WL 1001253 (D.D.C. Apr. 4, 2022)...........................3

*Morgan v. Astrue*,
   Civ. No. 08-2133, 2009 WL 3541001 (E.D. Pa. Oct. 30, 2009)................................3

*U.S. ex rel. Morsell v. Symantec Corp*.,
   471 F. Supp. 3d 257 (D.D.C. 2020) .......................................................................28

*Nat'l Indus. for Blind v. Dep't of Veterans Affs*.,
   296 F. Supp. 3d 131 (D.D.C. 2017) .......................................................................45

*Nat'l R.R. Passenger Corp. v. Bos. & Me. Corp*.,
   850 F.2d 756 (D.C. Cir. 1988) ...............................................................................18

*Newco Ltd. v. Gov't of Belize*,
   650 F. App'x 14 (D.C. Cir. 2016)...........................................................................42

*NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*,
   Civ. No. 19-cv-01618 (TSC), 2023 WL 2016932 (D.D.C. Feb. 15, 2023) .......16, 45

*Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp*.,
   724 F.3d 230 (D.C. Cir. 2013)...............................................................................40

*P.J.E.S. by & through Escobar Francisco v. Wolf*,
   502 F. Supp. 3d 492 (D.D.C. 2020).........................................................................3

*Process & Indus. Devs. Ltd. v. Federal Republic of Nigeri*a,
   962 F.3d 576 (D.C. Cir. 2020)...............................................................................44

*Red Lake Band of Chippewa Indians v. U.S. Dep't of Interior*,
    624 F. Supp. 2d 1 (D.D.C. 2009) ........................................................23

*Regan v. Spicer HB, LLC*,
    134 F. Supp. 3d 21 (D.D.C. 2015) .....................................................28

*In re Sealed Case*,
    825 F.2d 494 (D.C. Cir. 1987) ............................................................41

*Shurtleff v. EPA*,
    991 F. Supp. 2d 1 (D.D.C. 2013) .........................................................3

*Stati v. Republic of Kazakhstan*,
    199 F. Supp. 3d 179 (D.D.C. 2016) ...............................................25, 26

*Tethyan Copper Co. Pty Ltd. v. Islamic Republic of Pakistan*,
    590 F. Supp. 3d 262 (D.D.C. 2022) ............................................ *passim*

*Tidewater Inv. SRL v. Venezuela*,
    Civ. No. 17-1457 (TJK), 2018 WL 6605633 (D.D.C. Dec. 17, 2018) ...................36

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*,
    411 F.3d 296 (D.C. Cir. 2005) .......................................................42, 43

*Trans World Airlines, Inc. v. Franklin Mint Corp.*,
    466 U.S. 243 (1984) ...........................................................................23

*Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins.*
*Guaranty Ass'n*,
    455 U.S. 691 (1982) ....................................................................35, 36

*United States v. Bank of Am.*,
    78 F. Supp. 3d 520 (D.D.C. 2015) ......................................................23

*United States v. First Nat'l City Bank*,
    396 F.2d 897 (2d Cir. 1968) ...............................................................41

*United States v. Stuart*,
    489 U.S. 353 ......................................................................................24

*W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*,
    493 U.S. 400 (1990) ...........................................................................42

## International Cases

*Eastern Sugar B.V. v. Czech Republic*,
    SCC Case No. 088/2004, Partial Award (Mar. 27, 2007) ...........................9

Joined Cases 106-120/87, *Asteris v. Greece*,
    1988 E.C.R. 5531 (Sept. 27, 1988) ...................................................................38

*Moldova v. Komstro*y LLC,
    ECLI:EU:C:2021:655 (Sept. 2, 2021) ...........................................................7, 11

*Opinion 2/15 re EU-Singapore FTA*,
    CJEU Case EU:C:2017:376 (May 16, 2017) ........................................................10

*Opinion Pursuant to Article 218(11) TFEU*,
    CJEU Case EU:C:2019:341 (Apr. 30, 2019) ........................................................10

*Republic of Poland v. CEC Praha et al.*,
    Paris Court of Appeal, Case No. 20/14581 (2022) ..............................................10

*Republic of Poland v. PL Holdings Sàrl*,
    Case C-109/20 (Oct. 26, 2021) .........................................................12, 28, 29

*Slowakische Republik (Slovak Republic) v. Achmea BV*,
    CJEU Case C-284/16, Preliminary Ruling (Mar. 6, 2018), ......................... *passim*

**Statutes**

22 U.S.C. § 1650a ......................................................................................... *passim*

28 U.S.C. § 636(b)(1)(C) ..................................................................................4, 39

28 U.S.C. § 1605(a)(6) .................................................................................. *passim*

**Other Authorities**

European Commission, Decision on State Aid SA.40348 (2015/NN),
    2017 O.J. (C442) (Nov. 10, 2017) ....................................................................37

Jorge Liboreiro, *In U-turn, Brussels recommends EU-wide exit from controversial
    Energy Charter Treaty*, EuroNews.com, Feb. 7, 2023,
    https://www.euronews.com/my-europe/2023/02/07/in-u-turn-brussels-
    recommends-eu-wide-exit-from-controversial-energy-charter-treaty ......................7

Fed. R. Civ. P. 72(b)(3) .........................................................................................2

Restatement (Fourth) of Foreign Relations Law § 441 (2018) ...................................41

Restatement (Fourth) of Foreign Relations Law § 442 (2018) ..............................39, 41

On March 31, 2023, United States Magistrate Judge Moxila A. Upadhyaya issued a thorough and well-reasoned Report & Recommendation, ECF No. 63, (the "**R&R**"), recommending that the Kingdom of Spain's ("**Spain**") Motion to Dismiss under Rules 12(b)(1) and 12(b)(6) be denied, and that the Motion for Summary Judgment filed by Cube Infrastructure Fund SICAV, Cube Infrastructure Managers S.A., Cube Energy S.C.A. (now Cube Energy S.Á.R.L.) (the "**Cube Plaintiffs**"), Demeter Partners S.A. (now Demeter Investment Managers S.A.), and Demeter 2 FPCI's (the "**Demeter Plaintiffs**," and together with the Cube Plaintiffs, "**Plaintiffs**") be granted.  Judge Upadhyaya correctly concluded that Spain did not meet its burden of persuasion, by a preponderance of the evidence, to demonstrate that there was not an agreement to arbitrate that would confer subject matter jurisdiction upon this Court, and had not demonstrated any other grounds for dismissal of the Complaint.

## I.     PRELIMINARY STATEMENT

In Spain's objections to the R&R (the "**Objections**"), Spain seeks to take a fourth bite at the apple, rearguing its same defenses which were rejected by the arbitral tribunal in ICSID Case No. ARB/15/20 (the "**Tribunal**"), the ICSID annulment committee that adjudicated Spain's annulment application (the "**Annulment Committee**"), and, most recently, by Judge Upadhyaya in the R&R.  This Court should put a stop to Spain's efforts to perpetually reargue issues it has raised - and lost - and promptly enter judgment in Plaintiffs' favor to bring this matter to a close.

First, the R&R correctly found that this Court has subject matter jurisdiction under the FSIA's arbitration exception.  **Section IV(A)**.  Spain does not contest that it signed and ratified the Energy Charter Treaty (the "**ECT**") and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "**ICSID Convention**"), that Plaintiffs submitted a proper notice of arbitration commencing arbitration under those treaties, or that the award rendered in favor of Plaintiffs and against Spain in ICSID Case No. ARB/15/20 (the "**ICSID**

**Award**") was rendered in accordance with the applicable arbitral rules. None of Spain's allegations regarding EU law change these facts.

Second, the R&R correctly found that the ICSID award is entitled to "full faith and credit" pursuant to 22 U.S.C. §1650a ("**Section 1650a**"). **Section IV(B)**. It is axiomatic that courts are not permitted to examine the merits of an ICSID award, and so once this Court satisfies itself that it has jurisdiction, the ICSID Award must be recognized as "a final judgment of a court of general jurisdiction of one of the several States." 22 U.S.C. § 1650a(a).

Third, Spain's objections to the R&R's findings regarding the foreign sovereign compulsion and the act of state doctrines are unavailing. **Section IV(C)**. Spain does not object to the R&R's conclusion that the foreign sovereign compulsion doctrine does not apply to states, such as Spain, rendering its other objections merely an academic exercise. Similarly, the act of state doctrine is equally inapplicable as it does not apply to foreign judgments, and so nothing in the act of state doctrine would suggest that this Court is "bound" by decisions issued by the Court of Justice of the European Union (the "**CJEU**").

Fourth, the R&R correctly found that the defense of *forum non conveniens* is unavailable in this District in actions, like this one, which seek to confirm an arbitral award. **Section IV(D)**.

Finally, the R&R did not err in concluding that Plaintiffs' motion for summary judgment should be granted. **Section IV(E)**. Once this Court finds it has jurisdiction, pursuant to 22 U.S.C. § 1650a(a), the Award "shall" be recognized. Plaintiffs' cross-motion for summary judgment is the appropriate means to do so, and a discretionary stay pending any appeal by Spain is unwarranted.

## II.    LEGAL STANDARD

Spain only partially acknowledges the standard of review here. Objs. 2. While a review of a magistrate judge's report and recommendation is *de novo*, Fed. R. Civ. P. 72(b)(3), objections

must "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for the objection." LCvR 72.3(b). "[O]bjections which merely rehash an argument presented to and considered by the magistrate judge are not 'properly objected to' and are therefore not entitled to *de novo* review." *P.J.E.S. by & through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 507 (D.D.C. 2020) (Sullivan, J.) (alteration in original) (citation omitted); *Shurtleff v. EPA*, 991 F. Supp. 2d 1, 8 (D.D.C. 2013) ("objections which merely rehash an argument presented and considered by the magistrate judge are not 'properly objected to' and are therefore not entitled to *de novo* review." (citation omitted)). "To now re-address these issues would simply duplicate the thorough efforts of the Magistrate Judge and defeat any benefit of judicial efficiency gained by the report and recommendation process." *Morgan v. Astrue*, Civ. No. 08-2133, 2009 WL 3541001, at *4 (E.D. Pa. Oct. 30, 2009).

"[W]hen a party makes conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." *M.O. v. District of Columbia*, 20 F. Supp. 3d 31, 37 (D.D.C. 2013) (quoting *Alaimo v. Bd. Of Educ. Of the Tri-Valley Cent. Sch. Dist.*, 650 F.Supp.2d 289, 291 (S.D.N.Y.2009)); *see also McFadden v. Nationstar Mortg. LLC*, Civ No. 20-166 (EGS), 2022 WL 1001253, at *2 (D.D.C. Apr. 4, 2022) (Sullivan, J.) (same). "'Under the clearly erroneous standard, the magistrate judge's decision is entitled to great deference' and 'is clearly erroneous only if on the entire evidence the court is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Buie v. District of Columbia*, Civ. No. 16-1920 (CKK), 2019 WL 4345712, at *3 (D.D.C. Sept. 12, 2019) (citing *Graham v. Mukasey*, 608 F. Supp. 2d 50, 52 (D.D.C. 2009)) (internal quotations omitted)). Furthermore, "only those issues that the parties have raised in their objections to the Magistrate Judge's report will be reviewed." *M.O.*, 20 F. Supp. 3d at 37 (citation omitted); *see also* 28 U.S.C.

3

§ 636(b)(1)(C) ("judge of the [district] court shall make a *de novo* determination of **those portions** of the report or specified proposed findings or recommendations to which objection is made.").

## III.    FACTUAL BACKGROUND

### A.    THE APPLICABLE LEGAL FRAMEWORK

#### 1.    The Energy Charter Treaty

The ECT (ECF No. 1-4) is a multilateral investment treaty with 54 signatories (or "**Contracting Parties**"), including 27 EU Member States, the EU itself, and numerous non-EU countries such as Japan, Tajikistan, and Yemen. The ECT was adopted in 1998 and designed to promote cross-border cooperation in the energy industry and to provide an arbitration forum for disputes that arise under it. The ECT is a multilateral treaty which reflects the interests of all ECT Contracting Parties. Declaration of Andrea Bjorklund, July 15, 2022, ECF No. 53-1 ("**Bjorklund Decl**."), ¶¶ 112-119.

Article 26(6) of the treaty governs disputes. It states that "[a] tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of **international law**." (emphasis supplied). Under its plain language, an ECT tribunal is to apply principles of **international law** – not EU law. This is likely because, as Professor Andrea Bjorklund explained, the ECT was not "solely a European project." Bjorklund Decl., ¶ 43. The ECT is a "multilateral instrument, which imposes international law disciplines on its Member States, not European law disciplines." *Id.* at ¶ 44.

Article 26(3)(a) of the ECT provides that each Contracting Party "gives its **unconditional consent** to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article." ECT, art. 26(3)(a) (emphasis supplied).

The ECT also provides clear guidance regarding any possible conflict of laws. Pursuant to Article 16, in the event of a conflict between the ECT and another treaty, "nothing in such terms

of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty **or from any right to dispute resolution with respect thereto under this Treaty**, where any such provision is more favourable to the Investor or Investment."  ECT, art. 16 (emphasis supplied).  Article 26, the dispute resolution clause, is contained within Part V of the ECT.

Where the Contracting Parties to the ECT intended to carve out certain subject matters, they included what is called a "disconnection clause," a treaty concept used to carve certain subject matters or parties outside of a treaty's application.  For example, Annex 1 of the ECT provides that where the ECT conflicts with the previously ratified Svalbard Treaty, the ECT does not apply. ECT, Annex 1; Bjorklund Decl. ¶ 94.  Such a clause regarding intra-EU disputes was proposed during the initial drafting of the ECT – but was ultimately not included.  Bjorklund Decl. ¶ 96.

Article 46 of the ECT expressly states that "[n]o reservations may be made to this treaty," and so there are no limitations or exceptions that would preclude investors from certain Contracting Parties from resolving their disputes with any other Contracting Parties.  ECT, art. 46. This also precludes *ad hoc* amendments.  As Professor Bjorklund explains, the ECT "is a multilateral treaty which, by its plain terms, cannot be modified inter se absent adherence to strict provisions."  Bjorklund Decl. ¶ 125.  Under Article 42 of the ECT, "amendments must first be adopted by the Charter Conference, and . . . distributed to all Contracting Parties for ratification, acceptance, or approval."  *Id.*, ¶ 126.  This process has not occurred.  As a result, two or more ECT Contracting Parties cannot simply amend the treaty as between themselves without complying with the amendment process specified in the ECT.  *Id.*, ¶ 127.  For good reason; differing obligations between Contracting Parties "is not a matter of indifference to other Contracting Parties," as it can distort the levels of treatment available to nationals of the third-party states.  *Id.*, ¶ 112.

## 2.      The ICSID Convention

The ICSID Convention is a treaty that provides a comprehensive framework for resolving investment disputes between its signatory nations and the private investors of other signatory nations.  Arbitral awards rendered pursuant to the ICSID Convention, to which over 150 countries are parties, including the United States, France, Luxembourg, and Spain, are subject to recognition and enforcement in the United States under Article 54 of the ICSID Convention and its implementing legislation, Section 1650a.

Under this special regime, ICSID awards are "binding," "final judgment[s]" that are not "subject to any appeal or to any other remedy except those provided for in th[e] Convention." ICSID Convention, art. 53(1).  In the United States, ICSID awards are entitled to "full faith and credit," and must be recognized "as if the award were a final judgment of a court of general jurisdiction of one of the several States." 22 U.S.C. § 1650a.  ICSID awards are not subject to any defenses to confirmation that would be available under the FAA.  *Id.*  It is also well settled that United States courts have no authority to review an ICSID tribunal's decision, or to consider any merits defenses, and **must** enforce an ICSID award expeditiously by converting the award into a judgment once the court's jurisdiction is established.  As Professor Bjorklund explained:

> Article 53 of the ICSID Convention provides that the "award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention." Moreover, "[e]ach party shall abide by and comply with the terms of the award."  Under Article 54 of the Convention, State Parties further agree to "enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State."

Bjorklund Decl., ¶ 60 (internal citations omitted).  As a result, parties to the ICSID Convention, including Spain and the United States, agreed to enforce final ICSID awards as binding in their courts, and in the courts of any other contracting party.  This agreement "does not depend on

domestic courts' assessment of matters already decided by the tribunal."  Bjorklund Decl., ¶ 61; *see also id.*, ¶¶ 62-69.

> **3.     Neither the EU Treaties nor the Decisions of the Court of Justice of the European Union form Part of the Applicable Law Under the ECT**

While EU law may apply within the EU, this does not mean that EU law "trumps" other international obligations, including the ECT and the ICSID Convention.  The CJEU's judicial rulings in *Slowakische Republik (Slovak Republic) v. Achmea BV,* CJEU Case C-284/16, Preliminary Ruling (Mar. 6, 2018) ("***Achmea***")*,* and *Moldova v. Komstro*y LLC, ECLI:EU:C:2021:655 (Sept. 2, 2021) ("***Komstroy***") do not change this analysis.  As Professor Eeckhout has explained, while the CJEU may conclude "that certain provisions in treaties or agreements concluded by one or more Member States violate EU law," the CJEU "is incapable of annulling or invalidating such a treaty or agreement on the international plane."  First Declaration of Piet Eeckhout, Jan. 18, 2021, ECF No. 16-1 ("**First Eeckhout Decl.**"), ¶ 16.  Instead, EU Member States are tasked with taking steps to remedy the breach such as "renegotiating the relevant terms, or by denouncing or terminating the agreement in issue."  *Id.*[1]  Consistent with Professor Eeckhout's analysis, EU Member States have now signed what is called the "termination treaty," which seeks to terminate intra-EU bilateral investment treaties.  Moreover, the European Commission has launched infringement proceedings against EU Member States who failed to abrogate their intra-EU bilateral investment treaties.  Bjorklund Decl., ¶ 104.  As Professor Bjorklund explains, "[i]nfringement against EU Member States for their failure to terminate their intra-EU BITs would not be necessary were the treaties themselves negated simply by their

---

[1]   In fact, several EU Member States have expressed their intent to withdraw from the ECT including, Germany, France, Spain, The Netherlands, and Poland.  *See* Jorge Liboreiro, *In U-turn, Brussels recommends EU-wide exit from controversial Energy Charter Treaty*, EuroNews.com, Feb. 7, 2023, https://www.euronews.com/my-europe/2023/02/07/in-u-turn-brussels-recommends-eu-wide-exit-from-controversial-energy-charter-treaty.

incompatibility with EU law." *Id.* "No similar infringement proceedings have been brought regarding the ECT." *Id.*

The EU and several of its Member States are also attempting to renegotiate the ECT so as to include a disconnection clause that prohibit investors from a Contracting Party in one regional economic integration organization ("**REIO**"), such as the European Union, from bringing claims against a Contract Party that is part of the same REIO. Bjorklund Decl., Ex. 38, ECF. No. 53-39. By its own terms, the draft agreement will "enter into force 90 days after the ratification by three-fourths of the Contracting Parties." *Id.* at 2. So, unless and until it is ratified, it is indisputable that the ECT contains no such disconnection clause for intra-EU disputes.

### a) When the ECT was Ratified, There was No Doubt that Intra-EU Arbitration was Permissible

The European Union is a party to the ECT, and the European Commission was part of the team which negotiated the ECT. Bjorklund Decl., ¶ 170. Prior to the *Achmea* decision in 2018, there was no doubt that the ECT applied to intra-EU disputes. As Professor Bjorklund explains, "[w]hatever view the Commission, Spain, and Professor Hindelang may take today about the validity of intra-EU arbitration under the ECT, no one questioned at the time the ECT was concluded that EU members could bind themselves to arbitration regarding intra-EU disputes. The ECT negotiations took place in the 1990s." Bjorklund Decl., ¶ 101. EU Member States reiterated that "EU obligations did not preclude investment treaty obligations." Bjorklund Decl., ¶ 102 (recalling the position taken by The Netherlands in an official letter provided to the Slovak Republic stating that "European Union law aspects cannot and do not affect in a way the existing jurisdiction of this Arbitral Tribunal."). On January 13, 2006, the European Commission recalled:

> the effective prevalence of the EU acquis does not entail . . . the automatic termination of the concerned BITs or, necessarily, the non-application of all their provisions. . . [EU] Member States would have to strictly follow the relevant procedure provided for

> this in regard in the agreements themselves.  Such termination
> cannot have a retroactive effect.

*Eastern Sugar B.V. v. Czech Republic*, SCC Case No. 088/2004, Partial Award (Mar. 27, 2007),

ECF No. 43-8, ¶ 119.

### b)        The *Achmea* Decision Did Not Bar Intra-EU Arbitration

The CJEU's decision in *Achmea* was rendered on March 6, 2018 – nearly **three years** after

Plaintiffs initiated their arbitration against Spain, and nearly ten years after they invested in Spain

in reliance on the investment protections provided by the ECT.  In *Achmea*, the CJEU issued a

"preliminary ruling," finding that the arbitration clause contained in the Netherlands-Slovakia BIT

was not compatible with EU law because an arbitral tribunal constituted under that BIT would be

tasked with determining issues of EU law, something that it found only the EU's national courts –

which have the ability to refer questions to the CJEU – may do.  *Id.* ¶¶ 58-60.  The CJEU's analysis

focused on the choice of law clause contained in the relevant BIT, which required the *Achmea*

tribunal to apply EU law in resolving disputes.  *Id.* ¶¶ 39-42; *see also* First Eeckhout Decl. ¶ 35.

The CJEU clarified that its ruling applied **only** to BITs concluded between EU Member States,

and confirmed that an investor-state arbitration mechanism is **not automatically** incompatible

with EU law.  The CJEU distinguished the BIT at issue from other international agreements,

including agreements entered into by the EU itself (*e.g.*, the ECT).  *Id.*  ¶ 57.  The CJEU did not

rule out the possibility that "the EU could sign a treaty and agree to refer matters regarding

compliance with that treaty to independent dispute settlement."  Bjorklund Decl. ¶ 84.

Spain's suggestion that following *Achmea* it was apparent that intra-EU arbitration was

precluded under EU law, *see* Objs. 8-9,[2] is not reflected by relevant events that immediately

---

2      Spain highlights a recent case by the Paris Court of Appeal, *Republic of Poland v. CEC Praha
       et al.*, which applied *Achmea* to find that the Czech Republic-Netherlands BIT "cannot be the

followed.  Indeed, following *Achmea*, the CJEU continued to issue decisions which signaled that intra-EU arbitration was not necessarily in conflict with EU law.  In an April 30, 2019 decision concerning a trade agreement between Canada and the EU ("**CETA**"), the CJEU clarified that multilateral investor-state dispute settlement mechanisms that bypass the CJEU do not "adversely affect[] the autonomy of the EU legal order," and held that such arrangements – particularly when the EU is included as a Contracting Party – are compatible with EU law.  *See Opinion Pursuant to Article 218(11) TFEU*, CJEU Case EU:C:2019:341 (Apr. 30, 2019), ¶¶ 13-16, 115 (*hereinafter* "**CETA Decision**"), ECF No. 43-33; First Eeckhout Decl. ¶¶ 46-48.  The CETA Decision was consistent with prior CJEU precedent which had found that even where "provisions in an international agreement on investor-State dispute settlement . . . have the effect of excluding the jurisdiction of the ordinary courts of the Member States, in favour of international arbitration," such agreements are "not within EU competence" and are not *per se* invalid under EU law.  *See* First Eeckhout Decl. ¶ 24 & Ex. 17 (*Opinion 2/15 re EU-Singapore FTA*, CJEU Case EU:C:2017:376 (May 16, 2017)).

On January 15, 2019, several EU Member States issued their own non-binding "declarations" concerning the "legal consequences" of the *Achmea* decision on investment protection in the EU.  *See Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union,* Jan. 15, 2019 (*hereinafter* the "**January 2019 Declaration**"), ECF No. 43-12; First Eeckhout Decl. ¶¶ 84-87; *see also* Objs. 9.  Some EU Member States took the position that "all investor-State arbitration clauses contained in bilateral

---

basis for the jurisdiction of the arbitral tribunal."  Paris Court of Appeal, Case No. 20/14581 (2022).  That case is inapposite.  It involved an UNCITRAL arbitration, seated in Paris, which arose under a bilateral investment treaty between the Czech Republic and the Netherlands.

investment treaties concluded between Member States are contrary to Union law and thus inapplicable," and concluded that the *Achmea* decision similarly invalidated the ECT's arbitration mechanism. January 2019 Declaration at 1. As Spain acknowledges, not all EU Member States joined the January 2019 Declaration. Objs. 9. Sweden, Luxembourg (the home State of two of the Plaintiffs in this case), Finland, Malta, Slovenia, and Hungary each signed declarations refusing to adopt this view. *See* First Eeckhout Decl. ¶ 87 & n. 114; Bjorklund Decl. ¶ 124. Thus, as late as 2019, not even all EU Member States, let alone all ECT Contracting Parties, held unanimous views concerning the effect of *Achmea* on ECT arbitration. First Eeckhout Decl. ¶ 87.

c)    **The CJEU's Decisions Following the ICSID Award and Annulment Hearing**

Following the annulment hearing in this case, the CJEU decided Case C-741/19, *Republic of Moldova v. Komstroy LLC*. Second Declaration of Piet Eeckhout, July 15, 2022, ECF No. 16-1, ("**Second Eeckhout Decl.**"), Ex. 1, ECF No. 16-2. *Komstroy* involved an *ad hoc* arbitration under the ECT between a Ukrainian company and Moldova – not an intra-EU dispute, as neither Ukraine nor Moldova are EU Member States. The Paris Court of Appeal requested a preliminary ruling from the CJEU on whether a contract for the sale of electricity constituted an "investment" under the ECT. The CJEU addressed this question, but also chose to address, *sua sponte*, the compatibility of Article 26 of the ECT with EU law in the context of intra-EU disputes – an issue that was not presented by the case or parties before the court. The CJEU remarked that "despite the multilateral nature of the international agreement of which it forms part, a provision such as Article 26 ECT is intended, in reality, to govern bilateral relations between two of the Contracting Parties, in an analogous way to the provision of the bilateral investment treaty at issue in . . . *Achmea*." *Komstroy*, ¶ 64. Against that backdrop, the CJEU asserted that

> although the ECT may require Member States to comply with the arbitral mechanisms for which it provides in their relations with

> investors from third States who are also Contracting Parties to that treaty as regards investments made by the latter in those Member States, preservation of the autonomy and of the particular nature of EU law precludes the same obligations under the ECT from being imposed on Member States as between themselves."

*Id.* ¶ 65.

Then, on October 26, 2021, the CJEU issued a decision in *Republic of Poland v. PL Holdings Sàrl*, Case C-109/20 (Oct. 26, 2021), ("***PL Holdings***"), ECF No. 43-37.  PL Holdings concerned a Stockholm Chamber of Commerce ("**SCC**") arbitration initiated by a Luxembourg-based company against Poland under a BIT between the two states.  The SCC tribunal, seated in Sweden, issued an award in favor of PL Holdings.  Poland brought an action before the Swedish Court of Appeal to set aside the award on grounds that the arbitration clause of the BIT was incompatible with EU law.  The Swedish Court of Appeal found Poland tacitly agreed to arbitrate the dispute because it did not raise this objection during the arbitration.  Poland appealed to the Supreme Court of Sweden, which referred to the CJEU the question of whether, under EU law, EU Member States are precluded from implicitly entering into ad hoc arbitration agreements to arbitrate intra-EU disputes.  The CJEU concluded that Articles 267 and 344 of the TFEU precluded EU Member States from entering into ad hoc arbitrations pursuant to intra-EU BITs. PL Holdings, ¶ 47.  The CJEU made no findings regarding the ECT or ICSID arbitration.

### B.   THE ICSID ARBITRATION AND ANNULMENT PROCEEDING

Plaintiffs invested in photovoltaic facilities in Spain in June 2008, and in hydro facilities in June 2011 and June 2012, relying on Spanish legislation designed to encourage the creation of renewable energy facilities and help Spain achieve its renewable energy goals.  ECF No. 1, ¶¶ 13, 15, 18.  But, Spain later enacted new regulations to roll back the benefits it previously guaranteed investors, reducing the value of Plaintiffs' investments.  *Id.* ¶¶ 16-17.  Plaintiffs therefore invoked Spain's standing offer to arbitrate under the ECT and on April 16, 2015, commenced the ICSID

arbitral proceedings (the "**ICSID Arbitration**") by filing and serving a Request for Arbitration on Spain. *Id*. ¶ 32. On December 8, 2015, the ICSID tribunal (the "**Tribunal**") was constituted to adjudicate Plaintiffs' claims, which claimed that Spain's revocation of the incentives constituted a violation of the ECT's substantive investor protection provisions.

Over the next three years, the Tribunal received substantial briefing and evidence on the Tribunal's jurisdiction and the merits. Spain alleged, among other defenses, that the Tribunal lacked jurisdiction because EU law precludes the arbitration of ECT claims brought by investors from EU Member States against other Member States. *Id*. at ¶ 43. The Tribunal, in its Decision on Jurisdiction, Liability and Partial Decision on Quantum on February 19, 2019 (the "**Decision**"), rejected Spain's intra-EU defense and found that it had jurisdiction to hear the dispute. *Id*. ¶ 38. The Tribunal first rejected Spain's contention that it could not have agreed to arbitrate a dispute under the ECT with an investor from another state in the EU because EU law precludes it. *Id*.; *see also* ECF No. 1-2, ¶¶ 124, 130, 138. The Tribunal also addressed Spain's contention that EU law applies to the ECT as it is "one of the standards of international law." ECF No. 1-2, ¶ 79. As the Tribunal explained, "[t]o say that EU law is part of international law and yet has supremacy over other, non-EU components of international law is . . . to mischaracterize EU law and confuse questions belonging to two different legal orders." *Id.* ¶ 130. Pursuant to Article 26(6) of the ECT, the governing law is "international law," and the Tribunal found that "there is no evidence, and it cannot be supposed, that the intention was to apply principles of EU law to all disputes arising under [the] ECT." *Id.* ¶ 158. Indeed, "[w]hile the EU treaties are of course international agreements . . . they do not thereby become 'principles of international law.'" *Id.*

On July 15, 2019, the Tribunal issued the ICSID Award, which reaffirmed the Decision's rejection of Spain's jurisdictional objections, including its intra-EU objection. The Tribunal

determined that the intra-EU defense was **inapplicable** in ECT disputes because the ECT does not "differentiate between different classes of Contracting Parties." *Id.* at ¶ 124. The Tribunal awarded Plaintiffs EUR 30.81 million for losses caused to their investments. ECF No. 1, ¶ 47.

Under the ICSID Convention, the only post-arbitration review to which an ICSID award may be subjected is an ICSID annulment proceeding. ECF No. 1-3, art. 52; *see also id.* art 53(1) (recalling that domestic courts and other institutions are precluded from reviewing final awards on the merits). Spain took advantage of the annulment process and, on November 12, 2019, in accordance with Article 52(1)(b) of the ICSID Convention, Spain filed an application to annul the ICSID Award (the "**Annulment Proceeding**"). ECF No. 1, ¶¶ 48-49. In the Annulment Proceeding, Spain again alleged that the Tribunal lacked jurisdiction because EU investors are precluded from arbitrating disputes with EU Member States, including disputes under the ECT. ECF No. 53 at 7.

On March 28, 2022, in a 156-page decision (the "**Annulment Decision**"), the Annulment Committee rejected Spain's application, and affirmed the ICSID Award. ECF No. 53 at 7-8; *see also* ECF No. 33-1. As Plaintiffs have previously explained, the Annulment Committee carefully considered – and rejected – Spain's arguments regarding EU law. The Annulment Committee affirmed the Tribunal's conclusion that "the text of Article 26(1) [of the] ECT does not differentiate between classes of Contracting Parties" and that "while the ECT does impose explicit restrictions in order to accommodate the position of particular States, namely in the event of a conflict between the Svalbard Treaty and the ECT, no such provision was made in order to restrict the application of the ECT to disputes involving the EU or its Member States." Annulment Decision, ¶ 183. Likewise, it upheld the Tribunal's rejection of Spain's argument that EU law applied to the ECT (in intra-EU disputes). *Id.* ¶ 184.

## IV.   ARGUMENT

### A.   THE REPORT AND RECOMMENDATION CORRECTLY DETERMINED THAT THIS COURT HAS SUBJECT MATTER JURISDICTION

Spain objects that the R&R "misapprehends the applicable legal framework" governing subject matter jurisdiction in this case and fails to adequately consider Spain's EU law arguments. Objs. 12-20.  To the contrary, the R&R properly construes and correctly applies binding Circuit law governing the determination of subject matter jurisdiction in this case, which provides unequivocally that arbitrability objections such as those invoked here by Spain are insufficient to rebut the key jurisdictional facts demonstrating an "agreement to arbitrate" for purposes of assessing subject matter jurisdiction under the arbitration exception to sovereign immunity.  As explained below, Spain's argument, that EU law imposed an unwritten exception to Spain's express "unconditional consent" to arbitrate with investors like Plaintiffs, and/or retroactively invalidated that agreement, is irrelevant to this Court's analysis of its own subject matter jurisdiction.  Magistrate Judge Upadhyaya properly concluded that Spain has failed to prove by a preponderance of the evidence that Spain's signature on the ECT and Plaintiffs' request for ICSID arbitration did not confer subject matter jurisdiction on this Court.

#### 1.   Spain's Arbitrability Objection Goes to Scope and Not Formation of an Agreement to Arbitrate

Spain first argues that Judge Upadhyaya erred by failing to account for the difference between objections to arbitrability going to the formation of an agreement to arbitrate, and those going to the scope of that agreement, and by failing to recognize Spain's arbitrability objection as one about formation.  It further contends that Judge Upadhyaya was "led into . . . error" by relying on Judge Chutkan's decisions in *9REN Holding S.À.R.L. v. Kingdom of Spain*, Civ. No. 19-cv-01871 (TSC), 2023 WL 2016933 (D.D.C. Feb. 15, 2023) and *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, Civ. No. 19-cv-01618 (TSC), 2023 WL 2016932 (D.D.C. Feb. 15, 2023),

15

and by failing to consider Judge Leon's opinion in *Blasket Renewable Invs., LLC v. Kingdom of Spain*, Civ. No. 21-3249 (RJL), 2023 WL 2682013 (D.D.C. Mar. 29, 2023), Objs. 15-16.  The decisions of district court judges are, of course, not binding on other district courts, and need not be followed when not persuasive.  *See In re Exec. Off. of President*, 215 F.3d 20, 24 (D.C. Cir. 2000) ("District Court decisions do not establish the law of the circuit, nor, indeed, do they even establish the law of the district.").  Independent of what Judges Chutkan and Leon ruled in the cases before them, the R&R correctly applied the appropriate legal framework governing **this case**, and properly declined to follow the analysis set forth in *Blasket* to the extent that case (which, unlike this case, involves an award governed by the New York Convention) failed to correctly apply those standards.

The R&R properly understood Spain's arbitrability argument to fall within the same category as those alleged by Ecuador in *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200 (D.C. Cir. 2015), Moldova in *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871 (D.C. Cir. 2021), and Pakistan in *Tethyan Copper Co. Pty Ltd. v. Islamic Republic of Pakistan*, 590 F. Supp. 3d 262 (D.D.C. 2022), and properly reached the same result as in those cases.

Notwithstanding Spain's efforts to deny the applicability of the D.C. Circuit's decisions in *Chevron* and *Stileks*, the legal framework set forth in those cases provide the beginning and end points for this Court's analysis of subject matter jurisdiction in this case.  In *Chevron*, the Court of Appeals established the burden-shifting analysis governing a district court's determination of jurisdiction under Section 1605(a)(6) of the FSIA.  The Court held that subject matter jurisdiction under Section 1605(a)(6) turns on three key jurisdictional facts: (1) an agreement to arbitrate, (2) the existence of a treaty signed by the United States calling for recognition and enforcement of arbitral awards, and (3) the existence of an award.  *Id*. at 204.  The plaintiff bears the initial burden

of production of these facts, which it satisfies by producing the treaty, the notice for arbitration, and the arbitral award. *Id*. Thereafter, "the burden of persuasion rests with the foreign sovereign claiming immunity, which must establish the absence of the factual basis by a preponderance of the evidence." *Id*. However, the Court of Appeals held that objections concerning whether the dispute was arbitrable would not affect the FSIA inquiry, but would instead go to whether the award should be confirmed. *Id*. The Court found that Ecuador's claim that it "never agreed to arbitrate **with Chevron**" failed to rebut the prima facie showing of an agreement established by Chevron's production of the BIT and its notice of arbitration. *Id*. at 205 (emphasis supplied).

The D.C. Circuit reaffirmed and further clarified this analysis in *Stileks*, a case involving the same treaty as this case, finding that the plaintiff in that case established the application of the arbitration exception to immunity by producing "copies of the ECT, the notices of arbitration and the tribunal's decision." *Id*. at 877. In *Stileks*, Moldova could not contest that it was a signatory to the ECT. It argued instead that "[a]lthough the ECT may establish that [it] agreed to arbitrate certain disputes, it does not prove that it agreed to arbitrate **this particular dispute**." *Id*. at 878 (emphasis supplied). The Court of Appeals held, however, that "the arbitrability of a dispute is not a jurisdictional question under the FSIA." *Id*. (citing *Chevron*, 795 F.3d at 205–06). Notwithstanding Moldova's attempts to frame the arbitrability issue as one going to contract formation, the Court of Appeals held that "Moldova's signature on the treaty itself" was dispositive evidence of the arbitral tribunal's jurisdiction, and because the treaty (and the investor's chosen arbitration rules) delegated questions of arbitrability to the tribunal, the district court had "no authority to delve into the merits of Moldova's argument." *Id*. at 879.

Spain seeks to sidestep these decisions, basing its objection largely on the R&R largely on the fact it did not apply Supreme Court precedents involving arbitrability objections going to the

formation of an agreement to arbitrate.  Objs. 14-16.  But, put simply, the R&R does not treat Spain's objection to arbitrability as one concerning contract formation because **it is not one**.  Spain does not, and cannot, dispute that it was, from the time of Plaintiffs' investment to date, a signatory to the ECT, and that it entered into an agreement to arbitrate disputes falling within the ECT's scope as a matter of fact.  Rather, Spain argues that this Court should read an unwritten exception in Article 26 that implicitly carves out investors from other EU Member States from an otherwise unequivocal agreement to arbitrate.  It is obvious that Spain's arbitrability objection goes to the scope, rather than the formation, of an agreement to arbitrate because Spain has never alleged that Article 26(3)(a) is insufficient to constitute a "standing offer" to arbitrate with an investor from a non-EU Member State.  The D.C. Circuit has characterized a formation dispute as one concerning "whether the parties ever agreed to submit anything to arbitration in the first place."  *Nat'l R.R. Passenger Corp. v. Bos. & Me. Corp.*, 850 F.2d 756, 761 (D.C. Cir. 1988).  Notwithstanding its best efforts to frame its objection as one going to the "formation" of an agreement to arbitrate, Spain's briefing in this case makes clear that Spain is not claiming that it never agreed to arbitrate any dispute **with anyone at all** under the ECT; it is objecting to arbitration **with a subset of "Investors"** as defined under the treaty, specifically, those from other EU Member States.  Objs. 19-20; *see also* Motion to Dismiss, ECF No. 43-1, at 1 ("the ECT's arbitration provision does not extend to disputes between Member States").

In other words, Spain – like Moldova in *Stileks* – contends that "[a]lthough the ECT may establish that [it] agreed to arbitrate certain disputes, it does not prove that it agreed to arbitrate **this particular dispute**."  *Stileks*, 985 F.3d at 878 (emphasis supplied).  As the Court of Appeals explained unequivocally in *Chevron* and *Stileks*, because this kind of arbitrability argument does nothing to rebut the key jurisdictional facts of Spain's signature on the treaty and Plaintiffs' request

for arbitration, it cannot present "a jurisdictional question under the FSIA" and cannot rebut the presumption of "an agreement to arbitrate" for purposes of analyzing subject matter jurisdiction under Section 1605(a)(6) of the FSIA.  *Id.* (*citing Chevron*, 795 F.3d at 205–06).

Spain's arguments that the R&R "misstates the role of the EU Court of Justice in determining EU law" and "misunderstands the relationship between the Energy Charter Treaty and the European Treaties," Objs. 16-18, operate as red herrings in an FSIA jurisdictional analysis because, as explained above, the governing law of this Circuit does not require this Court to apply **any** principle of EU law for purposes of determining its own subject matter jurisdiction in this case.  The R&R therefore properly concluded that "[b]ecause Spain offers nothing else to rebut the presumption" established by Plaintiffs' production of the ECT (signed by Spain) and Plaintiffs' request for arbitration, Spain had failed to carry its burden of persuasion and the Court's analysis of subject matter jurisdiction was at an end.  R&R at 22.

## 2.    The R&R Properly Determined that Spain Delegated Its Arbitrability Objections to the ICSID Tribunal

As demonstrated above, because Spain's argument that its "unconditional consent" to arbitrate set forth in Article 26(a)(3) of the ECT did not extend to intra-EU investors like Plaintiffs pertains to the scope, rather than the formation, of an arbitration agreement, the R&R properly concluded that those arguments are irrelevant to this Court's determination of subject matter jurisdiction.  *See Chevron*, 795 F.3d at 205 (Ecuador's argument that its dispute with Chevron was "not covered by the BIT" did not go to the issue of jurisdiction); *Stileks*, 985 F.3d at 878 (Moldova's argument that its consent to arbitrate under Article 26 of the ECT did not extend to Derimen because it was not a "qualifying investor" did not present a "jurisdictional question").

Even if those arguments were relevant, they would be foreclosed by Spain's delegation of such questions to the Tribunal.  *See Stileks*, 985 F.3d at 878 ("The tribunal's jurisdictional grant

**derived from Moldova's signature on the [ECT] itself**, and – under our law – it is up to the tribunal to determine what the treaty means.  We thus have no authority to delve into the merits of Moldova's argument." (emphasis supplied)).  Here, as in *Stileks*, the record reflects clear and unmistakable evidence of Spain's delegation of questions of arbitrability to the Tribunal.  *See id.* at 878-79 (concluding that "Moldova agreed to assign arbitrability determinations to the tribunal" because "[u]nder Article 26 of the ECT, all parties agree to arbitration under UNCITRAL's rules," and "[t]hose rules state that the 'arbitral tribunal shall have the power to rule on its own jurisdiction'") (*citing Chevron*, 795 F.3d at 208 (holding that agreement to selection of UNCITRAL's arbitration rules was "clear and unmistakable evidence that the parties agreed to arbitrate arbitrability")).  Article 26 of the ECT and Article 41 of the ICSID Convention unambiguously provide, respectively, that "[t]he Tribunal shall be the judge of its own competence," and shall consider "[a]ny objection . . . that [a] dispute is not within the jurisdiction of [ICSID]."  ICSID Convention, art. 41.  As this Court held in *Tethyan*, much like the UNCITRAL Rules, "the ICSID Convention grants a tribunal the authority to be 'the judge of its own competence'" and so "the ICSID Tribunal determines its jurisdiction over a dispute."  *Tethyan*, 590 F. Supp. 3d at 275.

While *Stileks* involved the recognition of an ECT award subject to the New York Convention, its conclusion that Contracting Parties to the ECT have delegated issues of arbitrability to the arbitral tribunal must apply with even stronger force in the context of an ICSID award given the unique nature of ICSID arbitration.  Articles 53 and 54 of the ICSID Convention imposes upon Contracting States a mandate to enforce ICSID awards as "binding" and "final judgment[s]" that "shall not be subject to any appeal or to any other remedy."  ICSID Convention, arts. 53(1), 54(1).  Unlike the New York Convention, the ICSID Convention does not allow the

courts of contracting states to consider any grounds for non-recognition, including objections to the arbitral tribunal's jurisdiction. Bjorklund Decl., ¶ 61. In fact, national courts are given absolutely no role in reviewing the validity of an ICSID award. *Id.*; *see also supra* **Section IV(A)(2)**. Rather, the sole avenue of review of an ICSID award is a petition for annulment, which is decided by an annulment committee convened by ICSID. Bjorklund, ¶ 51; ICSID Convention, art. 52. An annulment committee is specifically empowered by the ICSID rules to consider objections to the tribunal's jurisdiction, including the lack of an agreement to arbitrate. ICSID Convention, art. 52(1). Once an ICSID Annulment Committee has ruled, courts of Contracting States must then recognize that award as a final and binding domestic judgment. ICSID Convention, art. 54(1) ("Each Contracting State **shall** recognize an award rendered pursuant to this Convention" and treat the award as if it were a final judgment of the courts of a constituent state." (emphasis supplied)). In other words, parties agreeing to ICSID arbitration agree that the ICSID tribunal's determination of its own jurisdiction (and, where applicable, an annulment committee's review of that decision) will constitute the final word on the matter, and national courts will have no further say. As this Court held in *Tethyan*, under the ICSID Convention, "ICSID's jurisdictional power . . . renders binding on this Court the Tribunal's arbitrability determination," leaving the court with "'no authority to delve into'" the merits of an ICSID Tribunal's determination that it had jurisdiction over the dispute. *Tethyan*, 590 F. Supp. 3d at 275.

Of course, Spain's arbitrability objection on the basis of *Achmea* and other sources of EU law was already considered and rejected by both the ICSID Tribunal and Annulment Committee in this case. ECF No. 1-2, ¶¶ 79, 124, 130, 138, 158 (regarding the ICSID Tribunal's findings); ECF No. 53, ¶¶ 183-186, 330-333 (regarding the Annulment Committee's findings); *see also*

*supra* **Section IV(B)**.[3]  In light of Spain's signature on the ECT and the "unconditional consent" provided in Article 26 to arbitrate under the ICSID Rules when such rules are chosen by the investor, Judge Upadhyaya properly determined that Circuit law prohibits this Court's *de novo* consideration of Spain's arbitrability objection, and that Spain's attempt at a fourth bite at the apple through the guise of an objection to this Court's jurisdiction under the FSIA was meritless under Circuit law.  *See Stileks*, 985 F.3d at 879 ("The tribunal's jurisdictional grant derived from Moldova's signature on the treaty itself, and – under our law – it is up to the tribunal to determine what the treaty means.").

### 3.  Even on *De Novo* Review, Spain Has Not Rebutted the Presumption of an Agreement to Arbitrate with Plaintiffs

As explained above, the R&R properly concludes that, under this Circuit's binding precedent, this Court is not required to consider the merits of Spain's arbitrability objection for purposes of determining its own subject matter jurisdiction, and not permitted to second-guess the Tribunal's rulings on arbitrability in light of Spain's delegation of such issues to the ICSID Tribunal by virtue of Spain's status as a signatory to both the ECT and ICSID Convention. However, even a *de novo* examination of whether there was an agreement to arbitrate in this case would demonstrate that there was.

In *Chevron*, the Court of Appeals held that the key facts that allowed it to exercise subject matter jurisdiction in that case were the "standing offer to all potential U.S. investors to arbitrate

---

[3]   Plaintiffs have no doubt that the ICSID Tribunal and the Annulment Committee fully understood the EU law issues in the Arbitration.  The Arbitral Tribunal included of UK barrister Vaughn Lowe KC, of Essex Court Chambers with experience in disputes before the CJEU and the European Court of Human Rights, and Christian Tomuschat, the professor emeritus of public international law and European law at Humboldt University in Berlin.  The Annulment Committee also included arbitrators with EU law experience.  It was chaired by Dr. Jacomijn van Haersolte-van Hof, a Dutch-trained lawyer, current Director of the London Court of International Arbitration, and a law professor at Leiden University in The Hague.

investment disputes" contained within the relevant BIT, and Chevron's acceptance of that offer "in the manner required by the treaty." *Chevron*, 795 F.3d at 206. Here, Spain has never contested that Plaintiffs "provide[d] [their] consent in writing for the dispute to be submitted to . . . [t]he International Centre for Settlement of Investment Disputes" in accordance with Article 26(4)(a)(i). Spain's objection centers around whether the "unconditional consent" set forth in Article 26(3)(a) extends to investors from other EU Member States, like Plaintiffs. As explained below, the plain text of that provision and the record of this case establish that it does.

> a)   **Spain's Argument Fails as a Matter of Contract and Treaty Interpretation**

As the Supreme Court has held, U.S. courts must interpret a treaty using ordinary principles of contract interpretation. *See Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 262 (1984) ("A treaty is essentially a contract between or among sovereign nations [and] [g]eneral rules of construction apply."); *Stileks*, 985 F.3d at 879 (finding U.S. case law on a "domestic, commercial contract," applicable to interpretation of the ECT because a "'treaty is a contract, though between nations'") (citation omitted). One such principle is the "plain meaning rule" which requires courts to interpret a contractual provision in accordance with its ordinary meaning where its language is clear and unambiguous. *See United States v. Bank of Am.*, 78 F. Supp. 3d 520, 526 (D.D.C. 2015) (finding that "[w]hen a contract is clear and unambiguous, courts presume that the words in the contract have their ordinary meaning"); *Red Lake Band of Chippewa Indians v. U.S. Dep't of Interior*, 624 F. Supp. 2d 1, 15 (D.D.C. 2009) (recalling that "[w]here the contract is unambiguous, as evidenced by the plain language of the contract, the court's inquiry is at an end, and the plain language of the contract controls"); *see also BG Grp. PLC v. Republic of Argentina*, 572 U.S. 25, 39 (2014) (applying the plain language test to the treaty at issue). The same rule would apply under the Vienna Convention on the Law of Treaties (the "**VCLT**"), which sets out

canons of interpretation widely considered to be customary international law.  *See* VCLT Article 31(a) ("A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."); Bjorklund, ¶ 91.  The Supreme Court has held that, unless the text is ambiguous, resort to anything beyond the text is not permitted:

> We must thus be governed by the text – solemnly adopted by the governments of many separate nations – whatever conclusions might be drawn from the intricate drafting history that petitioners and the United States have brought to our attention.  The latter may of course be consulted to elucidate a text that is ambiguous. But where the text is clear, as it is here, we have no power to insert an amendment.

*Chan v. Korean Airlines*, 490 U.S. 122, 134 (1989) (citing *Air Fr. v. Saks*, 470 U.S. 392 (1985)); *see also United States v. Stuart*, 489 U.S. 353, 371 (Scalia, J., concurring) ("Given that the Treaty's language resolves the issue presented, there is no necessity of looking further to discover 'the intent of the Treaty parties.'") (citation omitted).

While Spain has flooded the record with various kinds of alleged "parol evidence" of what EU Member States like Spain intended when they ratified the ECT – virtually all of it post-dating the negotiation of the ECT by more than a decade – critically, it has not **first** demonstrated any ambiguity in the text of Article 26.  Accordingly, the EU law authorities which Spain claims are "binding" on this Court simply have no relevance to this Court's interpretation of the scope of the "unconditional consent" set forth in Article 26(3)(a), because the plain meaning of that provision speaks for itself.  *See Kass v. William Norwitz Co*., 509 F. Supp. 618, 623 (D.D.C. 1980) ("A contract is not ambiguous merely because the parties to a contract later disagree on its meaning.").

Specifically, Article 26(3)(a) provides that "**[s]ubject only to subparagraphs (b) and (c),** each Contracting Party hereby gives its **unconditional consent** to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article," including

Article 26(4)(a)(i) providing for ICSID arbitration.  ECT, art. 26(3)(a) (emphasis supplied).  The

presence of subsections (b) and (c) of Article 26(3) demonstrates that where the Contracting Parties

intended to create an exception to the "unconditional consent" set forth in Article 26(3)(a), they

did so **expressly in writing**.[4]  Spain does not contend that either exception applies here.

Instead, Spain asks this Court to engraft an implicit exception to onto the "unconditional

consent" in Article 26 that would carve out investors from other EU Member States, based on

pronouncements of the EU courts postdating Plaintiffs' investment and their reliance upon that

"unconditional consent" in commencing arbitration.   While Spain quarrels with the R&R's

statement that Spain is asking this Court to "modif[y]" or "nullif[y] its treaty obligations under the

ECT," Objs. 18 (citing R&R at 16), that is precisely what Spain seeks.

This is not the first time this Court has been asked by an award debtor to "interpret" into

the ECT an unwritten exception to the "unconditional consent" set forth at Article 26(3)(a).  In

*Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179, 186 (D.D.C. 2016), Kazakhstan argued that

the mandatory three-month amicable settlement period set forth in Article 26(2) of the ECT should

be read as a condition-precedent to its consent to arbitrate, and that the arbitral tribunal lacked

jurisdiction because the award creditors in that case failed to abide by the settlement period.  *Id*. at

185.  This Court, relying on the plain meaning of the phrase "unconditional consent," rejected

Kazakhstan's argument and remarked that "[i]nterpreting the ECT to mean that the three-month

settlement period is a prerequisite to consent, as respondent suggests, would be an obscure way to

---

[4]   Neither subparagraph (b) or (c) is applicable in the present case. They state: "(b) (i) The
Contracting Parties listed in Annex ID do not give such unconditional consent where the
Investor has previously submitted the dispute . . . . (c) A Contracting Party listed in Annex IA
does not give such unconditional consent with respect to a dispute arising under the last
sentence of Article 10(1)." ECT, art. 26(3)(b)(c).  Plaintiffs had not previously submitted the
dispute, and neither Luxembourg, France, Spain nor the EU are listed in either Annexes IA.
*See* ECT, Annex IA.

include a third major exception to otherwise unconditional consent."  *Id*. at 186 (citing *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014) ("[I]t is generally presumed that statutes do not contain surplusage.")).  Spain's attempt in this case to convince the Court of an unwritten "intra-EU" exception to the "unconditional" offer provided by Article 26(3)(a) is even weaker, as it can point to no express language in the ECT that would even arguably support its interpretation.

To the contrary, there is ample evidence in the ECT that the Contracting Parties **did not** intend for any unwritten exceptions to Article 26.  First, Article 26 lacks a "disconnection clause" expressly carving out intra-EU disputes from its coverage.  This is notable because the Contracting Parties did incorporate a disconnection clause with respect to other provisions of the ECT.  For example, the ECT contains a disconnection clause preventing the operation of Article 16 of the ECT vis-à-vis the Svalbard Treaty.  Bjorklund Decl., ¶¶ 94-95.  Article 16 is a hierarchical clause within the ECT which expressly provides that, in the event of a conflict between the dispute resolution provisions of the ECT and a prior or subsequent treaty between two or more Contracting Parties, an ECT investor may choose whichever dispute resolution regime is more favorable to them.  *See* ECT, Article 16(b) (providing that "[w]here two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty . . .nothing in such terms of the other agreement shall be construed to derogate from . . . any right to dispute resolution with respect thereto under this Treaty, where any such [ECT] provision is more favourable to the Investor or Investment.").  The additional lack of a disconnection clause in respect of Article 16 *vis-à-vis* the EU Treaties – particularly where one was used *vis-à-vis* the Svalbard Treaty – is particularly conspicuous and further evidence that the Contracting Parties did not intend to carve out intra-EU disputes from the coverage of the ECT's dispute resolution

mechanisms.   Second, the addition of Article 46 of the ECT, which expressly prohibits any Contracting Party from taking reservations to the ECT, further cuts against the proposition that the Contracting Parties intended any limitations or carveouts beyond those expressly contained within the text of the treaty.  Indeed, the inclusion of this provision indicates that "the Contracting Parties viewed the terms of the Treaty as essential to ensure its full and desired implementation." Bjorklund Decl., ¶ 139.

Though principles of contract interpretation would prohibit it, if the Court were to look past the clear and unambiguous language of Article 26, and beyond the four corners of the ECT, the weight of parol evidence would nonetheless still demonstrate that the Contracting Parties, including Spain and the EU, did not intend to carve out an exception to the "unconditional consent" provided in Article 26(3)(a) with respect to investors from other EU Member States.

Spain's contention that Article 26 was void *ab initio* in light of the preexisting EU Treaties is belied by the conduct of the EU and its Member States in the first decade following their ratification of the ECT, which is void of any evidence that the Contracting Parties understood Article 26 to contain implicit limitations on intra-EU arbitration.  Bjorklund Decl. ¶¶ 100-104.  In fact, the negotiating history of the treaty reflects that, although the EU proposed to add a disconnection clause with respect to the EU treaties, that clause was not included in the final treaty. Bjorklund Decl. ¶ 96.  This Court should interpret the absence of the disconnection clause as evidence that the Contracting Parties did not intend to include it.  First Eeckhout Decl. ¶ 30 ("The glaring absence of a disconnection clause is striking and undermines the claim that the ECT cannot apply in an intra-EU context.").  Again, this absence is conspicuous because the EU and its Member States have regularly employed disconnection clauses in other treaties, including in treaties predating the ECT.  First Eeckhout Decl., ¶ 25.  Further, as a result of the absence in the

ECT of a disconnection clause with respect to the EU Treaties, the EU and its Member States are presently seeking to revise the ECT as part of an ongoing "modernization" process being undertaken by the Energy Charter Conference.  Bjorklund Decl., ¶ 132, Ex. 38.  Among the "main changes contained in the agreement in principle" proposed by the Conference is a new provision to prevent certain of the ECT's provisions, including Article 26, from applying to disputes arising among "Contracting Parties that are members of the same Regional Economic Integration Organization (i.e., the EU)."  Bjorklund Decl., ¶ 132, *see also* ECF No. 53-39, ¶ 6.  That the Energy Charter Conference is currently considering this addition is the further evidence that it does not exist in the current treaty.

In sum, the unambiguous text of the treaty constitutes conclusive evidence that there is no unwritten "intra-EU" exception to the "unconditional consent" to arbitrate undertaken by Spain. Spain's proffer of parol evidence in the form of the CJEU's decisions in *Achmea*, *Komstroy* and *PL Holdings* and the 2019 Declarations, are therefore irrelevant to the interpretation of Article 26 and cannot be relied on to contradict the plain meaning of the text of Article 26 under well-established rules of contract and treaty interpretation.  *See Regan v. Spicer HB, LLC*, 134 F. Supp. 3d 21, 32 (D.D.C. 2015) ("[E]xtrinsic or parol evidence which tends to contradict, vary, add to, or subtract from the terms of a written contract must be excluded.") (internal citations omitted); *see also U.S. ex rel. Morsell v. Symantec Corp.*, 471 F. Supp. 3d 257, 281 (D.D.C. 2020) (parol evidence cannot be used to "read a term into an agreement that is not found there.") (internal citations and alterations omitted).  However, even if the Court were to consider extrinsic evidence, the negotiating history of the ECT provides clear and overwhelming evidence that those Contracting Parties, including Spain and the EU, did not intend to create an implicit "intra-EU" exception to the dispute resolution mechanisms set forth in Article 26.  Under relevant principles

of contract interpretation, this evidence of the Contracting Parties' intention **at the time of contracting** must be afforded substantially more weight than the 2019 Declarations and the CJEU's decisions in *Achmea*, *Komstroy*, and *PL Holdings*, all of which postdated the ECT by more than twenty years.  *See e.g., 1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 205 (D.C. 1984) (recalling that "[t]he meaning must be ascertained in light of all the circumstances surrounding the parties **at the time the contract was made**." (emphasis supplied)); *see also Int'l Bhd. of Painters & Allied Trades v. Hartford Acc. & Indem*. Co., 388 A.2d 36, 43 (D.C. 1978) (recalling that "[p]articularly significant is extrinsic evidence concerning the parties' negotiations prior to and contemporaneous with the formation of the agreement, as well as their course of conduct under the contract.").

> ### b)    EU Law and the CJEU's Decisions Have No Relevance to This Proceeding

Spain objects that the R&R's failure to apply *Achmea* and *Komstroy* in its analysis of arbitrability was a "mistake [that] has significant consequences for the resolution of this case." Objs. 17.  It argues that "a decision of a foreign jurisdiction's highest court as to the meaning of that state's law is binding on federal courts," and concludes that this Court is therefore bound by the decisions of the CJEU.  *Id.*  Spain's conclusion is a *non sequitur*.

Contrary to Spain's assertion, the R&R neither "misstates the role of the [CJEU]" nor "misunderstands the relationship between the [ECT] and the European Treaties." *Id.* 16-17.  There is no dispute between the parties that the CJEU is the ultimate arbiter on matters of EU law.  First Eeckhout Decl., ¶ 75.  But that does not make the CJEU the ultimate arbiter on interpreting the scope and effect of the ECT.  The CJEU is "not an international court" for the purpose of interpreting and applying the ECT.  *Id.*  "It has the function of a supreme domestic court, no more. It is, for purposes of the ECT, the highest court of one of the Contracting Parties, not the court

29

tasked with enforcing the treaty between the Contracting Parties." *Id*. The CJEU's decisions cannot have the effect of invalidating a treaty because the "[CJEU]'s jurisdiction is limited to matters of EU law." *Id*.

The fact that the CJEU is the supreme arbiter of EU law, however oft repeated by Spain, also does not transform this case into one governed by EU law. Spain's justification for why it believes EU law governs the agreement to arbitrate relies on a false equivalence. Spain erroneously reasons that because Article 26(6) of the ECT requires an arbitral tribunal to decide a dispute under the treaty in accordance with the ECT "and applicable rules and principles of international law," and because "[t]he EU Treaties are international law," then the arbitral tribunal must apply the EU Treaties. Objs. 19. This conclusion suffers from an obvious logical flaw: the fact that the EU Treaties are international legal instruments that may be considered to form **part of** international law does not mean that those treaties would supply the "**applicable** rules and principles of international law" in an ECT dispute. Article 26(6) of the ECT "makes no reference whatsoever to the domestic laws of the Parties, nor to other treaties or agreements applicable between the Parties." First Eeckhout Decl., ¶ 57. Indeed, EU law cannot be considered the "applicable rules and principles of international law" within the meaning of Article 26(6) "because it is not binding on the non-EU Contracting Parties to the ECT." *Id*.; *see also* Bjorklund Decl., ¶ 146 ("[T]he ECT does not permit an arbitral tribunal to apply EU law . . ."). Rather, Article 16(6) calls for arbitration "under generally applicable principles of international law, with the law applied to be the obligations found in the ECT itself." Bjorklund Decl., ¶ 146.

Spain's claim that "it is undisputed that the Tribunal was called upon to resolve 'disputes which may concern the application or interpretation of EU law'" willfully disregards the record of the arbitration, which demonstrates unequivocally that the Tribunal expressly disclaimed the

application of EU law to the parties' disputes over jurisdiction or the merits of the case.  The Tribunal determined that "[w]hile the EU treaties are of course international agreements . . . they do not thereby become principles of international law," and found that "there is no evidence, and it cannot be supposed, that the intention was to apply principles of EU law to all disputes arising under Article 26 ECT."  ECF No. 1-2, ¶ 158.  Likewise, the Annulment Committee found that "while EU treaties, which obviously includes the TFEU, are international agreements, that does not make them principles of international law pursuant to Article 26(6) [of the] ECT and they are therefore not applicable."  ECF No. 33-1, ¶¶ 330-333 (further recalling that this decision "applies *a fortiori* to secondary provisions of EU law, such as . . . rules against State aid").  It further concluded that EU law does not (and cannot) "have supremacy [over international law] and such claim to priority would challenge the basis of the ECT as a multilateral treaty."  *Id*. ¶ 184; *see also id*. ¶ 186 ("Article 16(2) ECT . . . confirms that the ECT Contracting Parties did not agree that EU legal rules take precedence over any incompatible rules of whatever source. . . ").  Thus, both the Tribunal and Annulment Committee, after a full and fair litigation of Spain's jurisdictional objections, correctly rejected Spain's attempt to shoehorn EU law into the parties' dispute.

Spain's repeated references to the "primacy" of EU law have no place in this proceeding because "the mere fact that the legal relationship between the EU Member States is effectuated by international treaties **does not make those treaties superior to other international agreements** as a matter of international law."  Bjorklund Decl., ¶¶ 148-49 (emphasis supplied).  The principles of primacy and autonomy are principles of EU law, not international law, and are "exclusively concerned with the relationship between EU law and the domestic laws of the Member States."  First Eeckhout Decl., ¶ 77; Bjorklund Decl., ¶ 148.  While the EU and its Member States can, within the EU legal order, accord supremacy to EU law over any other obligation, the decision to

do so "does not, however, negate their obligations on the international plane." Bjorklund Decl., ¶¶ 149-50 ("EU law cannot be part of international law yet also act in a manner that is completely self-contained and divorced from any other principle of international law."). "The desire to preserve the autonomy of EU law might lead the EU or its Member States not to take on international obligations," but if they do take on those obligations, as Spain and the EU did here when they became Contracting Parties to the ECT, "they are obliged to perform them in good faith and they will be held internationally responsible if they breach them." Bjorklund Decl., ¶ 152.

Spain finally argues that "[i]f the Court were to follow the Report . . . it would be nullifying the Member States' obligations under both the ECT and the European Treaties," and warns that "[t]he United States is not a signatory to any of those treaties, and its courts should not purport to modify them." Objs. 18. To the contrary, the R&R does not, and cannot, "nullify" the Member States' treaty obligations; it simply upholds Spain's obligations on the international plane. Bjorklund Decl., ¶¶ 148-50. To the extent that any perceived conflict created by Spain's signatory status to both the EU Treaties and the ECT requires a choice between upholding one treaty obligation or the other, that choice will not have to be made by this Court because Spain, and every other Contracting Party to the ECT, already agreed, when it signed the ECT, to the supremacy of Article 26 of the ECT over any less favorable dispute resolution option provided by another treaty. First Eeckhout Decl., ¶¶ 73-74 ("[T]here is no rule that EU law prevails, or has primacy, over treaties concluded between EU Member States. Even if there were, it would not take precedence over Article 16 of the ECT."); Bjorklund Decl., ¶ 150 ("EU law cannot be part of international law yet also act in a manner that is completely self-contained.").

The only relevant treaty obligations requiring vindication for purposes of this proceeding are those of the United States as a signatory to the ICSID Convention. Those obligations require

the prompt recognition and enforcement of the ICSID Award as a final and binding domestic judgment.  In sum, Spain offers no basis for why this Court should depart from the traditional principles of contract interpretation discussed above for purposes of interpreting the ECT, which, when properly applied, unequivocally establish this Court's subject matter jurisdiction, and the Court should exercise that jurisdiction to promptly recognize the ICSID Award.

### 4. Even if *Achmea* and *Komstroy* Were Applicable, Those Decisions Could Not Be Applied to Invalidate an Already Performed Arbitration Agreement

Spain is incorrect that it "lacked the legal authority to make a standing offer to arbitrate" this dispute.  Objs. 20 (quoting *Blasket*, 2023 WL 2682013).  Article 26 of the VCLT, which enshrines the principle of *pacta sunt servanda*, provides that "[e]very treaty in force is binding upon the parties to it and must be performed by them in good faith."  Bjorklund Decl., ¶ 152, n.110. Spain signed and ratified the ECT and therefore agreed to "take on those obligations" and "to perform them in good faith."  Bjorklund Decl., ¶ 152.  As Professor Bjorklund explains, Spain's "desire to preserve that autonomy might even cause them to breach their international obligations, but that choice does not excuse them from the international obligation; it simply places them in breach on the international plane, regardless of the effect on the EU plane."  Bjorklund Decl., ¶ 152.  Spain is, of course, free to alter its obligations by withdrawing from or renegotiating the ECT and appears to be in the process of taking both of these steps.  Bjorklund Decl., ¶ 153; *see also id.* at ¶ 132; *supra* at 7, n. 1.  But Spain's discovery, upon the CJEU's issuance of the *Achmea* and *Komstroy* decisions, of a conflict between its obligations under the ECT and the EU Treaties is, as a matter of public international law, insufficient and cannot be used to retroactively invalidate its agreement to arbitrate this already-adjudicated dispute with Plaintiffs.  Spain may not, as a matter of public international law, relieve itself of its obligations under the ECT on the basis of a conflict with EU law.  Article 27 of the VCLT provides "the bedrock principle of international

law" that a treaty party "may not invoke the provisions of its internal law as justification for its failure to perform a treaty."  Bjorklund Decl., ¶ 154 (quoting VCLT, art. 27).  Article 46 of the VCLT confirms this:

> A State may not invoke the fact that its consent to be bound by a treaty has been expressed in violation of a provision of its internal law regarding competence to conclude treaties as invalidating its consent unless that violation was manifest and concerned a rule of its internal law of fundamental importance.

Bjorklund Decl., ¶ 155 (quoting VCLT, art. 46).[5]  Here, Spain argues that because its consent to be bound by the ECT violates its internal law (*i.e.*, EU law), its consent has been invalidated.  But, to excuse Spain, the violation must be "manifest."  It is not.  Spain ratified the ECT in accordance with the treaty's formal requirements and all requirements under Spanish law.  Bjorklund Decl., ¶ 157.  Notwithstanding the fact that Articles 267 and 344 of the TFEU existed prior to Spain's ratification of the ECT, it nonetheless entered into the ECT willingly.  Spain is accordingly bound to comply with its commitments.  *See* Bjorklund Decl., ¶ 161 (explaining that the European Court of Human Rights previously found that "while nothing in the European Convention of Human Rights precluded a transfer of authority to an international organization (in this case the EU), Convention rights needed to remain secured, and the responsibility of Member States therefore continued after the transfer" of authority to the European Union.).

### B.   THE AWARD IS ENTITLED TO FULL FAITH AND CREDIT

Magistrate Judge Upadhyaya properly found that the ICSID Award is entitled to full faith and credit and must be enforced.  R&R at 22-23.  Spain largely recycles its objections to subject

---

[5]   Notably, during the negotiation of the ECT, the European Commission itself requested that the ECT include an explanatory note that no Contracting Party "invoke the provisions of its internal law as justification for its failure to perform."  European Energy Charter Conference Secretariat, Note from the Secretariat, 42/94, CONF 115 (Jan. 6, 1995), Annex 1 "Note of Chairman," ECF No. 16-32.

matter jurisdiction to attack the ICSID Award's entitlement to full faith and credit – namely that the Tribunal lacked jurisdiction and that the Tribunal's Award exceeded its authority, Objs. 21-22 – but those arguments are likewise unavailing on the merits for all of the reasons discussed in **Section IV(A)(1)** above.  As Judge Upadhyaya correctly held, courts "are not permitted to examine an ICSID award's merits . . . or the ICSID tribunal's jurisdiction to render the award."  R&R at 22 (quoting *Mobil Cerro Negro, Ltd. v. Venezuela*, 863 F.3d 96, 102, 118 (2d Cir. 2017)).  Given Spain's "conclusory" and "general objections" which "simply reiterate[] [Spain's] original arguments," Spain's full faith and credit allegations should be reviewed "only for clear error." *M.O.*, 20 F. Supp. 3d at 37; *Bank of Am. v. Solis*, Civ. No. 09–2009 (EGS), 2014 WL 4661287, at *3 (D.D.C. July 2, 2014).

In any event, the R&R's conclusion in this regard is correct not only under the ICSID Convention, but under well-settled principles of *res judicata*.  In *Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guaranty Ass'n*, 455 U.S. 691 (1982), a case which Spain concedes applies, Objs. 21, the Supreme Court held that a recognizing court cannot, for purposes of examining whether a judgment is entitled to full faith and credit, revisit the rendering tribunal's determination that it had subject matter jurisdiction to issue the judgment sought to be recognized where the jurisdictional issue was fully and fairly litigated.  *Id*. at 706 ("[A] judgment is entitled to full faith and credit – **even as to questions of jurisdiction** – when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment." (emphasis supplied)).  The Supreme Court emphasized the "limited scope of review one court may conduct to determine whether a foreign court had jurisdiction to render a challenged judgment," and held that, where the issue of subject matter jurisdiction "was fully considered and finally determined" by the rendering court, "the

judgment was entitled to full faith and credit." *Id*. at 706-07; *see also Durfee v. Duke*, 375 U.S. 106, 111 (1963) (finding that judgment was entitled to full faith and credit upon court's determination that issue of rendering court's subject matter jurisdiction was fully and fairly litigated). This is true "even as to questions of **ICSID's jurisdiction**." *Tidewater Inv. SRL v. Venezuela*, Civ. No. 17-1457 (TJK), 2018 WL 6605633, at *6 n.4 (D.D.C. Dec. 17, 2018) (emphasis supplied).

Spain has not argued that it did not have the opportunity to litigate its jurisdictional objections before the Tribunal. Spain, in fact, availed itself of a second opportunity to litigate its jurisdictional objections before the Annulment Committee, and lost there too. ECF No. 1-2, ¶¶ 123, 138; 156; ECF No. 33-1, ¶¶ 330-333. Accordingly, the R&R properly rejected Spain's attempt to "'recycle a losing jurisdictional argument' to deny full faith and credit to an award" – which is not permitted. *See* R&R at 23 (quoting *Tethyan*, 590 F. Supp. 3d at 276).[6] Where jurisdiction "has been 'fully and fairly litigated and finally decided' by the tribunal, this Court has no authority to relitigate the matter." *Tidewater*, 2018 WL 6605633 at *6 n.4 (citation omitted).

Likewise, Spain's argument that the ICSID Award is not entitled to full faith and credit because it constitutes unlawful state aid and exceeded the Tribunal's authority, Objs. 21-22, fails because – again – those issues were fully and fairly litigated, decided by the Tribunal, and affirmed by the Annulment Committee. ECF No. 1-2, ¶¶ 306-07; ECF No. 33-1, ¶¶ 185, 221, 224-228. As Judge Upadhyaya properly held, under Article 53 of the ICSID Convention, which precludes unenumerated defenses, "[t]his Court cannot disturb the findings of the Tribunal, which considered

---

[6] *See also Tethyan*, 590 F. Supp. 3d at 275 ("the ICSID Convention grants a tribunal the authority to be 'the judge of its own competence,'" and so "the ICSID Tribunal determines its jurisdiction over a dispute" and the tribunal's authority "renders binding on this Court the Tribunal's arbitrability determination.") (first quoting ICSID Convention, art. 41(1); then citing *Stileks*, 985 F.3d at 879).

and rejected this argument." *See* R&R at 23 n.8.  Spain's attempt yet again to collaterally attack the ICSID Award fails: "[Spain] cannot use the same previously litigated jurisdictional argument – even one about subject matter jurisdiction – to deny full faith and credit to the Award." *Tethyan*, 590 F. Supp. 3d at 276.

But even if this Court were to consider Spain's state aid argument, it must be rejected. Neither EU law, nor EU regulations concerning state aid form part of the "applicable legal framework" at issue in this case.  *See supra* **Section III(A)**.  But, even if they did, Spain is wrong that payment of the ICSID Award constitutes state aid.  Articles 107 to 109 of the TFEU provide that EU Member State are precluded from providing aid that would "distort[] . . . competition by favouring certain undertakings or the production of certain goods," TFEU, art. 107(1), and the European Commission is granted the authority to review decisions concerning state aid. TFEU, art. 108(3).  However, the European Commission cannot make blanket pronouncements regarding hypothetical cases, it may only decide the issue placed before it.  First Eeckhout Decl., ¶¶ 92, 94. Neither Plaintiffs' ICSID Award, nor the energy regime at issue in the arbitration have been reviewed by the European Commission.  *Id.* at ¶ 92.  (explaining that the European Commission's 2017 State Aid decision analyzes Spain's 2014 support schemes (not those under which Plaintiffs invested)).  And the European Commission has not held that the incentives concerned in this case here were illegal state aid.  *See* Second Eeckhout Decl. ¶ 27.  Indeed, the EC's Decision on State Aid SA.40348 (2015/NN), 2017 O.J. (C442) (Nov. 10, 2017), ECF No. 43-66, held that a separate Spanish regulatory regime – the one which replaced the incentives at issue in the ICSID Arbitration – was "compatible with the internal market" and not impermissible state aid.  *Id.* at 34; *see also id.* ¶ 156; § 2.1; First Eeckhout Decl. ¶¶ 90-91.  Thus, Spain's renewable energy regime (and an award stemming from it) may be lawful even if it is state aid.

Even more clearly, a U.S. judgment enforcing the Award cannot be characterized as state aid.  The Award does not give Plaintiffs an economic advantage; it compensates them for damages caused by Spain's violation of the ECT.  First Eeckhout Decl. ¶ 97.  Once compensated, Plaintiffs are no better off than they would have been but for Spain's violation of its ECT obligations. The Award cannot distort competition, or affect trade in the EU.  Second Eeckhout Decl. ¶ 23. Payment of the Award, as mandated by a court, cannot be "imputed" onto Spain, as externally imposed legal obligations are not state aid.  *See* First Eeckhout Decl. ¶ 68.  The CJEU itself has recognized that state aid is "fundamentally different . . . from damages" ordered by "competent national authorities" as "compensation" for injuries caused by the state.  Joined Cases 106-120/87, *Asteris v. Greece*, 1988 E.C.R. 5531 ¶ 23 (Sept. 27, 1988), ECF No. 16-28; *see also id*. ¶ 24, *dispositif* 3. Spain cites no authority for the proposition that it could be **unlawful** for an EU Member State to pay a **U.S. court judgment**.  Nor has it shown that it would violate EU law for Spain to meet its treaty commitment under the ICSID Convention to "abide by" and "comply with" the Award.

### C.  THE REPORT AND RECOMMENDATION CORRECTLY DETERMINED THAT THE FOREIGN COMPULSION DOCTRINE DID NOT PRECLUDE ENFORCEMENT

The R&R properly refused to dismiss the Complaint on grounds of the foreign compulsion doctrine.  **First**, Magistrate Judge Upadhyaya properly determined that the foreign sovereign compulsion "doctrine applies to private parties, not governments."  R&R at 24.  Spain has not specifically objected to the R&R's finding in this regard, nor does it offer any authority to demonstrate that the doctrine can and should be applied to foreign governments.  Accordingly, that finding should be affirmed and adopted by this Court, and the Court need not analyze Spain's foreign sovereign compulsion argument any further.  *M.O.*, 20 F. Supp. 3d at 37 ("[O]nly those issues that the parties have raised in their objections to the Magistrate Judge's report will be reviewed by this court." (citation omitted)); *see also* 28 U.S.C. § 636(b)(1)(C) ("judge of the

[district] court shall make a *de novo* determination of **those portions** of the report or specified proposed findings or recommendations to which objection is made." (emphasis supplied)).

**Second**, the R&R accurately notes that "[t]he doctrine . . . exists mainly in the realm of antitrust" and Spain has offered "no authority to support its contention that the doctrine applies here to a government outside the antitrust context," or "any meaningful argument for the expansion of the law." R&R at 24 (citing *In Re: Vitamin C Antitrust Litig.*, 8 F.4th 136, 145 (2d Cir. 2021) ("A defendant invoking [the foreign sovereign compulsion doctrine] must show that a 'foreign government's order . . . compelled [its] business to violate American antitrust law.'") (alteration in original) (quoting *Mannington Mills*, 595 F.2d at 1293)). Spain's Objections make no significant effort to provide further guidance in this regard. Objs. 23. However, as the Restatement on Foreign Relations explains, "[t]here is no general doctrine of international law that requires a state to excuse compliance with its law because of conflict with the law of another state. Nor does federal law provide a general defense of foreign-state compulsion that applies in all cases." Restatement (Fourth) of Foreign Relations Law § 442 (2018). The Restatement notes that a "court has more room to recognize the defense and to moderate the sanctions that otherwise might apply for noncompliance with federal law" in situations "when a court is exercising powers that are **inherently discretionary**, such as ordering discovery or compelling the production of information as part of a criminal or administrative investigation." *Id.* (emphasis supplied). The nature of the Court's mandate in this case under 22 U.S.C. § 1650a, however, is **mandatory**, not discretionary. *See* 22 U.S.C. § 1650a ("The pecuniary obligations imposed by such an award **shall be enforced** and **shall be given** the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." (emphasis supplied)). Moreover, applying the foreign compulsion doctrine in this case would effectively create an exception to the unconditional

39

mandate to recognize ICSID awards set forth in Section 1650a, which would place the statute at odds with the ICSID Convention's prohibition on "any appeal" or "any other remedy" beyond the Convention itself. *See* ICSID Convention, art. 53(1) ("The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention."). The R&R properly declined to create such a conflict between Section 1650a and the treaty it is intended to implement. *See Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*, 724 F.3d 230, 233-34 (D.C. Cir. 2013) (noting that "courts prefer to avoid such conflicts [between treaties and federal statutes] altogether").

**Third**, the R&R properly held that the foreign sovereign compulsion doctrine cannot absolve Spain of liabilities it affirmatively undertook by "willfully submitt[ing] to and participat[ing] in the ICSID process." R&R at 24. Spain objects that it "did not willfully submit to the arbitration," because "it objected at every stage to the Tribunal's exercise of jurisdiction and its rendering of an award in violation of EU State aid law." Objs. 23. That objection rings hollow when viewed against the fact that Spain ratified both the ECT and ICSID Convention, and thereby not only submitted to ICSID arbitration, but also agreed to "abide by" and "comply" any resulting award. *See* ECT, art. 26(8) ("The awards of arbitration, which may include an award of interest, shall be final and binding upon the parties to the dispute. . . . Each Contracting Party shall carry out without delay any such award and shall make provision for the effective enforcement in its Area of such awards."); ICSID Convention, Art. 53(1). While Spain asserts that "[o]rdering [it] to comply with the Award would violate EU law," it fails to explain how this Court's entry of a judgment recognizing an already-established liability and its compulsory enforcement of that judgment against its assets in the United States could cause Spain to violate EU law. Objs. 23; *see In re Sealed Case*, 825 F.2d 494, 498 (D.C. Cir. 1987) (recalling that the doctrine's "[m]ost

important" feature is compulsion of a foreign person by an American court "to violate the laws of a different foreign sovereign on that sovereign's own territory").

 **Fourth**, even if Spain could demonstrate that this Court's recognition and enforcement of the ICSID Award would violate EU law, the foreign compulsion doctrine may only be invoked if the "person in question appears likely to suffer severe sanctions for failing to comply with foreign law," and "the person in question has acted in good faith to avoid the conflict." Restatement (Fourth) of Foreign Relations Law § 442 (2018). As noted above in **Section IV(B)**, as Spain has demonstrated no more than a "remote" or "speculative" risk of sanctions, it cannot rely on the foreign sovereign compulsion doctrine to avoid its liabilities under the ICSID Award. *See United States v. First Nat'l City Bank*, 396 F.2d 897, 905 (2d Cir. 1968).

 **Fifth**, Spain's contention that this Court "is bound by the EU Court of Justice decision and the pronouncements of the European Commission" as "acts of [state]" is meritless. Objs. 24. As a preliminary matter, Spain's analysis here is a verbatim reiteration of its original arguments, *compare* Objs. 24, *with* Mot. Dismiss, at 25. Spain's act of state allegation should be reviewed "only for clear error." *Bank of Am*, 2014 WL 4661287, at *3. But, even under a *de novo* review, Spain's objection fails. The CJEU's decisions are not entitled to consideration as "acts of state" because "[t]he act of state doctrine does not apply to the judgments of foreign courts." Restatement (Fourth) of Foreign Relations Law § 441 (2018). With respect to the "pronouncements" of the European Commission, the act of state doctrine is inapplicable in this case because this Court is not being asked to judge "the validity" of those pronouncements, as Spain claims. Objs. 24. As explained above, this proceeding, which seeks only the recognition and enforcement of the ICSID Award pursuant to the ICSID Convention, does not even require consideration of the "EU Court of Justice decision and the pronouncements of the European Commission," let alone a declaration

on the validity of those decisions. *See Am. Int'l Grp., Inc. v. Islamic Republic of Iran*, 493 F. Supp. 522, 525 (D.D.C. 1980) ("the Act of State Doctrine **does not preclude judicial review where**, as here, **there is a relevant, unambiguous treaty setting forth agreed principles of international law applicable to the situation at hand**." (emphasis supplied)); *see also W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990) (noting that "[i]n **every** case in which we have held the act of state doctrine applicable, the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." (emphasis supplied))

### D. THE REPORT AND RECOMMENDATION CORRECTLY FOUND FORUM NON CONVENIENS TO BE AN UNAVAILABLE DEFENSE

The R&R properly applied binding D.C. Circuit precedent unequivocally holding "that *forum non conveniens* is **not available** in proceedings to confirm a foreign arbitral award." R&R at 25 (emphasis supplied) (quoting *Stileks*, 985 F.3d at 876 n.1 (citing *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 303-04 (D.C. Cir. 2005))). Spain attempts to avoid the holding of *TMR Energy* by claiming, without any supporting authority, that it does not apply where a party is contesting the Court's subject matter jurisdiction under the FSIA. Objs. 24-25.

There is no support for Spain's contention. The D.C. Circuit has affirmed *TMR Energy* in subsequent cases involving foreign states, affirming that "**the doctrine of *forum non conveniens* does not apply to actions in the United States to enforce arbitral awards against foreign nations**." *BCB Holdings Ltd. v. Gov't of Belize*, 650 F. App'x 17, 19 (D.C. Cir. 2016) (emphasis supplied); *Newco Ltd. v. Gov't of Belize*, 650 F. App'x 14, 16 (D.C. Cir. 2016) (same). And courts in this District have concluded that *forum non conveniens* is not an available defense even where the sovereign "vigorously contests" jurisdiction. *See Stileks*, 985 F.3d at 876 n.1 (Moldova objected to subject matter jurisdiction, yet the court concluded Moldova's *forum non conveniens*

argument did "not require sustained discussion" because "*forum non conveniens* is not available in proceedings to confirm a foreign arbitral award.") (citing *TMR Energy*, 411 F.3d at 303-04 ; *Blasket*, 2023 WL 2682013 at *3 n.3 (Spain challenged subject matter jurisdiction, yet the court found its *forum non conveniens* challenge "futile" under binding precedent) (citing *Tatneft*, 21 F.4th at 840); *Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 697 F. Supp. 2d 46, 57 (D.D.C. 2010) (Nigeria objected to both subject matter and personal jurisdiction, yet the Court confirmed the applicability of *TMR Energy*).  Indeed, contrary to Spain's assertion, *TMR Energy* categorically bars a foreign state from "**ever** obtaining dismissal of a petition to enforce an arbitration award . . . based on *forum non conveniens.*"  *Entes Indus. Plants, Constr. & Erection Contracting Co. v. Kyrgyz Republic*, Civ. No. 18-2228 (RC), 2019 WL 5268900, at *5 (D.D.C. Oct. 17, 2019) (emphasis supplied).

### E.  THE REPORT AND RECOMMENDATION CORRECTLY CONCLUDED THAT SUMMARY JUDGMENT IS WARRANTED, AND A STAY OF THIS CASE PENDING APPEALS IN THREE OTHER CASES IS UNWARRANTED

Magistrate Judge Upadhyaya correctly found that Plaintiffs are entitled to the entry of judgment as a matter of law.  R&R at 25-27.  Notwithstanding the absence of any further issues to adjudicate in this case, Spain argues that this Court should nonetheless refrain from taking the final step of entering judgment because Spain still believes this Court lacks subject matter jurisdiction and intends to appeal any unfavorable decision this Court may render on that issue.  Objs. 26.  Spain's objections here are, again, merely "conclusory" and "general objections" and "simply reiterate[] [Spain's] original arguments."  *M.O.*, 20 F. Supp. 3d at 37.  Spain's objections to the entry of judgment following the Court's adoption of the R&R should therefore be reviewed only for clear error. *Bank of Am*, 2014 WL 4661287, at *3.

As the R&R accurately notes, Spain offered no authority in its Motion to Dismiss that would require this Court, "within the context of an ICSID award enforcement action, to hold off

simply because it wishes to take an interlocutory appeal on the issue of jurisdiction," R&R at 27 n.11, and makes no further attempt to supply such authority in its Objections.  Indeed, Spain has "forgo[ne] its entitlement to a threshold determination of immunity . . . by opting to brief all of its defenses together."  *Process & Indus. Devs. Ltd. v. Federal Republic of Nigeri*a, 962 F.3d 576, 585-86 (D.C. Cir. 2020).  Accordingly, once Magistrate Judge Upadhyaya concluded that Spain lacked immunity and denied Spain's other grounds for dismissal as a matter of law, she properly determined that the case would present no factual issues to try, as U.S. courts have an "exceptionally limited" role in enforcing ICSID arbitral awards.  *Id.* at 27 (quoting *TECO Guatemala Holdings, LLC v. Republic of Guatemala*, 414 F. Supp. 3d 94, 101 (D.D.C. 2019)).  Because Spain has never disputed the lack of any factual issues in this case to be resolved at trial, its attempt to appeal to the preservation of judicial resources and avoidance of "unnecessary litigation," Objs. 26, has little force here, as the judicial resources required to conclude this proceeding by issuing a money judgment would be minimal.

The R&R's recommendation that the proceeding should therefore be promptly concluded with the issuance of a judgment was also eminently reasonable in light of this Court's policy favoring the speedy enforcement of arbitral awards.  *See e.g.*, *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 71 (D.D.C.), *judgment entered*, 987 F. Supp. 2d 82 (D.D.C. 2013), *and aff'd sub nom. Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200 (D.C. Cir. 2015) ("the adjournment of enforcement proceedings impedes the goals of arbitration – the expeditious resolution of disputes and the avoidance of protracted and expensive litigation" (citation omitted)).  As the *Tethyan* court found, "judicial economy also favors swift adjudication."  *Tethyan*, 590 F. Supp. 3d at 270.

Spain's additional argument that this Court should stay its proceedings pending resolution of the appeals pending before the D.C. Circuit in the *Blasket*, *NextEra*, and *9REN* cases was set forth in Spain's Objections before the parties filed their April 27, 2023 Joint Status Report, ECF No. 72, and should no longer be considered in light of its covenant and stipulation in that Joint Status Report not to seek a stay of these proceedings. *Id.* ¶ 1.

Even absent Spain's express agreement in that regard, and while hereby reserving the right to respond in full should Spain nonetheless make a formal motion to seek such relief, Plaintiffs submit that a stay of this proceeding pending the appeals in *9REN*, *NextEra* and *Blasket* would be inappropriate. "[I]t is well established that a stay pending the resolution of unrelated legal proceedings is an extraordinary remedy." *Nat'l Indus. for Blind v. Dep't of Veterans Affs*., 296 F. Supp. 3d 131, 137 (D.D.C. 2017). As the Supreme Court explained, "[o]nly in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both." *Landis v. N. Am. Co*., 299 U.S. 248, 255 (1936). Thus, "[i]f there is 'even a fair possibility' that a stay would adversely affect another party, the movant for the stay must demonstrate a 'clear case of hardship or inequity in being required to go forward.'" *Nat'l Indus. for Blind*, 296 F. Supp. 3d at 137-38 (quoting *Landis*, 299 U.S. at 255). Spain has failed to even begin to articulate any such hardship. Indeed, Spain cannot now demand that this Court wait on rulings in different cases before resolving the issues – jurisdictional or otherwise – that it chose to present here. *See Hulley Enters. Ltd. v. Russian Federation*, 2022 WL 1102200, at *1 n.1, *2 (D.D.C. Apr. 13, 2022) (rejecting stay request by foreign sovereign that had briefed "both its jurisdictional and non-jurisdictional, merits defense[s] . . . concurrently").

## V.   CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request the Court to enter an order dismissing Spain's Motion to Dismiss and granting Plaintiffs' Summary Judgment.

Dated:        April 28, 2023
              New York, New York

                                        _/s/ James E. Berger_____
                                        James E. Berger (D.C. Bar 481408)
                                        Charlene C. Sun (D.C. Bar 1027854)
                                        Joshua S. Wan (*Pro Hac Vice*)
                                        Erin Collins (D.D.C. Bar NY0359)

                                        DLA PIPER LLP (US)
                                        1251 Avenue of the Americas
                                        New York, New York 10020
                                        Tel: (212) 556-2200
                                        Fax: (212) 556-2222
                                        1251 Avenue of the Americas
                                        New York, NY 10020
                                        *james.berger@us.dlapiper.com*
                                        *charlene.sun@us.dlapiper.com*
                                        *joshua.wan@us.dlapiper.com*
                                        *erin.collins@us.dlapiper.com*

                                        *Attorneys for Plaintiffs*